5/29/2024 3:58 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 88228026
By: Monica Jackson
Filed: 5/29/2024 3:58 PM

# 2024-33882 / Court: 269

CAUSE NO. _____

| | | |
|---|---|---|
| ALEXANDRA LOZANO IMMIGRATION LAW, PLLC, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| JUAN PABLO DIAZ CUENCA | § § | HARRIS COUNTY, TEXAS |
| and | § § | |
| MENESES LAW, PLLC | § § § | |
| Defendants. | § | \_\_\_\_\_ JUDICIAL DISTRICT |

**PLAINTIFF'S ORIGINAL VERIFIED PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND REQUEST FOR EXPEDITED DISCOVERY**

Now comes Plaintiff Alexandra Lozano Immigration Law, PLLC, ("ALIL" or "Plaintiff") by and through undersigned counsel, for their Verified Petition for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction and Expedited Discovery against Defendants Juan Pablo Diaz Cuenca ("Diaz") and Meneses Law, PLLC ("Meneses Law") (collectively, "Defendants"), to state as follows:

## INTRODUCTION

1.      This case involves a concerted effort by Defendants to engage in unfair competition, misappropriate trade secrets, and violate restrictive covenants, as well as to infringe on a valuable trademark.  Through a scheme of utilizing proprietary and confidential information belonging to Plaintiff and hiring away key employees who had access to Plaintiff's confidential and proprietary information regarding business operations, growth strategies, data management, and software systems, the Defendant seeks to build an exact replica of ALIL's highly successful immigration law practice, but under the Meneses Law banner.

2.      Despite reasonable efforts to quickly remedy the violations and resultant harm to

**Exhibit**

**A-2**

ALIL, Defendants Diaz and Meneses Law refuse to comply.  ALIL has now been forced to bring action to enforce contractual rights and remedy ongoing irreparable harm it faces in the form of unfair competition, loss of confidential proprietary information and trade secrets, and trademark infringement.

3.     Accordingly, ALIL now files this Verified Petition seeking temporary, preliminary, and permanent injunctive relief prohibiting Diaz and Meneses Law from using ALIL's confidential information and trade secrets, from soliciting current and former ALIL employees, and using ALIL's trademarks.

### DISCOVERY-CONTROL PLAN

4.     Plaintiff intends to conduct discovery pursuant to "Level 2" as set forth in Rule 190 of the Texas Rules of Civil Procedure.  Plaintiff reserves the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure and seek expedited discovery.

### PARTIES

5.     Plaintiff Alexandra Lozano Immigration Law, PLLC is a Washington professional limited liability company headquartered at 6720 Fort Dent Way, Suite 230, Tukwila, Washington, and was founded in 2014 by attorney Alexandra Lozano ("Lozano").  The firm specializes in immigration law and has served over 50,000 clients, providing protection, permits, and papers for undocumented immigrants residing in the United States.  ALIL has related entities operating in foreign countries, including its subsidiary, Quetzal International Services ("Quetzal"), which operates in Colombia.

6.     Defendant Juan Pablo Diaz Cuenca ("Diaz") is a former employee of ALIL and dual citizen of the United States and Colombia.  Diaz is an individual, is a resident of the City of

Houston, Harris County, Texas.  Defendant Diaz may be served with process at 8311 Brecha Ln., Houston, Texas, 77055 or wherever he may be found.  Starting in or about May 2021, Diaz first worked with ALIL through a staffing company, and then as an independent contractor while residing in Colombia.  In or about February 2022, ALIL moved Diaz to the United States and he became a full-time ALIL employee, serving as a paralegal in the firm's headquarters in Tukwila, Washington.  Diaz was then promoted in or about August 2023 to the position of Legal Line and Support Teams Senior Manager, reporting directly to ALIL's Chief Operating Officer.  Diaz's employment was terminated on or about November 17, 2023, due to misconduct.  Diaz currently resides in Houston, Texas, and is employed as Senior Operations Manager at Meneses Law.[1]

7.     Defendant Meneses Law, PLLC, is a professional limited liability company headquartered at 2900 North Loop West, Suite 300, Houston, Texas 77092.  Meneses Law was founded by Frances Christine Meneses ("Meneses").

## JURISDICTION AND VENUE

8.     Plaintiff brings this suit in this Court pursuant to Texas Rules of Civil Procedure 680 through 693, and Texas Civil Practice and Remedies Code Sections 65.001 through 65.045 to obtain a temporary restraining order and temporary and permanent injunctions enjoining Defendants from breaching their contractual, common law, and statutory duties and obligations to Plaintiff.   Additionally, Plaintiff seeks damages from Defendants that exceed the minimum jurisdictional amount to file suit in this Court

9.     This Court has personal jurisdiction over Diaz because he resides in Texas,

---

[1]     Diaz is subject to a Mutual Dispute Resolution Agreement that requires that the claims asserted here be addressed in arbitration.  However, the Mutual Dispute Resolution Agreement allows the parties thereto to seek provisional relief, such as a temporary restraining order and/or preliminary injunction, from a court of competent jurisdiction to preserve the *status quo* pending arbitration.  *See* Mutual Dispute Resolution Agreement at ¶ II.A., attached as Exhibit A.  By way of filling this Verified Petition, Plaintiff has not waived its right to seek arbitration of the dispute to the extent necessary.

conducts business in Texas, is employed in Texas, and because this action arises from his actions related to his employment in Texas.

10.     This Court has personal jurisdiction over Meneses Law because it is registered and headquartered in Houston, Texas, because it transacts business in Texas, and because this action arises from its actions in this State.

11.     Venue is proper in this Court because Meneses Law has its principal place of business in Houston, Texas, located within this judicial district and because a substantial part of Defendants' actions giving rise to the claims for relief occurred in this judicial district.

## FACTUAL BACKGROUND

**A.     ALIL Is A Groundbreaking Law Firm That Revolutionized The Practice of Immigration Law.**

12.     The field of immigration law is highly competitive and demand for immigration services is on the rise.  There are over 11 million undocumented immigrants in the United States, the vast majority of whom come from Mexico and Central America.[2]  Many of these individuals seek out legal assistance to obtain legal status or citizenship.  This has led to increased competition among immigration law firms to serve this population and has fueled innovative approaches to both the practice of immigration law and the business of immigration law firms.

13.     Lozano founded ALIL in 2014 and took a novel approach to serving the immigrant population.  (Decl. of A. Rios, May 22, 2024 at ¶ 5, hereinafter "Rios Decl.", attached as Exhibit B).  Specifically, Lozano turned to rarely applied niche provisions of immigration laws to obtain green cards, work permits, permanent residency, and citizenship for her clients.

14.     In setting her firm apart from the pack, Lozano employed her specialized

---

[2]     *See* Profile of Unauthorized Population: United States, Migration Policy Institute, available at https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US, last visited Apr. 18, 2024.

knowledge of Violence Against Women Act ("VAWA") visas and Victims of Trafficking in Person or "T" visas, which are underutilized and largely misunderstood.  Many attorneys believe that these types of visas have extremely limited application to women and sex trafficking, respectively, when in fact, both visas can be used more broadly.  Importantly, these visas can lead to work authorizations and make it possible to obtain green cards without having to leave the country to obtain legal status, an option that is critical for vulnerable immigrants, including immigrant victims of domestic violence, human trafficking, and other violent crimes.  (Rios Decl. at ¶ 5).

15.     Lozano also coined the phrase, "Arreglar sin salir", which translates to "fix without leaving" to raise awareness among the Spanish-speaking immigrant community of the possibilities of the VAWA and T visas.  (*Id.* at ¶ 6).

16.     Lozano has continuously used the phrase "Arreglar sin salir" in commerce as a trademark since at least as early August 2016 in connection with Lozano's legal services.  (*Id.*).

17.     On or about July 15, 2022, Lozano filed an application for the mark "ARREGLAR SIN SALIR!" with the U.S. Patent and Trademark Office, which was assigned Serial No. 97504788 and registered on or about April 11, 2023.  (*Id.* at ¶ 7).

18.     The ARREGLAR SIN SALIR! mark is so strong, that it has obtained a secondary meaning in the marketplace.  Lozano and ALIL are often referred to as the ARREGLAR SIN SALIR! attorneys.  (*Id.* at ¶ 8).

19.     ALIL's innovative uses of immigration laws changed the way many attorneys now approach immigration law, and Lozano taught hundreds of immigration attorneys how to use niche laws to assist clients.  (*Id.* at ¶ 9).

20.     The market for competitive and innovative legal strategies in immigration law is

significant.  Lozano, through her educational entity Ally Lozano, LLC earned over $1.7 million between 2019 and 2021, teaching legal strategies around VAWA and T visas to other immigration lawyers, including training attorneys on how to screen for these visas and set up efficient processes to obtain these visas for clients.  Lozano also offered general business and marketing advice.  (*Id.* at ¶ 10).

21.     Notably, since discontinuing her trainings, ALIL has changed its processes, organization, and developed proprietary software and data management that was not in existence when Lozano was teaching other immigration lawyers and is not generally known to the public or anyone not employed with ALIL and subject to confidentiality agreements.  (*Id.* at ¶11).

22.     In developing these new and proprietary systems and procedures, Lozano revolutionized the organization of an immigration law firm to provide the best customer service experience while achieving high results for clients and moving applications expeditiously through the U.S. immigration process.

23.     Rather than the typical immigration law firm set-up where cases are managed by paralegals from intake through granting of papers, ALIL developed a proprietary business model that divides the firm into different departments that each handle a different aspect of a client's case, from intake, through investigation, to preparing documentation, and final review.  ALIL also began hiring staff across the U.S. and abroad to manage the firm's caseload.  (*Id.* at ¶¶ 12-13).

24.     Of relevance here, in February 2021, ALIL began building a back-office operation in Bogotá, Colombia, which is now known as Quetzal and has grown to employ over 400 individuals.  ALIL also has smaller back-office operations in Mexico and Argentina that staff and support many of the ALIL departments.  The back-offices perform supportive functions for ALIL such as human resources, case management, data management and analysis, software

development, and other case preparation support.  (*Id.* at ¶¶ 13-14).

25.    The novel structure of the firm allowed ALIL to scale nationwide.  Beginning in 2022, ALIL developed a confidential growth strategy to open larger regional offices in cities with high-density immigrant populations.  To date, the firm has regional offices in Berwyn, Illinois, Houston, Texas, San Antonio, Texas, and Commerce, California.  In 2024, the firm leveraged its innovative and proprietary approach to further expand its novel concept by opening "micro-offices" around the country with a lean staff providing the exact same quality of service and high results in smaller cities with high-density immigrant populations.  (*Id.* at ¶ 15).

26.    ALIL has developed many proprietary systems to support its business in terms of intake software, immigration form completion software, data management and analytics, and case management.  ALIL has invested millions of dollars into technology over the past three years and currently employs over 100 full-time software developers focused exclusively on automation solutions for various components of the ALIL immigration process.  (*Id.* at ¶ 16).

27.    ALIL's novel business structure, strategies, operations, and proprietary systems have garnered goodwill with ALIL's clientele and within the immigrant community at-large.  (*Id.* at ¶¶ 17-19).

28.    Indeed, ALIL's goodwill generated from the excellent and efficient results it achieves on behalf of its clients inspires existing clients to recommend ALIL to their family and friends.  Since 2022, referrals from existing clients have represented over 32% of all new clients gained by ALIL, and thus far, in 2024, that number has jumped to nearly 50%.  (*Id.* at ¶ 18).

29.    These referrals and repeat clients are a critical part of ALIL and represent a significant revenue stream that, due to its unpredictability and the U.S. government's changing approach to immigration law, would be nearly impossible to quantify if it was lost.

30.     ALIL's proprietary operations, innovative growth strategies, technological developments, and data management also give ALIL a competitive advantage in the immigration law field, increase its market share, and provide a significant economic advantage over other firms in the same space.  (*Id.* at ¶¶ 17, 19).

31.     In just five years, ALIL has grown from 15 employees to over 750 employees, and the firm's revenue has more than quadrupled all because of the proprietary methodologies implemented and developed by ALIL and the firm's founder and namesake, Lozano.  (*Id.* at ¶ 19).

**B.    ALIL Protects Its Proprietary Confidential Information And Trade Secrets.**

32.     ALIL goes to great lengths to protect its proprietary, confidential information, and trade secrets.  Apart from taking necessary steps externally to ensure a robust cyber security system, robust defenses of its data and servers, and mandating the use of strong password protections, ALIL also implements several layers of protection internally.  (*Id.* at ¶¶ 20-23).

33.     To begin, not all ALIL employees have equal access to information related to ALIL's proprietary operations, systems, and data.  ALIL places internal restrictions on this type of information via a role-based access control framework, which restricts network access based on a person's role within the company.  The roles with the highest level of access in the company are executive level and select director level employees in operations, technology, and data: a small subset of ALIL employees.  (*Id.* at ¶ 24).

34.     Further, all U.S. based ALIL employees sign a "Restrictive Covenant Agreement" as a term of their employment in which they agree to hold all confidential information in the strictest confidence, and even after the end of their employment, agree to refrain from utilizing, disclosing, or making available any confidential information, or to use the confidential information

to attempt to solicit, induce, recruit, or take away clients, suppliers, or customers of ALIL.  (*Id.* at ¶ 25).

35.     U.S. based ALIL employees also agree that they will not solicit customers or current or former employees that worked for ALIL in the U.S. or were otherwise engaged by the Company, which covers Quetzal employees that work exclusively for ALIL in Colombia.  It is important to note that Quetzal exists only to perform back-office functions for ALIL and its subsidiaries. (*Id.* at ¶ 26).

36.     ALIL also has policies and procedures all employees are trained on and expected to follow that prohibit the reproduction, copying, or transfer of any of the proprietary data, information, or methodologies used within ALIL.   These policies are disseminated to all employees on a monthly basis and violation of such policies is strictly enforced, resulting in discipline up to and including termination. (*Id.* at ¶ 27).

37.     With few exceptions, ALIL generally does not permit employees to work remotely, in part to control the flow of and access to confidential information and trade secrets.  Only certain senior-level employees and attorneys have authorization from the firm to work hybrid and/or remotely.  (*Id.* at ¶ 28).

38.     ALIL regularly protects its trademarks from infringement, especially where there is a high likelihood of confusion for consumers of legal services.  Most recently, ALIL has taken action in U.S. District Court for Arizona to protect the firm's intellectual property from impersonators using its trademarks in an attempt to defraud ALIL clients. (*Id.* at ¶ 29).

**C.     Diaz Was A Trusted ALIL Employee With Access to the Highest Levels of ALIL's Confidential, Proprietary Information, and Trade Secrets.**

39.     Diaz started with ALIL as an independent contractor in February of 2021 when the firm was just beginning to build its own office in Colombia.  As ALIL grew rapidly, he became a

senior employee relative to the many new hires.  Over time, Diaz also ingratiated himself to Lozano.  Lozano would regularly run business ideas past Diaz and included him in family social events on occasion.  (*Id.* at ¶ 30; *see also* Decl. of N. Hererra, May 21, 2024, at ¶ 6, hereinafter "Herrera Decl.", attached as Exhibit C).

40.    Lozano paid for Diaz to relocate to Tukwila, Washington upon learning that he was a dual citizen of the U.S. and Colombia.  When he relocated to the U.S., Diaz became a full-time ALIL employee, serving first as a paralegal, then as Legal Line and Support Teams Senior Manager.  This move benefited the firm because Diaz had proven leadership skills, and it benefited Diaz by giving him further growth opportunities within ALIL without the need for a visa.  (Rios Decl. ¶32; Herrera Decl. ¶¶ 6-7).

41.    In his senior position within the firm, Diaz had nearly unfettered access to confidential information concerning all of ALIL's proprietary business operations including salary information, growth strategies, data management, vendors, and proprietary software (both software developed internally, and the confidential mix of external software providers integrated into the ALIL practice).  (Rios Decl. ¶33; Herrera Decl. ¶8).

42.    Diaz's wife, Laura Catalina Rodriguez ("Rodriguez") was also employed by ALIL as a Data Analyst Team Lead.  In this position, Rodriguez had access to sensitive, proprietary information regarding ALIL's operations, processes, clients, and software in order to extract meaningful operational and financial analyses for the executive team.  (Rios Decl. ¶ 34; Herrera Decl. ¶ 20).

43.    Even more, Diaz was intimately involved with the creation of ALIL's Quetzal office in Bogotá, Colombia as well as the creation of the front offices throughout the U.S.  Diaz knew the structure of the offices (both in the U.S. and internationally), the various departments

needed for the novel immigration law firm setup Lozano developed, the employee profiles needed to staff the offices, the compensation of those employees, and all of the vendors that ALIL used domestically and abroad.  In short, Diaz possessed ALIL's entire blueprint to open back-offices in Latin America and front offices throughout the U.S.  (Rios Decl. ¶¶ 35-36; Herrera Decl. ¶¶ 7-8).

44.     Diaz supervised many of ALIL's employees, particularly those working in Colombia.  Unfortunately, ALIL discovered that Diaz abused his position of power within ALIL and acted inappropriately with subordinate employees.  Diaz was warned, counseled, and coached regarding his behavior; however, Diaz failed to correct his behavior and ALIL terminated his employment.  (Rios Decl. ¶¶ 37-38).

45.     Rodriguez resigned from her position at ALIL just a few days after Diaz was terminated allegedly "in protest" of her husband's termination.  Upon information and belief, Rodriguez absconded with ALIL's confidential information and trade secrets.  (*Id.* at ¶ 39).

46.     Clearly both Diaz and Rodriguez are motivated to harm ALIL, and based on information and belief, it appears Diaz in particular has taken steps to position himself to take aim at the heart of ALIL's business by engaging with a direct competitor of ALIL's, providing that competitor ALIL's blueprints and playbooks, poaching ALIL's key employees, and even sourcing ALIL's exact vendors to that competitor's benefit.

**D.     Meneses Law Is A Competitor of ALIL, And Has Deployed A Strategy Of Hiring Current and Former ALIL Employees To Gain Access to ALIL Proprietary and Confidential Information and Trade Secrets.**

47.     The kind of success ALIL has achieved attracts imitators.  Meneses Law is one such imitator.  However, rather than developing its own business strategies, Meneses Law attempts to clone ALIL.

48.     Meneses Law is a direct competitor of ALIL.   Meneses Law serves clients nationwide and similarly uses niche areas of immigration law, such as VAWA and T visas to gain clients legal status in the United States.  (Rios Decl. ¶¶ 45-46).

49.     Meneses Law imitates ALIL's marketing materials.   Meneses Law also uses ALIL's "ARREGLAR SIN SALIR!" trademark on print advertising without authorization or license from ALIL.  Below is a recent example of a Meneses Law banner in which she not only uses the "ARREGLAR SIN SALIR!" mark, but she also copies the pose, format, and text of ALIL's banners.  It is important to note that despite Meneses Law adding "del pais," which translates to "the country," onto the end of the mark, this does not materially change the meaning of the phrase for Spanish speakers, nor does it change the English translation.  (Rios Decl. ¶¶ 47-49).

  

| Meneses Imitation Banner (2024) | ALIL Arreglar Sin Salir Banner (2022) | Same "Dedicated to Results" text (2022) |

50.     Through Diaz, Meneses Law strategically targeted employees in key positions from ALIL and Quetzal, approached ALIL's exact vendors, and used ALIL's confidential business

strategies and methodologies to scale its operations in Colombia rather than develop its own innovative business strategies.

51.     Meneses Law hired Diaz in or around January 2024, after his employment with ALIL was terminated.

52.     Meneses Law initially hired Diaz as a Customer Service Manager, but within three short months gave Diaz a significant promotion to Senior Operations Manager.  In this new role, Diaz no doubt has a greater impact on the overarching strategy and company development for Meneses Law and has made use of his inside knowledge of ALIL to improperly benefit Meneses Law.  (Rios Decl. ¶¶ 51-52).

53.     Upon information and belief, Diaz is primarily based out of Meneses Law's Houston, Texas office and is living in corporate housing provided by Meneses Law.  Diaz uses Meneses Law's Houston-based private jet to fly to Colombia on Meneses Law business.

54.     Since Meneses Law hired Diaz, over a dozen former employees of ALIL and Quetzal are now employed by Meneses Law.  These individuals include Rodriguez, who is now employed as a Research Analyst by Meneses Law, and Sonia Peñarete, who was the head of Quetzal's Customer Experience department with access to all of ALIL's systems and proprietary technology and is now working as Operations Manager – Colombia, for Meneses Law.  Diaz, Rodriguez, and Peñarete together can recreate most, if not all, of ALIL's proprietary business operations, growth strategies, data management, and proprietary software based on ALIL's confidential information and trade secrets.  (Rios Decl. ¶¶ 54-57; Herrera Decl. ¶¶ 17-20).

55.     Meneses Law and Diaz have recruited other ALIL managers and employees from across ALIL's departments who all were exposed to different aspects of ALIL's confidential information and trade secrets (collectively, these individuals are referred to as "Other Employees")

to work for Meneses Law.  Diaz either supervised these Other Employees, was in the chain of command for these Other Employees, or regularly worked with these Other Employees on behalf of ALIL.  (Rios Decl. ¶¶ 56-58; Herrera Decl. ¶¶ 17-20).

56.     Upon information and belief, Diaz uses the exact same educational materials (including PowerPoint slides, handouts, and other documentation) developed by ALIL to train Meneses Law's operational staff.  For example, Diaz recently gave a training presentation on April 16, 2024, at a Hotel Dann Carlton in Bogotá, Colombia to Meneses Law employees that appears to use ALIL materials—*even down to the font of the text for the presentation.*  (Rios Decl. ¶ 59; Herrera Decl. ¶ 24-25).¶



14

**E.     ALIL's Restrictive Covenant Agreements**

57.     Diaz and Rodriguez both entered into Restrictive Covenant Agreements as conditions of their employment with ALIL.   A true and accurate copy of Diaz's executed Restrictive Covenant Agreement is attached as Exhibit D.  (Rios Decl. ¶ 40).

58.     Paragraph 2 of the Restrictive Covenant Agreement governs confidentiality.  The Paragraph defines "Confidential Information" as:

> [I]nformation that: (i) is disclosed to Employee or of which the Employee becomes aware as a consequence of or through Employee's employment with the Company, (ii) is not generally known outside of the Company, (iii) has value to the Company, (iv) relates to the business of the Company, and (v) could be damaging to the Company's business if disclosed to or used by others.  Such information may include but is not limited to, data and information with regard to *business plans*, *trade secrets*, finances, records, *personnel*, designs, marketing, customers and customer lists, customer requirements, sales, products, *systems*, *processes*, trade secrets, *methods*, *know-how*, *sales methodologies*, *training methodologies*, sales channels, product development plans, and/or pricing.  (Restrictive Covenant Agreement, ¶2(a)) (emphasis added).

59.     In Paragraph 2(E) of the Restrictive Covenant Agreement, Diaz agreed:

> [D]uring the two-year period immediately following the end of Employee's employment with the Company, Employee will not, anywhere in the United States, directly or indirectly (i) utilize, disclose, or make available to any other person or entity, any of the Company's Confidential Information; or (ii) use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers, or customers of the Company.  Employee understands and agrees that the time and territory limits on this restriction do not apply to trade secrets (discussed below), which are protected by law.  (*Id.*, ¶ 2(e)).

60.     In Paragraph 5 of the Restrictive Covenant Agreement, Diaz agreed that for one year after the cessation of employment with ALIL:

> Employee shall not seek to influence or induce to leave the Company's employment or service, any person (a) who was employed or otherwise engaged by the Company at any time during the twelve (12) months ending on Employee's last day of employment with the Company and (b) with whom Employee had Material Contact during such period.  (*Id.*, ¶ 5).

61.     Upon information and belief, Meneses Law was aware of these Restrictive Covenant Agreements at the time that it hired Diaz and the other ALIL and Quetzal employees it poached.  Further, ALIL sent Meneses Law a copy of Diaz's Restrictive Covenant Agreement on or about April 5, 2024.  (Rios Decl. ¶ 42).

**F.      Meneses Law and Diaz Recruit ALIL Employees In Violation of Restrictive Covenant Agreements And Use ALIL's Confidential Information and Trade Secrets To Unfairly Compete With ALIL.**

62.     Meneses Law is actively soliciting ALIL employees and using these employees to gain access to ALIL confidential information and trade secrets.  Meneses Law is then using this confidential information and trade secrets to unfairly compete directly with ALIL.

63.     To wit, Meneses Law had no presence in Colombia until it hired Diaz.  Upon information and belief, Meneses Law then instructed Diaz to set up a back-office in Colombia identical to ALIL's.  Diaz began to set up that office by contacting the exact attorney ALIL used to set up its Colombian back-office, Quetzal, to create a Colombian entity for Meneses Law.[3] Upon information and belief, Diaz has reached out to other vendors and suppliers he learned about through his employment with ALIL and Quetzal.  It can only be assumed that he would utilize his inside knowledge of the pricing structure, negotiation tactics, and suite of features selected by ALIL to then recreate the same services, functionality, and relationships for Meneses Law.  (Rios Decl. ¶ 64).

64.     Diaz and Peñarete also began to improperly solicit ALIL employees to work virtually for the Meneses Law Bogotá office.  Upon information and belief, Diaz used his knowledge of ALIL salary structures to create competitive compensation packages for the former ALIL employees and offered fully remote work to improperly entice them away from their

---

[3]     Fortunately, that attorney contacted ALIL to notify the company of the conflict of interest and refused to work with Diaz in perpetuating his scheme.

employment with ALIL and in direct contravention of his contractual obligations to ALIL. (Herrera Decl. ¶ 16).

65.    For example, the screenshot below shows a message that Peñarete was circulating to her former direct reports at Quetzal advertising a job fair Meneses Law was hosting (Carlos Barrios is a current employee at Quetzal who forwarded this message from Peñarete to other Quetzal employees).  (Rios Decl. ¶ 60; Herrera Decl. ¶ 15).



---

4    This message translates to: "Good afternoon, I hope you are well.  I received this open call for Meneses [Law] so those who want can send their resume and try to attend the event on the 10th.  I know there are some who are not lawyers but they can also try to send their resumes.  You can also share it with other people and on the day of the event, you can ask for Sonia Peñarete."  As noted above, Sonia Peñarete is a former ALIL employee.

66.     Diaz also advertised this job fair on his Instagram account, in which, at the time, he still affiliated himself with ALIL.  (Rios Decl. ¶ 61; Herrera Decl. ¶ 21).



67.     Prior to the job fair, ALIL reminded both Diaz and Meneses Law of Diaz's obligations under the Restrictive Covenant Agreement that prohibits him from soliciting ALIL's current and former employees.  (Rios Decl. ¶¶ 41-42; 62).

68.     On or about April 2, 2024, ALIL's counsel sent Diaz a letter demanding that Diaz cease and desist the use and disclosure of ALIL's confidential and proprietary information.  A true and accurate copy of this correspondence is attached as Exhibit E.

69.     On or about April 5, 2024, ALIL's counsel sent Meneses Law a letter noting that ALIL was aware that Meneses Law was poaching ALIL and Quetzal employees, and that these former employees were using ALIL's confidential and proprietary information.   The letter demanded Meneses Law cease and desist the use and disclosure of ALIL's confidential and proprietary information, and the solicitation of ALIL and Quetzal employees in violation of ALIL's Restrictive Covenant Agreement with Diaz.   ALIL's counsel also sent Meneses Law a copy of Diaz's Restrictive Covenant Agreement.   A true and accurate copy of this correspondence is attached to this Petition as Exhibit F.

70.     ALIL's counsel also had discussions with Diaz's counsel regarding the job fair on or about April 8, 2024, and again on or about April 9, 2024, where it was reiterated that the Restrictive Covenant Agreement applied to both current and former employees of ALIL with whom Diaz worked during the covered period.   (Rios Decl. ¶ 62).

71.     Defendants ignored these admonitions and interviewed former ALIL employees at the job fair.   Defendants also encouraged current ALIL employees who tried to attend the job fair to first resign from employment and then submit resumes to Meneses Law, presumably under the mistaken assumption that the non-solicitation restriction only applied to current and not former employees.   This direct attempt to circumvent the Restrictive Covenant to which Diaz is bound not only shows recklessness, but a total disregard for ALIL's contractual rights.   (Rios Decl. ¶ 63; Herrera Decl. ¶¶ 22-23).

72.     Without court intervention, it is clear that Defendants will continue to improperly use ALIL's trademark and its confidential information and trade secrets in an effort to improperly recreate ALIL's business model and growth strategies, to solicit ALIL and Quetzal employees and to otherwise unfairly compete with ALIL.

## CAUSES OF ACTION
### COUNT I
### Breach of Contract
### (As to Defendant Diaz)

73.     Plaintiff pleads the following cause of action in the alternative and incorporates the preceding paragraphs of this Petition as if fully rewritten herein.

74.     The Restrictive Covenant Agreement, the terms of which are incorporated by reference, is a valid and enforceable contract.

75.     The restrictions set forth in the Restrictive Covenant Agreement are reasonable and necessary to protect ALIL's legitimate business interests.

76.     ALIL performed all of its obligations under the Restrictive Covenant Agreement.

77.     Diaz has materially breached Paragraphs 2 and 5 of the Restrictive Covenant Agreement by accepting employment with Meneses Law, and then using ALIL confidential information to assist Meneses Law in setting up a competing business and recruiting current and former ALIL employees and those otherwise engaged by ALIL with whom he had "Material Contact" as defined in the Restrictive Covenant Agreement to work at Meneses Law.

78.     As a result of Diaz's breach, ALIL has suffered and continues to suffer immediate, substantial, and irreparable harm and/or threatened irreparable harm in the form of loss of market share, loss of future business opportunities, loss of customer goodwill, and loss of confidential proprietary information and trade secrets all of which cannot be adequately quantified and cannot be remedied at law by money damages.

### COUNT II
### Federal Misappropriation of Trade Secrets – 18 U.S.C. § 1836
### (As to all Defendants)

79.     Plaintiff pleads the following cause of action in the alternative and incorporates the preceding paragraphs of this Petition as if fully rewritten herein.

20

80.     ALIL's trade secrets, including but not limited to, business operations, business strategy, growth strategy, data management, proprietary software, and other highly confidential information that Diaz had access to via their former employment with ALIL, are trade secrets which ALIL has taken reasonable measures to keep secret and from which ALIL derives independent value from them not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

81.     ALIL's trade secrets are used to provide immigration law services to customers across the U.S. and throughout the world, and throughout ALIL's operations nationwide and globally.  As a result, ALIL's trade secrets are related to a product or service used in or intended for use in interstate and foreign commerce.

82.     Defendants Diaz and Meneses Law have misappropriated ALIL's trade secrets in the following ways:

    a.  By acquiring ALIL's trade secrets through improper means (*e.g.*, breach or inducement of a breach of a duty to maintain secrecy);

    b.  By disclosing and/or using ALIL's trade secrets without ALIL's consent;

    c.  By disclosing and/or using ALIL's trade secrets without ALILs' consent for their own commercial benefit while knowing, or having reason to know, at the time of the disclosure and/or use, that the ALIL trade secrets were acquired through improper means;

    d.  By disclosing and/or using ALIL's trade secrets without ALILs' consent for their own commercial benefit while knowing, or having reason to know, at the time of the disclosure and/or use, that the ALIL trade secrets were acquired

under circumstances giving rise to a duty to maintain the secrecy and limit the use of those trade secrets;

e.  By disclosing and/or using ALIL's trade secrets without ALILs' consent for their own commercial benefit while knowing, or having reason to know, at the time of the disclosure and/or use, that the ALIL trade secrets were derived from or through a person who owed a duty to ALIL to maintain the secrecy and limit the use of those trade secrets.

83.  Defendants took such actions (and continue to engage in such actions) willfully, maliciously, and/or with reckless disregard for ALIL's rights, in that Defendants knew, or had reason to know, pursuant to the terms of ALIL's Restrictive Covenant Agreements, that Defendants were not authorized to use ALIL's trade secrets in competition with ALIL or for Defendants' own commercial benefit.

84.  As a result of Defendants' misappropriation of ALIL's trade secrets, ALIL has suffered and will continue to suffer irreparable harm if Defendants' misconduct is not enjoined.

85.  Pursuant to 18 U.S.C. § 1836(b)(3)(C), ALIL is entitled to exemplary damages for Defendants' willful and malicious misappropriation of ALIL's trade secrets.

86.  Pursuant to 18 U.S.C. §1836(b)(3)(D), ALIL is entitled to recovery of its attorneys' fees because of Defendants' willful and malicious misappropriation of ALIL's trade secrets.

**COUNT III**
**Misappropriation of Trade Secrets – Texas Civil Practices and Remedies Code Section 134A, *et seq.***
**(As to all Defendants)**

87.  Plaintiff pleads the following cause of action in the alternative and incorporates the preceding paragraphs of this Petition as if fully rewritten herein.

88.     The Texas Uniform Trade Secrets Act ("TUTSA") protects trade secrets from wrongful misappropriation.   Among other information, TUTSA protects "a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers." TEX. CIV. PRAC. & REM. CODE §§ 134A.001 – 134A.008.

89.     The trade secrets owned by ALIL and improperly acquired by Defendants, include but are not limited to, business operations, business strategy, growth strategy, data management, proprietary software, educational materials, and other highly confidential information that Diaz and the Other Employees had access to via their former employment with ALIL.

90.     ALIL's trade secrets are not public.   ALIL has taken, and continues to take, reasonable measures to maintain their secrecy, and ALIL derives independent value from these trade secrets not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

91.     Defendants improperly acquired ALIL's trade secrets.   Defendant Diaz retained ALIL trade secrets and improperly misappropriated them by sharing such trade secrets with his new employer, Meneses Law, which is a breach of the Restrictive Covenant Agreement and a breach of his common law duty to maintain the secrecy of such information.

92.     Meneses Law improperly acquired ALIL's trade secrets through inducing breaches of ALIL's Restrictive Covenant Agreements and ALIL employees' common law duties to maintain secrecy.

93.     Defendants knew when they acquired and/or used ALIL's trade secrets that they had acquired those trade secrets by improper means, by knowingly inducing breaches of and

breaching the Restrictive Covenant Agreement, in conscious disregard of ALIL's rights as owner of those trade secrets.

94.     ALIL never authorized or consented to Defendants' acquisition by improper means or use of its trade secrets.

95.     Defendants acquired, used, and/or disclosed the misappropriated trade secrets to unjustly gain market share and commercial advantage.

96.     Defendants' misappropriation of trade secrets has injured ALIL, has caused financial damage to ALIL, and will continue to injure and cause financial damage to ALIL unless enjoined by this Court.

97.     Defendants' misappropriation of ALIL's trade secrets was willful and malicious. Accordingly, ALIL is entitled to an award of exemplary damages and is entitled to court costs and attorneys' fees pursuant to Sec. 134A.004 and .005 of the Texas Civil Practices and Remedies Code.

**COUNT IV**
**Tortious Interference With A Contract**
**(As to all Defendants)**

98.     Plaintiff pleads the following cause of action in the alternative and incorporates the preceding paragraphs of this Petition as if fully rewritten herein.

99.     ALIL had a contract with Diaz, the Restrictive Covenant Agreement attached as Exhibit D, and contracts with all of its U.S. based employees substantially similar to the Restrictive Covenant Agreement, protecting confidential information and prohibiting solicitation of ALIL current and former employees.

100.     Defendants were aware of these contracts.

101.    Meneses Law willfully and intentionally interfered with Diaz's Restrictive Covenant Agreement.

102.    Meneses Law and Diaz willfully and intentionally interfered with contracts substantially similar to the Restrictive Covenant Agreement that other ALIL employees entered into with ALIL.

103.    Defendants willfully and intentionally interfered with these agreements by using ALIL's confidential information.  Defendants also tortiously interfered with these agreements by soliciting ALIL employees and actively encouraging those employees to resign from ALIL.

104.    Moreover, ALIL has valuable business relationships with its employees, clients, customers, vendors, contractors, consultants, partners and other third parties and had a reasonable expectation to maintain these valuable relationships for years to come.  By virtue of his position, Diaz had and has knowledge of ALIL's business relationships and access to Confidential Information and worked with these individuals and entities throughout his tenure at ALIL.

105.    Now, in his competitive role with Meneses Law, Diaz has or will in the imminent future solicit and do business with ALIL current or former employees, clients, customers, vendors, contractors, consultants, partners and other third parties and wrongfully intend that these individuals and entities amend or terminate their relationship with ALIL.

106.    Defendants lacked any privilege to tortiously interfere with ALIL's contracts. Defendants' willful and malicious interference has caused, and will continue to cause, ALIL irreparable harm and injury, as well as yet to be determined monetary damages.

### COUNT V
### Unfair Competition
### (As to all Defendants)

107.    Plaintiff pleads the following cause of action in the alternative and incorporates the preceding paragraphs of this Petition as if fully rewritten herein.

108.     ALIL expended substantial time, labor, skill, and money in developing its valuable training, Confidential Information, trade secrets, and goodwill within the industry.  It developed a proprietary and password protected database with confidential client information, internal billing practices, pricing strategies, marketing approaches, growth strategies and related sales and recruiting approaches, processes, and protocols, including the confidential information and trade secrets described in this Petition.

109.     ALIL has also invested substantial time, money, skill, and effort into developing its employees by providing extensive and ongoing training, and investing in sales and client service strategies, marketing, and ALIL's internal systems and database.  ALIL has advocated for its employees and provided Diaz and many other employees opportunities to promote and develop their careers.

110.     Plaintiff invested substantial time, money, skill, and effort into developing employee, client, customer, vendor, contractor, consultants, and partner relationships.  These partnerships allow ALIL to build and implement solutions critical for the firm's continued success in the industry.

111.     Diaz has or will in the near future use ALIL's confidential information to wrongfully solicit ALIL's business opportunities, and employees, to divert business from ALIL directly to Meneses Law.

112.     Defendants are wrongfully gaining a pecuniary advantage by avoiding the considerable costs, time, and uncertainties otherwise involved in soliciting new clients, vendors, or employees.  Use of ALIL's confidential information and trade secrets to directly compete with ALIL is contrary to honest practice in commercial matters and constitutes unfair competition.

113.    Defendants' conduct has proximately caused ALIL to suffer damages, including loss of clients, loss of business goodwill, impaired future earnings and business relationships, and a loss of business revenue, and has caused or will continue to cause ALIL irreparable harm and injury, as well as monetary damages yet to be determined.

**COUNT VI**
**Misappropriation/Conversion of Confidential Information**
**(As to all Defendants)**

114.    Plaintiff pleads the following cause of action in the alternative and incorporates the preceding paragraphs of this Petition as if fully rewritten herein.

115.    In the course of his employment with ALIL, Diaz acquired trade secrets, and proprietary and confidential information belonging to ALIL. This confidential information was painstakingly developed over years and developed at substantial cost to ALIL. It is an extremely valuable competitive advantage in the marketplace and is not known by or available to the public.

116.    ALIL took appropriate measures to protect its confidential information and trade secrets including implementing privacy and non-disclosure policies with its employees and partners as well as utilizing password protected databases and company equipment. Its employment policies including requiring employees to work in-office further served to protect the secrecy of its valuable confidential information.

117.    Diaz owes ALIL common law duties of confidentiality prohibiting him from using or disclosing ALIL's confidential information and trade secrets to benefit any person or entity other than ALIL and/or to the detriment of ALIL. Diaz was reminded of his duties upon termination and again when he began working for Meneses Law, but nevertheless continues to work for a direct competitor of ALIL in a role that necessarily requires his to utilize, if not disclose, ALIL's confidential information and trade secrets—all to ALIL's detriment and Meneses Law's unjust enrichment.

27

118.     As a result of the wrongful conduct described herein, ALIL has suffered damages including, but not limited to, loss of clients and customers, diminution of the relationships and valuable collaborative advantages with vendors, contractors, and/or partners, loss of business and goodwill, and lost profits.  Diaz's wrongful conduct—in the course of his employment by Meneses Law—has proximately caused and will continue to cause, ALIL irreparable harm and injury, as well as monetary damages yet to be determined.

**COUNT VII**
**False Designation of Origin – 15 U.S.C.  § 1125(a)(1)(A)**
**(As to Defendant Meneses Law)**

119.     Plaintiff pleads the following cause of action in the alternative and incorporates the preceding paragraphs of this Petition as if fully rewritten herein.

120.     ALIL owns and uses the registered trademark "ARREGLAR SIN SALIR!"

121.     Meneses Law is using the trademark without license or permission.

122.     Meneses Law's unauthorized use in commerce of the "ARREGLAR SIN SALIR!" trademark, has already deceived and is likely to deceive consumers of legal services as to the origin, source, sponsorship, or affiliation of Meneses Law and is likely to cause consumers to believe, contrary to fact, that Meneses Law's services are sold, authorized, endorsed, or sponsored by Plaintiff, or that Meneses Law is in some way affiliated with or sponsored by Plaintiff, or that Meneses Law actually is ALIL.

123.     Meneses Law's unauthorized use in commerce of the "ARREGLAR SIN SALIR!" trademark as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

124.     Upon information and belief, Meneses Law committed the conduct alleged herein with full knowledge of ALIL's prior rights in the "ARREGLAR SIN SALIR!" trademark and with

the willful intent to cause confusion, mistake, or deception and trade on ALIL's reputation and goodwill.

125.    Meneses Law's conduct as alleged herein is willful and is intended to cause, has caused, and is likely to continue to cause confusion, mistake, or deception as to the affiliation, connection, or association of Meneses Law with ALIL.

126.    Meneses Law's conduct as alleged herein, constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

127.    Meneses Law's conduct as alleged herein is causing immediate and irreparable harm and injury to ALIL, and to its goodwill and reputation and will continue to both damage Plaintiff and confuse the public unless enjoined by this Court.  ALIL has no adequate remedy at law.

128.    ALIL is entitled to, among other relief, injunctive relief and an award of actual damages, Meneses Law's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT VIII
**Application For Temporary Restraining Order And Injunctive Relief**
**(As to all Defendants)**

129.    Plaintiff pleads the following cause of action in the alternative and incorporates the preceding paragraphs of this Petition as if fully rewritten herein.

130.    Despite being reminded of their individual post-employment obligations owed to ALIL, Diaz and his employer Meneses Law ignore the gravity of the situation and defy contractual, statutory, and common-law obligations to ALIL by apparently utilizing its confidential

information and trade secrets to solicit ALIL clients and employees and otherwise unfairly compete with ALIL.

131.    If Defendants are not enjoined from their continued wrongful conduct, ALIL will suffer irreparable harm for which no adequate remedy at law exists.  Indeed, Diaz appears intent on violating the terms of his Restrictive Covenant Agreement by competing with ALIL, and specifically soliciting its employees, vendors, and other business relationships.  (*See* Rios Decl. and Herrera Decl.).

132.    In addition to the incalculable profits already lost because of Defendants' unlawful and improper actions, ALIL suffered and continues to suffer damage to its reputation, loss of clients, vendors, employees, and other business deals, impairment of future earnings capacity, diminution in the value of its business, and loss of goodwill.

133.    A temporary restraining order and temporary injunction are necessary to preserve ALIL's rights pending a trial on the merits of this action, and a permanent injunction is warranted by the plain language and requirements of the Restrictive Covenant Agreement.

134.    There is a substantial likelihood that ALIL will prevail on the merits because Defendant Diaz has clearly and repeatedly violated the terms of his Restrictive Covenant Agreement and Defendants have willfully interfered with ALIL's business relationships.  As noted herein, Diaz has already begun working for Meneses Law and has already successfully solicited more than a dozen ALIL employees to leave ALIL and seek employment with its direct competitor Meneses Law.

135.    Defendants have violated their duties to ALIL and capitalized on the valuable relationships, rapport, and contacts ALIL created with its clients, customers and vendors to which Diaz was privy during the scope of his employment with ALIL.

136.    Such egregious violations and improper conduct have or will cause substantial and irreparable harm to ALIL.  Meneses Law is a competitor, and clearly Diaz is intent on improperly diverting ALIL clients, customers, employees, deals, and other business relationships and/or opportunities to Meneses Law.

137.    The threatened irreparable injury to ALIL outweighs any possible damage to Defendants.  The Restrictive Covenant Agreement provides for the entry of an injunction against Defendant Diaz for breach of the Restrictive Covenants.  An injunction would not prevent Meneses Law from serving clients nationwide and practicing in the immigration space, just without the benefit of ALIL's confidential information and trade secrets, and trademarks.

138.    The public interest is served by an injunction as it protects the substantial investments made by ALIL in acquiring and developing its successful business, confidential information, and trade secrets, and an injunction would enforce better business ethics by depriving Defendants of the benefit of misappropriated property and violations of contractual, statutory, and common law duties.  Moreover, injunctive relief will protect the interests of ALIL's remaining employees who are diligently working to continue the success of the firm and meet the needs of its clients and the communities ALIL serves.  Finally, the public interest is served when state and federal laws are enforced.

## COUNT IX
### Punitive Damages
### (As to all Defendants)

139.    ALIL re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

140.     Diaz's tortious conduct was aggravated by the willfulness, wantonness, and malice for which the law allows the imposition of punitive damages.  His conduct was intentional, willful, wanton and without justification or excuse.

141.     Meneses Law aided and abetted Diaz's conduct, providing him the opportunity to improperly utilize ALIL's confidential information, trade secrets, and other protected business interests developed with significant monetary investment by ALIL, to his individual benefit and to the benefit of Meneses Law.

142.     Defendants engaged in the malicious, intentional, and unjustified actions described above with gross indifference to ALIL's rights and with the conscious desire to interfere with ALIL's business relationships to the detriment of ALIL and even Diaz's former co-workers.  To punish such action and to deter others from similar wrongdoing, Defendants should be assessed punitive damages in an amount determined by the trier of fact.

## COUNT X
### Attorneys' Fees
### (As to all Defendants)

143.     ALIL re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

144.     As a result of Defendants' wrongful actions described above, ALIL retained counsel to prosecute these claims.  ALIL is, therefore, entitled to recover reasonable and necessary attorneys' fees and costs incurred in the prosecution of this lawsuit pursuant to, inter alia, Texas Civil Practices and Remedies Code Sections 38.001(8), 37.009 and 134A.005.

### REQUEST FOR TEMPORARY RESTRAINING ORDER

1.     As explained herein, Defendant Diaz has ignored and violated his contractual, statutory and common law duties to ALIL.  The only adequate and effective relief for ALIL would

be to restrain the Defendants from continuing to engage in the prohibited activities detailed herein. Without preserving the status quo, ALIL will face irreparable harm.

2.      Pursuant to Rule 680 of the Texas Rules of Civil Procedure, Section 65.001 et. seq., ALIL seeks an ex parte Temporary Restraining Order to preserve the status quo during the pendency of this action and, upon hearing, seeks a temporary and permanent injunction.

3.      All ALIL's attempts to resolve this dispute informally and quickly have been disregarded or thwarted by Meneses Law and Diaz.

4.      Defendants are continuing to engage in unfair competition and capitalize on the goodwill and business relationships ALIL developed through its investment of time, effort, money and resources.  As clearly shown in the Declarations of Amy Rios and Nicolas Herrera attached as Exhibits B and C, Diaz has already misappropriated ALIL's confidential information and trade secrets.  Diaz's work with Meneses Law will necessarily lead to the improper disclosure and utilization of ALIL's confidential information and trade secrets all to the detriment of ALIL.  There is no indication that Defendants will halt their improper and illegal activities any time soon.

## REQUEST AND MOTION FOR EXPEDITED DISCOVERY

Plaintiff further moves the Court to grant limited expedited discovery ahead of a hearing. Pursuant to Texas Rules of Civil Procedure 191.1, the Court may modify discovery procedures and limitations if there is good cause, and if the modification is not specifically prohibited by some other rule.   The critical need for certain limited discovery and the imminence of the hearing on Plaintiff's Application for Temporary Injunction constitute good cause under Tex. R. Civ. Proc. 191.1 to permit expedited discovery.  Plaintiff primarily seeks limited discovery only, specific documents and/or information needed for the hearing, reserving more fulsome discovery for later

in the proceedings. While the Court can receive testimony at the hearing, discovery measures are necessary to obtain certain items in advance, in order to prepare.

Therefore, Plaintiff requests the following expedited discovery schedule:

1.  The Plaintiff may depose Defendant Diaz for no longer than three (3) hours;

2.  The Plaintiff may depose a corporate representative of Defendant Meneses Law, PLLC for no longer than three (3) hours;

3.  Notice for such depositions will be provided by Defendant in writing with two (2) days' advance notice;

4.  The Plaintiff may serve on Defendant Diaz requests for documents (5 requests or fewer) with responses (and any objections) due within seven (7) days of service;

5.  The Plaintiff may serve on Defendant Meneses Law, PLLC requests for documents (5 requests or fewer) with responses (and any objections) due within seven (7) days of service; and,

6.  Discovery conducted hereunder will not waive rights to future additional discovery in this matter.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, ALIL respectfully requests that:

1.      Defendants be cited to appear;

2.      This Court issue a Temporary Restraining Order against Defendants, their partners, agents, servants, employees, employers, and attorneys ("Enjoined Parties") who received actual notice of this Temporary Restraining Order ordering that they shall be enjoined as follows:

      a)   Enjoined Parties are prohibited from directly or indirectly, using, reviewing, disclosing, publishing, sharing, disseminating, and/or allowing access to, destroying, concealing, deleting, or removing any of ALIL's Confidential Information and/or trade secrets including, but not limited to, data and information with regard to business plans, trade secrets, finances, records,

personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods, know-how, sales methodologies, training methodologies, sales channels, product development plans, and/or pricing;

b) Enjoined Parties are prohibited from destroying any record, document, report, spreadsheet, communication, or other information, whether in written or electronic format, in their respective possession, control, or otherwise accessible to him, that is contains information that could be relevant or discoverable in this lawsuit, including but not limited to any ALIL's Confidential Information, trade secrets, or any other ALIL proprietary or protected information;

c) Enjoined Parties are prohibited from engaging in any acts that would constitute a breach of the Restrictive Covenant Agreement and are prohibited from engaging in any act, omission, communication, or other effort to assist Diaz in any additional or further breach of his Restrictive Covenant Agreement;

d) Enjoined Parties are prohibited from interfering with any business opportunities or relationships of ALIL, including bidding on any current or pending agreements, sales, or transactions between ALIL and its customers, vendors, partners, or clients;

e) Enjoined Parties are prohibited from directly or indirectly hiring, soliciting, recruiting, or otherwise attempting to induce any person who is, or within the preceding twelve (12) months prior to November 17, 2023 was, (i)

employed or otherwise engaged by ALIL and (ii) with whom Diaz had Material Contact during such period, meaning Diaz (a) supervised such person or was otherwise in such person's chain of command; (b) regularly worked with the person on behalf of the ALIL; or (c) whom Diaz received Confidential Information in the ordinary course of business about the person.

f) Enjoined Parties are prohibited from otherwise disrupting, damaging, impairing, or interfering with the business of ALIL or from directly or indirectly deriving any economic benefit from the goodwill, business relationships, or reputation of ALIL.

g) Enjoined Parties must immediately cease and desist use of the trademark "Arreglar Sin Salir!" in any capacity and are prohibited from using such trademark or any variation thereof in commerce.

3.    A temporary injunction be ordered following a hearing and enjoining Defendants from the conduct described above;

4.    A permanent injunction be ordered on final trial of this cause enjoining Defendants from the conduct described above;

5.    ALIL recover exemplary damages against Defendants in a sum in excess of the minimum jurisdictional limits of the Court;

6.    ALIL recover costs of suit, pre-judgment and post-judgment interest at the maximum rate permitted by law;

7.    ALIL be awarded reasonable and necessary attorneys' fees in an amount to be determined by this Court; and,

8.     ALIL be granted its motion included herein for expedited discovery;

9.     ALIL be awarded any further relief in equity or law that it has shown itself entitled.

Date: May 29, 2024                  Respectfully submitted,

*/s/ Charles T. Jeremiah*
Lauren Hope Whiting
Texas Bar No.  24084091
JACKSON LEWIS P.C.
93 Red River St., Ste.  1150
Austin, Texas 78701
512.362.7408 [Telephone]
512.362.5574 [Facsimile]
Lauren.Whiting@jacksonlewis.com

Charles T. Jeremiah
Texas Bar No. 00784338
Jackson Lewis P.C.
717 Texas Avenue, Suite 1700
Houston, TX 77002
713.650.0404 [Telephone]
713.650.0405 [Facsimile]
Charles.Jeremiah@jacksonlewis.com

Kirsten R.  Fraser
(*Pro Hac Vice Application Forthcoming*)
Organ Law LLP
1330 Dublin Road
Columbus, Ohio 43215
614.481.0900 [Telephone]
614.481.0904 [Facsimile]
kfraser@organlegal.com

*Attorneys for Plaintiff Alexandra Lozano*
*Immigration Law, PLLC*

# EXHIBIT A

Unofficial Copy Office of Marilyn Burgess District Clerk

## Mutual Dispute Resolution Agreement

I.   Introduction

Alexandra Lozano Immigration Law, PLLC ("Company") believes that most work-related concerns can be addressed with Company managers or Human Resources. Employees are encouraged, but not required, to speak with their manager or Human Resources to resolve any work-related problem before initiating the procedures set forth in this Mutual Dispute Resolution Agreement ("Agreement"). If resolution cannot be achieved through the Company's internal resources, then the undersigned individual and the undersigned individual's heirs, executors, administrators, successors, and assigns (collectively, "Employee") and the Company agree to use the procedures in this Agreement instead of a trial in court before a judge or jury. By issuance of this Agreement, the Company agrees to be bound without signing it. If Employee accepts or continues employment with the Company, both Employee and the Company will be bound by its terms.

II.   Arbitration Clause, Covered Claims, and Excluded Claims

A.   Arbitration is the process by which a neutral third party resolves a dispute through a binding decision. Employee and the Company agree that Covered Claims shall be subject to arbitration pursuant to this Agreement and shall be adjudicated exclusively by binding arbitration, rather than by a judge or jury in court. "Covered Claims" means any past, present, or future controversy, dispute, or claim relating to Employee's employment or association with the Company (or with Related Entities) that could otherwise be raised in court that (i) the Company has against Employee, (ii) Employee has against the Company or Related Entities, or (iii) Employee has against the past, present, and future owners, partners, officers, directors, members, employees, vendors, clients, customers, agents, insurers, attorneys, parents, subsidiaries, affiliates, predecessors, successors, assigns, or any person or entity alleged to be a joint employer with the Company or Related Entities. "Related Entities" means the Company's past, present, and future parents, subsidiaries, affiliates, predecessors, successors, and assigns. The Related Entities and other persons and entities identified in subparagraph (iii) of this Paragraph are intended third party beneficiaries of this Agreement. Covered Claims do not include Excluded Claims as defined in Paragraph II.C below. Notwithstanding the above, if an arbitration award would be rendered ineffectual without provisional relief including, but not limited to, preliminary injunctions or temporary restraining orders, either party may request such relief from a court of competent jurisdiction to preserve the *status quo* pending arbitration.

B.   Covered Claims include, but are not limited to, claims for wages and other compensation, breach of contract, misappropriation of trade secrets or unfair competition, violation of public policy, wrongful termination, privacy violations; tort claims (such as negligence, defamation, intentional infliction of emotional distress, false imprisonment, assault, battery, conversion, fraud, and malicious prosecution); claims for unlawful retaliation, discrimination and/or harassment; workers' compensation interference or retaliation claims; individual claims under state private attorneys general laws (e.g., California Private Attorneys General Act, California Labor Code §§ 2698, *et seq.* ("PAGA")); and claims for violation of any federal, state, or other government law, statute, regulation, or ordinance, such as, for example,

claims under the Age Discrimination in Employment Act; the Americans with Disabilities Act; Title VII of the Civil Rights Act of 1964; the Equal Pay Act; the Fair Credit Reporting Act; the Fair Labor Standards Act; the Family and Medical Leave Act; the Pregnancy Discrimination Act; the Rehabilitation Act; Section 1981 through 1988 of Title 42 of the United States Code; the Worker Adjustment and Retraining Notification Act; the California Fair Employment and Housing Act, the California Labor Code, the California Business and Professions Code, and any other applicable federal, state, or local law.

C.     Excluded Claims. The only claims not subject to arbitration under this Agreement are defined as "Excluded Claims," which are the following: (i) claims covered by the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (9 USC. § 402(a)); (ii) claims for workers' compensation or unemployment benefits; (iii) claims under ERISA plans or stock option or equity plans governed by ERISA (iv) violations of the National Labor Relations Act; (v) petitions or charges that could be brought before the National Labor Relations Board ("NLRB"); (vi) charges filed with the Equal Employment Opportunity Commission ("EEOC") or a similar government agency; (vii) representative claims for public injunctive relief under California Business and Professions Code § 17203, but only to the extent that federal law, after application of the Federal Arbitration Act ("FAA") and FAA preemption principles, prohibits enforcement of the representative action waiver (discussed in Paragraph III below); (viii) certain claims under the Dodd-Frank Act; and (ix) claims which, after application of the FAA and FAA preemption principles, are not subject to arbitration or pre-dispute arbitration agreements.

D.     This Agreement does not limit any federal, state, or local government or administrative agency's jurisdiction and nothing herein shall be construed to constitute a waiver of Employee's right to file a charge or complaint with any such agency, including but not limited to the NLRB and the EEOC. Nothing in this Agreement excuses a party from satisfying any conditions precedent or exhausting administrative remedies under applicable law before bringing a claim in arbitration.

E.     Nothing in this Agreement prevents Employee from reporting good faith allegations of unlawful employment practices to appropriate federal, state or local agencies; reporting any good faith allegation of criminal conduct to any appropriate federal, State, or local official; participating in a proceeding with any appropriate federal, State, or local government agency enforcing discrimination laws; making any truthful statements or disclosures required by law, regulation, or legal process; or requesting or receiving confidential legal advice.

III.   Waiver of Multi-Plaintiff, Multi-Claimant, Class, Collective, Representative Actions ("Class Waiver")

A.     Covered Claims must be brought, heard, and adjudicated on an individual basis only. The Parties agree that, to the maximum extent permitted by law, there shall be no right or authority for any Covered Claim to be brought, heard, or adjudicated as a multi-plaintiff, multi-claimant, class, collective, or representative action, or with any other person or entity as a member in any purported multi-plaintiff, multi-claimant, class, collective, representative proceeding. No arbitrator or court has authority to consolidate Covered Claims or to allow Company or Employee to proceed on a multi-plaintiff, multi-claimant, class, collective, or representative basis. Should

such a Covered Claim be initiated on a multi-claimant, class, collective, or representative basis in arbitration, the arbitrator shall summarily reject it as beyond the scope of this Agreement. To the extent Employee seeks to bring claims under PAGA or any other private attorney general act statute, Employee's individual PAGA or private attorney general act claims shall be arbitrated on an individual basis. Excluded Claims (as defined in Paragraph II.C above) are not subject to the Class Waiver.

B.     Any disputes concerning the applicability or validity of the Class Waiver shall be decided by a court of competent jurisdiction, not by the arbitrator. In the event that the Class Waiver, or any portion of the Class Waiver, is determined to be unenforceable with respect to any claim, any portion of the Class Waiver that is enforceable shall be enforced in arbitration such that any claim subject to an enforceable Class Waiver must only be initiated and proceed in arbitration on an individual basis (subject to applicable claims and defenses) as the exclusive forum.  If, however, the Class Waiver is determined to be unenforceable in its entirety with respect to any claim, the Class Waiver shall not apply to that claim, and that claim may only be initiated and proceed in court (subject to applicable claims and defenses) as the exclusive forum.

IV.   Authority to Determine Arbitrability

Except as provided in Paragraph III.B, as otherwise provided by federal law, and except if a party requests provisional relief from a court of competent jurisdiction to preserve the *status quo* pending arbitration, the arbitrator shall have the exclusive authority to resolve any dispute relating to the arbitrability of any individual claim or the enforceability or formation of this Agreement (including all defenses to contract enforcement such as, for example, waiver of the right to compel arbitration). Enforcement of this Agreement may not be precluded or delayed on the grounds that (1) a party to this Agreement also is a party to a pending court action or special proceeding with a third party arising out of the same transaction or series of related transactions, or (2) a party to this Agreement asserts arbitrable and non-arbitrable claims. In California, the parties expressly adopt the time and tolling limitations set forth under California Code of Civil Procedure section 1281.12.

V.    Arbitration Procedures for Covered Claims

A.     Initiating Arbitration. To initiate arbitration, a party must submit a demand for arbitration. Any demand for arbitration must be in writing, personally signed by the person initiating the claim, and initiated within the time period required under the statute of limitations applicable to the claims had the claims been raised in court (or within one year of the conduct that forms the basis of the claim if no statutory limitation period is applicable). To initiate arbitration, Employee must deliver the written and personally signed demand to the Company at 6720 Fort Dent Way Suite 230, Tukwila, WA 98188, Attn: Alejandro Mata. For the Company to initiate arbitration, it must deliver the written demand for arbitration, signed by the Company, to Employee at the last known address recorded in Employee's personnel records. The party initiating arbitration also must, within the time period required under the applicable statute(s) of limitations, submit the written and signed demand to the arbitration service that will administer the claim (as explained below) pursuant to the arbitration service's rules. The Company shall pay all arbitration fees and costs that would not be incurred in a court proceeding.

Page 3 of 6

B.     Arbitration Process and Rules. The arbitration shall be before a single neutral arbitrator. Unless the parties otherwise agree, Judicial Arbitration and Mediation Services, Inc. ("JAMS")" shall administer the arbitration and the hearing shall take place in the county in which the dispute arose. The JAMS Employment Arbitration Rules & Procedures ("JAMS Rules"), or the employment rules of the arbitration service used, shall govern the arbitration proceedings, but to the extent the rules conflict with this Agreement, the provisions of this Agreement shall apply. Employee may obtain a copy of the JAMS Rules before signing this Agreement at www.jamsadr.com, by contacting JAMS directly (toll-free 800-352-5267), or by contacting the Company's Human Resources department at HR@abogadaalexandra.com.

C.     Each party shall have the right to conduct discovery (including third-party subpoenas) adequate to fully and fairly present the claims and defenses consistent with the streamlined nature of arbitration. The parties shall have the right to file, and the arbitrator must issue rulings on, dispositive motions pursuant to the Federal Rules of Civil Procedure in the jurisdiction in which the arbitration is conducted (including without limitation motions to dismiss or for summary judgment). The arbitrator is authorized to issue third-party subpoenas and shall permit any form of discovery available to the parties had the dispute been adjudicated in a court of competent jurisdiction.

D.     The arbitrator shall apply the substantive law relating to all claims and defenses to be arbitrated the same as if the matter had been heard in court, including with respect to the award of any remedy, relief, award of costs and attorney's fees to the prevailing party, and offers of judgment or compromise. Rule 68 of the Federal Rules of Civil Procedure shall apply in all arbitrations, except that (a) California Code of Civil Procedure section 998 shall apply to arbitrations in California; and (b) any Offer of Judgment/Offer to Compromise and acceptance of an Offer of Judgment/Offer to Compromise shall be filed with the arbitrator and not with a court. Absent applicable law providing otherwise, the parties shall each bear their own costs and attorneys' fees. The arbitrator also may award monetary and non-monetary sanctions or other relief against a party or a party's attorney(s) for violation of this Agreement, the JAMS Rules, an Arbitrator's Order, the filing of frivolous claims, and/or violation of Federal Rule of Civil Procedure 11.

E.     The arbitrator's award shall be in writing, with factual findings, reasons given, and evidence cited to support the award. The Parties agree that any arbitration award shall have no preclusive effect as to issues or claims in any other dispute or arbitration proceeding and that arbitrators are barred from giving prior arbitration awards precedential effect. Any authorized decision or award of the arbitrator shall be final and binding on the parties. Any court of competent jurisdiction may enter judgment upon the award, either by (i) confirming the award or (ii) vacating, modifying, or correcting the award on any ground permitted by applicable law.

VI.   Jury Trial Waiver

To the extent any controversy, dispute, or claim is not subject to arbitration under this Agreement (e.g., sexual harassment and sexual assault claims and other Excluded Claims), and to the maximum extent permitted by law, Employee and the Company mutually agree to waive any rights to a jury trial with respect to any such controversy, dispute, or claim relating to Employee's

employment or association with the Company (or with Related Entities) that (i) the Company has against Employee, (ii) Employee has against the Company or Related Entities, or (iii) Employee has against past, present, and future shareholders, owners, partners, officers, directors, members, employees, vendors, clients, customers, agents, insurers, or attorneys of the Company or Related Entities, or any person or entity alleged to be a joint employer with the Company. This Paragraph VI does not apply in California.

VII.   Governing Law, Consideration, Severability, Final Agreement

The Federal Arbitration Act (9 U.S.C. Sections 1, *et seq.*) shall govern this Agreement. State law pertaining to agreements to arbitrate (such as, for example, N.H. Rev. Stat. Ann. § 542, *et seq.*) shall apply only to the extent not preempted by the FAA and to the extent consistent with the procedures set forth in this Agreement.

The Parties agree that the mutual promises in the Agreement serve as adequate consideration. To the extent permitted by applicable law, new or continued employment, and the Company's agreement to pay all fees and costs unique to arbitration serve as additional consideration. As to only those individuals currently employed by the Company when they sign this Agreement, in further consideration for such current employee's acceptance of this Agreement, the Company will provide all such current employees who sign this Agreement with an additional amount of paid time off days beyond what current employees are entitled by applicable Company policy to take. Specifically, each current employee who signs their acceptance to both this Agreement and the Restrictive Covenant Agreement contemporaneously provided to employees along with this Agreement, will be provided four (4) days (or, if employed by the Company on a part-time basis, a pro-rata number of days based on their regular schedule as compared to a full-time employee) of paid time off to be taken during the final week of the 2023 calendar year (between the Christmas holiday and up to and including New Year's Eve). If, however, a current employee signs only this Agreement and not the Restrictive Covenant Agreement (or vice versa), the employee will only receive two (2) days of paid time off (or pro-rata share for part-time employees) to be taken during the final week of the 2023 calendar year. If the current employee signs neither this Agreement nor the Restrictive Covenant Agreement, no additional paid time off days will be provided.

Subject to Paragraph III(B) above, if any part of this Agreement is held to be invalid, void, or unenforceable, the remainder of the Agreement will still be enforceable.

This Agreement will go into effect on the "Effective Date", which is the date this Agreement is signed by Employee. If there is a preexisting agreement between Employee and Company regarding arbitration of employment disputes, then (1) the preexisting agreement will continue to govern Covered Claims that Company had knowledge of prior to the Effective Date or if the Employee does not sign the Agreement; provided, however, that the Company hereby partially waives the arbitration provision to the extent that it purports bar or restrict Employee's right to engage in protected-concerted activity or file charges with the National Labor Relations Board, and the Company hereby acknowledges Employee's right to engage in such activity; and (2) for all other Covered Claims, this Agreement sets forth the final agreement of the Parties and supersedes all prior negotiations, representations or agreements, whether written or oral, pertaining

to arbitration of employment disputes. If there is no preexisting agreement between Employee and Company regarding arbitration of employment disputes, this Agreement sets forth the final agreement of the parties and supersedes all prior negotiations, representations or agreements, whether written or oral, pertaining to arbitration of employment disputes, regardless of whether such disputes arose before or after the Effective Date. This Agreement shall survive any termination of Employee's employment with the Company.

Nothing in this Agreement constitutes an express or implied contract of employment for any defined period of time. Nor does it alter any applicable employment at will relationship between Employee and the Company.

\* \* \* \* \*

BY ISSUANCE OF THIS AGREEMENT, THE COMPANY AGREES TO BE BOUND WITHOUT SIGNING IT.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. THIS CONTRACT ALSO CONTAINS BINDING JURY TRIAL WAIVER AND CLASS WAIVER PROVISIONS WHICH MAY ENFORCED BY THE PARTIES.

BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE RECEIVED, READ, AND HAVE HAD SUFFICIENT OPPORTUNITY TO CONSIDER THIS AGREEMENT AND I AGREE TO ITS TERMS. I UNDERSTAND THAT THIS AGREEMENT REQUIRES COVERED CLAIMS TO BE SUBMITTED TO BINDING ARBITRATION INSTEAD OF A JUDGE OR JURY TRIAL IN COURT.


_Juan Diaz Cuenca_                                    Aug 14, 2023
_____                         _____
Employee Signature                                        Date

# EXHIBIT D



## RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement (the "Agreement"), is made and entered into this 14 day of 08 , 2023, by and between Juan Diaz Cuenca ("Employee") and Alexandra Lozano Immigration Law, PLLC (the "Company").

1.  <u>Consideration.</u> As to only those individuals currently employed by the Company when they sign this Agreement, in consideration for such current employee's acceptance of this Agreement, the Company will provide all such current employees who sign this Agreement with an additional amount of paid time off days beyond what current employees are entitled by applicable Company policy to take. Specifically, each current employee who signs their acceptance to both this Agreement and the Mutual Dispute Resolution Agreement contemporaneously provided to employees along with this Agreement will be provided four (4) days (or, if employed by the Company on a part-time basis, a pro-rata number of days based on their regular schedule as compared to a full-time employee) of paid time off to be taken during the final week of the 2023 calendar year (between the Christmas holiday and up to and including New Year's Eve). If, however, a current employee signs only this Agreement and not the Mutual Dispute Resolution Agreement (or vice versa), the employee will only receive two (2) days of paid time off (or pro-rata share for part-time employees) to be taken during the final week of the 2023 calendar year. If the current employee signs neither this Agreement nor the Mutual Dispute Resolution Agreement, no additional paid time off days will be provided.

2.  <u>Confidential Information.</u>

a.   "Confidential Information" means information that: (i) is disclosed to Employee or of which the Employee becomes aware as a consequence of or through Employee's employment with the Company, (ii) is not generally known outside of the Company, (iii) has value to the Company, (iv) relates to the business of the Company, and (v) could be damaging to the Company's business if disclosed to or used by others. Such information may include, but is not limited to, data and information with regard to business plans, trade secrets, finances, records, personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods, know-how, sales methodologies, training methodologies, sales channels, product development plans and/or pricing (collectively, "Confidential Information"). The Company agrees to provide Employee with access to such Confidential Information as is necessary to perform Employee's duties for the Company.

Confidential Information does not include information in the public domain or information that is generally known and used within the industry or industries in which the Company engages in business (unless such information entered the public domain and/or became known within the industry through any improper, unauthorized and/or inadvertent disclosure). Confidential Information also does not include information protected from disclosure by the National Labor Relations Act (or other federal or state law) and, for example, does not include information about the terms and conditions of non-management employees' employment at the Company that comes to Employee's attention in the normal course of Employee's employment, but Confidential Information does include information in the Company's non-public records and files.

b.      Subject to the provisions of Paragraph 8, below, Employee acknowledges and agrees that all Confidential Information is proprietary to the Company and is a valuable, special and unique asset of the Company, and that any disclosure or unauthorized use of Confidential Information will cause irreparable harm and loss to the Company.  Employee understands and acknowledges that each and every component of the Confidential Information (i) has been developed by the Company at significant effort and expense and is sufficiently secret to derive economic value from not being generally known to other parties, and (ii) constitutes a protectible business interest of the Company.

c.      Employee acknowledges and agrees that the Company owns the Confidential Information.  Employee agrees not to dispute or deny any such ownership rights at any time.

d.      Subject to the provisions of Paragraph 8, below, throughout Employee's employment with the Company: (i) Employee will hold all Confidential Information in the strictest confidence, take all reasonable precautions to prevent its inadvertent disclosure to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (ii) Employee will not, directly or indirectly, utilize, disclose or make available to any other person or entity, any of the Confidential Information, other than in the proper performance of Employee's duties during Employee's employment with the Company; and (iii) Employee will not use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.

e.      Subject to the provisions of Paragraph 8, below, during the two-year period immediately following the end of Employee's employment with the Company, Employee will not, anywhere in the United States, directly or indirectly (i) utilize, disclose, or make available to any other person or entity, any of the Company's Confidential Information; or (ii) use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.  Employee understands and agrees that the time and territory limits on this restriction do not apply to trade secrets (discussed below), which are protected by law.

f.      Employee acknowledges that some of Company's Confidential Information may also qualify as trade secrets as defined by governing state law. Employee acknowledges and agrees that nothing in this Agreement diminishes or reduces Employee's obligations under trade secret law to continue to protect the Company's trade secrets after the end of Employee's employment, and to not use or disclose such trade secrets for as long as they remain protected by law.

3.      Return of Company Property.  At the request of the Company or upon cessation of Employee's employment with the Company for any reason, Employee will immediately deliver to the Company all property of the Company that is then in Employee's possession, custody or control, including, without limitation, all keys, access cards, cellular or smart phones, computer hardware (including but not limited to any hard drives, diskettes, laptop computers and personal data assistants and the contents thereof, as well as any passwords or codes needed to operate any such hardware), computer software and programs, data, materials, papers, books, files, documents, records, policies, client and customer information and lists, rolodexes, financial data, marketing information, design information, specifications and plans, database information and lists, mailing lists, notes, and any other property or information relating to the Company.

2

4. <u>Non-Solicitation of Customers.</u>

 a. Subject to the provisions of Section 6, below, during the Restricted Period, other than in the proper performance of Employee's duties while employed by the Company, Employee shall not, directly or in concert with others (whether as owner, officer, partner, principal, joint venturer, shareholder, director, member, manager, investor, agent, employee, or otherwise) sell, promote or provide, or attempt to sell, promote or provide, any Competitive Products and Services to any Restricted Customer.

 b. Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth in Paragraph 4 are reasonable and necessary in order for Company to protect its Confidential Information and trade secrets and are fair in that they do not prohibit Employee from continuing to be employed in Employee's chosen field of work.

 c. For purposes of this Agreement, the following definitions apply:

  (i) "Competitive Products and Services" shall mean products or services that serve one or more of the same functions as, or could be used to replace, in whole or in part, products or services which the Company offered to customers at the time Employee's work with the Company ended or which the Company was actively preparing to sell or provide during such time.

  (ii) "Material Contact" means: (1) Employee sold products or services to the customer or client; (2) Employee personally provided services to the customer or client; (3) Employee supervised those who sold products or provided services to the customer or client and had business-related discussions with the customer or client on behalf of the Company; or (4) Employee received Confidential Information in the ordinary course of business about the customer or client.

  (iii) "Restricted Customer" means any person or entity (1) which was a customer or client of the Company during the one-year period ending on Employee's last day of employment and (2) with which Employee had Material Contact during such period.

  (iv) "Restricted Period" means during Employee's employment and for the one-year period immediately following the cessation of Employee's employment with the Company for any reason.

5. <u>Non-Solicitation of Employees.</u> Subject to the provisions of Paragraph 6, below, Employee agrees that during the Restricted Period, Employee shall not seek to influence or induce to leave the Company's employment or service, any person (a) who was employed or otherwise engaged by the Company at any time during the twelve (12) months ending on Employee's last day of employment with the Company and (b) with whom Employee had Material Contact during such period. For purposes of this Paragraph 5, "Material Contact" means: (i) Employee supervised such person or was otherwise in such person's chain of command; (ii) Employee regularly worked with the person on behalf of the Employer; or (iii) Employee received Confidential Information in the ordinary course of business about the person.

3

6.      <u>Limitations on Non-Solicitation Obligations.</u>  Notwithstanding the foregoing, if Employee's annualized earnings from the Company do not exceed $116,593.18,[1] then: (1) the obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that apply during Employee's employment with the Company shall only be applicable to Employee to the extent they are consistent and coextensive with Employee's common law duties (including the duty of loyalty), statutory duties, and duty to avoid conflicts of interest and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; (2) the obligations and restrictions set forth in Paragraph 4 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any customer of the Company to cease or reduce the extent to which it is doing business with the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; and (3) the obligations and restrictions set forth in Paragraph 5 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any employee of the Company to leave the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets.   In addition, even if Employee makes more than $116,593.18 per year in earnings from the Company, the post-employment obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that are in addition to those described in this Paragraph 6 shall not apply to Employee following Employee's separation from the Company if Employee is terminated by the Company as the result of a layoff, unless the Company, at its sole option, elects to pay Employee compensation equivalent to Employee's base salary at the time of termination for the post-employment restricted period, less any compensation earned by Employee through subsequent employment during that period.

7.      <u>Enforcement.</u>  Employee acknowledges and agrees that to the extent any form of legal action is required to enforce any of Paragraphs 2 through 5 above, the Company shall be entitled to recover its reasonable costs and attorney's fees to the extent the Company is the prevailing party.  The Company will be considered the "prevailing party" if the Company obtains any form of partial or complete injunctive relief, whether temporary, preliminary, or otherwise. The parties understand and agree that nothing in the Agreement is intended to or shall operate to alter, denigrate, or deny Employee the rights and remedies set forth in RCW 49.62.080. If any part of this Agreement is held void or unenforceable, every other term of this Agreement shall remain valid and fully enforceable.  If any court refuses to enforce any part of this Agreement as written,

---

[1] The term "earnings" as used in this Paragraph 6 means the compensation reflected on box one of Employee's United States internal revenue service form W-2 that is paid to Employee over the prior year, or portion thereof for which Employee was employed, annualized and calculated as of the earlier of the date enforcement of the provisions in this Agreement are sought or the date of Employee's separation from employment with the Company. The $116,593.18 figure referenced in this Paragraph 6 is current through December 31, 2023, but is deemed to be automatically adjusted for inflation on an annual basis in accord with the adjustments specified in RCW 49.62.040 (or any successor statute).

4

the court shall, if permitted by applicable law, modify that part to the minimum extent necessary to make it enforceable under applicable law and shall enforce it as so modified.

8.    Authorized Disclosures.   Under the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against the Company for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Nothing contained in this Agreement prohibits or prevents Employee from filing a charge with or participating, testifying, or assisting in any investigation, hearing, whistleblowing proceeding or other proceeding before any federal, state, or local government agency, e.g. the EEOC, NLRB, SEC, etc., or in any legislative or judicial proceeding nor does anything in this Agreement preclude, prohibit or otherwise limit, in any way, Employee's rights and abilities to contact, communicate with or report unlawful conduct to federal, state, or local officials for investigation or participate in any whistleblower program administered by any such agencies.  The Company further acknowledges Employee's rights to make truthful statements or disclosures required by law, regulation, or legal process and to request or receive confidential legal advice, and nothing in this Agreement shall be deemed to impair those rights.  The Company also acknowledges Employee's rights to make truthful statements or disclosures about unlawful employment practices which are defined to mean any form of unlawful discrimination, harassment, or retaliation that is actionable under Title VII of the Civil Rights Act of 1964 or any comparable state statue or any other related federal or state rule or law that is enforced by the Equal Employment Opportunity Commission or a comparable state agency.  For the sake of clarity, nothing in the Agreement is intended to or shall prevent Employee from disclosing information that Employee has a right to disclose under applicable law, including but not limited to, Employee discussing or disclosing: (i) Employee's own compensation information with other employees, or with third parties who are not future employers or competitors of the Company; and (ii) information relating to conduct that Employee reasonably believes to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.  This Agreement shall not be construed to limit Employee's rights under the National Labor Relations Act including, but not limited to, the right to engage in protected concerted activity, including discussing terms and conditions of employment with coworkers, and attempting to improve terms and conditions of employment through channels outside the immediate employee-employer relationship, such as through the National Labor Relations Board.

9.    Entire Agreement.   This Agreement constitutes the entire Agreement and understanding between the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof.  No other agreement or amendment to this Agreement shall be binding upon either party including, without limitation, any agreement or amendment made hereafter unless in writing, signed by both parties.

10.    Successors and Assigns.  This Agreement may be freely assigned by the Company and is fully enforceable by any successor in interest to the Company.  Employee hereby gives

5

Employee's consent to any such assignment. Employee shall not assign any of Employee's rights, powers, duties, or obligations hereunder.

11.  <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state in which Employee worked for the Company at the time Employee signs this Agreement without regard to its conflict of laws provision.  In the event Employee is deemed to be a Washington-based employee for purposes of this Agreement, then this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Washington.

12.  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which when executed and delivered shall be deemed an original and all of which, taken together, shall constitute the same agreement. This Agreement and any document or schedule required hereby may be executed by facsimile signature, electronic signature or PDF format, which shall be considered legally binding for all purposes.

13.  <u>Notifications To Third Parties</u>.  Employee agrees that during my employment with the Company and for a period of twelve (12) months after the cessation of Employee's engagement with the Company, Employee will provide a copy of this Agreement to any person or entity with which Employee seeks employment or engagement prior to the commencement of any such employment or engagement, and agrees that the Company may notify any such person or entity of this Agreement.

14.  <u>Disclosure of Existing Obligations</u>.  Except as Employee has disclosed in writing at the end of this Agreement, Employee is not bound by any agreement or obligation that directly or indirectly: (i) restricts Employee from using or disclosing any confidential information of any person or entity in the course of Employee's employment with the Company; (ii) restricts Employee from competing with, or soliciting actual or potential customers or business from, any person or entity; (iii) restricts Employee from soliciting any current or former employees of any person or entity; or (iv) limits Employee's ability to perform any assigned duties for the Company. Employee represents that Employee does not possess any confidential information or trade secrets of any entity other than the Company, including any prior employers of Employee.  Employee acknowledges and agrees that Employee can perform Employee's job duties on behalf of the Company without using or relying upon any confidential information or trade secrets of any other entity, including any prior employer, and the Company hereby instructs Employee not to use or rely upon any such confidential information or trade secrets.

15.  <u>Knowing and Voluntary</u>.  Employee acknowledges that Employee has read, understood, and accepts the provisions of this Agreement.  The Company is hereby advising Employee, in writing, to consult with an attorney before signing this Agreement.  Employee is further advised that Employee has thirty (30) calendar days to review this Agreement before signing it.

6

EMPLOYEE

*Juan Diaz Cuenca*

Print: Juan Diaz Cuenca

Date: Aug 14, 2023

THE COMPANY

Print: Alejandro Mata

Title: Chief Human Resources Officer

Date: July 19, 2023

Unofficial Copy Office of Marilyn Burgess District Clerk

7

## DISCLOSURES

Unofficial Copy Office of Marilyn Burgess District Clerk

8

# EXHIBIT E

Unofficial Copy Office of Marilyn Burgess District Clerk

# OWEN | VANDERBRUG

*james@owenvanderbrug.com*
*vanessa@owenvanderbrug.com*

April 2, 2024

***Via Electronic Mail***
Juan Diaz Cuenca
Juanpablo.diazcuenca@gmail.com


RE:     *Notice to Cease and Desist*

Dear Mr. Diaz Cuenca:

      This letter serves as a formal demand for you to immediately cease and desist from the use and disclosure of confidential and proprietary information belonging to Alexandra Lozano Immigration Law, PLLC (ALIL). It has come to our attention that you have engaged in actions that violate the Uniform Trade Secrets Act (RCW 19.108 *et. seq.*) and the terms of the Restrictive Covenant Agreement ("Agreement") you signed on August 14, 2023, specifically regarding the protection of ALIL's trade secrets and confidential information. A copy of the Agreement is enclosed, for your reference.

      During your employment with ALIL, you had access to valuable and sensitive information that is considered a trade secret and proprietary to ALIL. This information includes, but is not limited to, business strategies, our unique business model, marketing methodology and client lists. The unauthorized use or disclosure of such information constitutes a breach of Washington law and your contractual obligations.

      We have evidence that suggests you have used proprietary information to start a competing business and shared proprietary information with competitors. Such actions have caused or have the potential to cause significant harm to ALIL's competitive position and financial well-being.

      You must immediately:

(1) Cease all use and disclosure of ALIL's trade secrets and confidential information.

(2) Return all documents, electronic files, and other materials containing ALIL's proprietary information.

SEATTLE
1700 SEVENTH AVENUE, SUITE 2100
SEATTLE, WASHINGTON  98101
P: (206) 467-1400   F: (206) 467-4884

SPOKANE
421 WEST RIVERSIDE AVENUE, STE. 416
SPOKANE, WASHINGTON  99201
P: (509) 863-9771   F: (206) 467-4884

www.owenvanderbrug.com

**OWEN | VANDERBRUG**

April 2, 2024
Page 2 of 2

Provide a written assurance within five days of receipt of this letter that you have complied with these demands and will refrain from any further unauthorized use or disclosure of ALIL's trade secrets and confidential information.

Please be advised that ALIL is prepared to take all necessary legal actions to protect its interests, including filing a lawsuit for injunctive relief and damages without further notice if you fail to comply with the demands outlined in this letter.

We expect your immediate attention to this matter. Please contact the undersigned to discuss your compliance with these demands.

Very truly yours,

*Vanessa Vanderbrug*

Vanessa M. Vanderbrug

cc:  Alexandra Lozano
     Katie Nentwick

Unofficial Copy Office of Marilyn Burgess District Clerk

SEATTLE
1700 SEVENTH AVENUE, SUITE 2100
SEATTLE, WASHINGTON  98101
P: (206) 467-1400   F: (206) 467-4884

SPOKANE
421 WEST RIVERSIDE AVENUE, STE. 416
SPOKANE, WASHINGTON  99201
P: (509) 863-9771   F: (206) 467-4884

www.owenvanderbrug.com

## RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement (the "Agreement"), is made and entered into this 14 day of 08 , 2023, by and between Juan Diaz Cuenca ("Employee") and Alexandra Lozano Immigration Law, PLLC (the "Company").

1.    Consideration. As to only those individuals currently employed by the Company when they sign this Agreement, in consideration for such current employee's acceptance of this Agreement, the Company will provide all such current employees who sign this Agreement with an additional amount of paid time off days beyond what current employees are entitled by applicable Company policy to take. Specifically, each current employee who signs their acceptance to both this Agreement and the Mutual Dispute Resolution Agreement contemporaneously provided to employees along with this Agreement, will be provided four (4) days (or, if employed by the Company on a part-time basis, a pro-rata number of days based on their regular schedule as compared to a full-time employee) of paid time off to be taken during the final week of the 2023 calendar year (between the Christmas holiday and up to and including New Year's Eve). If, however, a current employee signs only this Agreement and not the Mutual Dispute Resolution Agreement (or vice versa), the employee will only receive two (2) days of paid time off (or pro-rata share for part-time employees) to be taken during the final week of the 2023 calendar year. If the current employee signs neither this Agreement nor the Mutual Dispute Resolution Agreement, no additional paid time off days will be provided.

2.    Confidential Information.

a.    "Confidential Information" means information that: (i) is disclosed to Employee or of which the Employee becomes aware as a consequence of or through Employee's employment with the Company, (ii) is not generally known outside of the Company, (iii) has value to the Company, (iv) relates to the business of the Company, and (v) could be damaging to the Company's business if disclosed to or used by others.  Such information may include, but is not limited to, data and information with regard to business plans, trade secrets, finances, records, personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods, know-how, sales methodologies, training methodologies, sales channels, product development plans and/or pricing (collectively, "Confidential Information").  The Company agrees to provide Employee with access to such Confidential Information as is necessary to perform Employee's duties for the Company.

Confidential Information does not include information in the public domain or information that is generally known and used within the industry or industries in which the Company engages in business (unless such information entered the public domain and/or became known within the industry through any improper, unauthorized and/or inadvertent disclosure).  Confidential Information also does not include information protected from disclosure by the National Labor Relations Act (or other federal or state law) and, for example, does not include information about the terms and conditions of non-management employees' employment at the Company that comes to Employee's attention in the normal course of Employee's employment, but Confidential Information does include information in the Company's non-public records and files.

b.      Subject to the provisions of Paragraph 8, below, Employee acknowledges and agrees that all Confidential Information is proprietary to the Company and is a valuable, special and unique asset of the Company, and that any disclosure or unauthorized use of Confidential Information will cause irreparable harm and loss to the Company.  Employee understands and acknowledges that each and every component of the Confidential Information (i) has been developed by the Company at significant effort and expense and is sufficiently secret to derive economic value from not being generally known to other parties, and (ii) constitutes a protectible business interest of the Company.

c.      Employee acknowledges and agrees that the Company owns the Confidential Information.  Employee agrees not to dispute or deny any such ownership rights at any time.

d.      Subject to the provisions of Paragraph 8, below, throughout Employee's employment with the Company: (i) Employee will hold all Confidential Information in the strictest confidence, take all reasonable precautions to prevent its inadvertent disclosure to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (ii) Employee will not, directly or indirectly, utilize, disclose or make available to any other person or entity, any of the Confidential Information, other than in the proper performance of Employee's duties during Employee's employment with the Company; and (iii) Employee will not use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.

e.      Subject to the provisions of Paragraph 8, below, during the two-year period immediately following the end of Employee's employment with the Company, Employee will not, anywhere in the United States, directly or indirectly (i) utilize, disclose, or make available to any other person or entity, any of the Company's Confidential Information; or (ii) use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.  Employee understands and agrees that the time and territory limits on this restriction do not apply to trade secrets (discussed below), which are protected by law.

f.      Employee acknowledges that some of Company's Confidential Information may also qualify as trade secrets as defined by governing state law. Employee acknowledges and agrees that nothing in this Agreement diminishes or reduces Employee's obligations under trade secret law to continue to protect the Company's trade secrets after the end of Employee's employment, and to not use or disclose such trade secrets for as long as they remain protected by law.

3.      <u>Return of Company Property</u>.  At the request of the Company or upon cessation of Employee's employment with the Company for any reason, Employee will immediately deliver to the Company all property of the Company that is then in Employee's possession, custody or control, including, without limitation, all keys, access cards, cellular or smart phones, computer hardware (including but not limited to any hard drives, diskettes, laptop computers and personal data assistants and the contents thereof, as well as any passwords or codes needed to operate any such hardware), computer software and programs, data, materials, papers, books, files, documents, records, policies, client and customer information and lists, rolodexes, financial data, marketing information, design information, specifications and plans, database information and lists, mailing lists, notes, and any other property or information relating to the Company.

2

4.     Non-Solicitation of Customers.

a.     Subject to the provisions of Section 6, below, during the Restricted Period, other than in the proper performance of Employee's duties while employed by the Company, Employee shall not, directly or in concert with others (whether as owner, officer, partner, principal, joint venturer, shareholder, director, member, manager, investor, agent, employee, or otherwise) sell, promote or provide, or attempt to sell, promote or provide, any Competitive Products and Services to any Restricted Customer.

b.     Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth in Paragraph 4 are reasonable and necessary in order for Company to protect its Confidential Information and trade secrets and are fair in that they do not prohibit Employee from continuing to be employed in Employee's chosen field of work.

c.     For purposes of this Agreement, the following definitions apply:

(i)     "Competitive Products and Services" shall mean products or services that serve one or more of the same functions as, or could be used to replace, in whole or in part, products or services which the Company offered to customers at the time Employee's work with the Company ended or which the Company was actively preparing to sell or provide during such time.

(ii)     "Material Contact" means: (1) Employee sold products or services to the customer or client; (2) Employee personally provided services to the customer or client; (3) Employee supervised those who sold products or provided services to the customer or client and had business-related discussions with the customer or client on behalf of the Company; or (4) Employee received Confidential Information in the ordinary course of business about the customer or client.

(iii)     "Restricted Customer" means any person or entity (1) which was a customer or client of the Company during the one-year period ending on Employee's last day of employment and (2) with which Employee had Material Contact during such period.

(iv)     "Restricted Period" means during Employee's employment and for the one-year period immediately following the cessation of Employee's employment with the Company for any reason.

5.     Non-Solicitation of Employees.  Subject to the provisions of Paragraph 6, below, Employee agrees that during the Restricted Period, Employee shall not seek to influence or induce to leave the Company's employment or service, any person (a) who was employed or otherwise engaged by the Company at any time during the twelve (12) months ending on Employee's last day of employment with the Company and (b) with whom Employee had Material Contact during such period. For purposes of this Paragraph 5, "Material Contact" means: (i) Employee supervised such person or was otherwise in such person's chain of command; (ii) Employee regularly worked with the person on behalf of the Employer; or (iii) Employee received Confidential Information in the ordinary course of business about the person.

3

6.     Limitations on Non-Solicitation Obligations. Notwithstanding the foregoing, if Employee's annualized earnings from the Company do not exceed $116,593.18,[1] then: (1) the obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that apply during Employee's employment with the Company shall only be applicable to Employee to the extent they are consistent and coextensive with Employee's common law duties (including the duty of loyalty), statutory duties, and duty to avoid conflicts of interest and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; (2) the obligations and restrictions set forth in Paragraph 4 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any customer of the Company to cease or reduce the extent to which it is doing business with the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets and (3) the obligations and restrictions set forth in Paragraph 5 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any employee of the Company to leave the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets.   In addition, even if Employee makes more than $116,593.18 per year in earnings from the Company, the post-employment obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that are in addition to those described in this Paragraph 6 shall not apply to Employee following Employee's separation from the Company if Employee is terminated by the Company as the result of a layoff, unless the Company, at its sole option, elects to pay Employee compensation equivalent to Employee's base salary at the time of termination for the post-employment restricted period, less any compensation earned by Employee through subsequent employment during that period.

7.     Enforcement. Employee acknowledges and agrees that to the extent any form of legal action is required to enforce any of Paragraphs 2 through 5 above, the Company shall be entitled to recover its reasonable costs and attorney's fees to the extent the Company is the prevailing party. The Company will be considered the "prevailing party" if the Company obtains any form of partial or complete injunctive relief, whether temporary, preliminary, or otherwise. The parties understand and agree that nothing in the Agreement is intended to or shall operate to alter, denigrate, or deny Employee the rights and remedies set forth in RCW 49.62.080. If any part of this Agreement is held void or unenforceable, every other term of this Agreement shall remain valid and fully enforceable. If any court refuses to enforce any part of this Agreement as written,

---

[1] The term "earnings" as used in this Paragraph 6 means the compensation reflected on box one of Employee's United States internal revenue service form W-2 that is paid to Employee over the prior year, or portion thereof for which Employee was employed, annualized and calculated as of the earlier of the date enforcement of the provisions in this Agreement are sought or the date of Employee's separation from employment with the Company. The $116,593.18 figure referenced in this Paragraph 6 is current through December 31, 2023, but is deemed to be automatically adjusted for inflation on an annual basis in accord with the adjustments specified in RCW 49.62.040 (or any successor statute).

the court shall, if permitted by applicable law, modify that part to the minimum extent necessary to make it enforceable under applicable law and shall enforce it as so modified.

       8.    <u>Authorized Disclosures</u>.  Under the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against the Company for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nothing contained in this Agreement prohibits or prevents Employee from filing a charge with or participating, testifying, or assisting in any investigation, hearing, whistleblowing proceeding or other proceeding before any federal, state, or local government agency, *e.g.* the EEOC, NLRB, SEC, etc., or in any legislative or judicial proceeding nor does anything in this Agreement preclude, prohibit or otherwise limit, in any way, Employee's rights and abilities to contact, communicate with or report unlawful conduct to federal, state, or local officials for investigation or participate in any whistleblower program administered by any such agencies. The Company further acknowledges Employee's rights to make truthful statements or disclosures required by law, regulation, or legal process and to request or receive confidential legal advice, and nothing in this Agreement shall be deemed to impair those rights. The Company also acknowledges Employee's rights to make truthful statements or disclosures about unlawful employment practices which are defined to mean any form of unlawful discrimination, harassment, or retaliation that is actionable under Title VII of the Civil Rights Act of 1964 or any comparable state statue or any other related federal or state rule or law that is enforced by the Equal Employment Opportunity Commission or a comparable state agency. For the sake of clarity, nothing in the Agreement is intended to or shall prevent Employee from disclosing information that Employee has a right to disclose under applicable law, including but not limited to, Employee discussing or disclosing: (i) Employee's own compensation information with other employees, or with third parties who are not future employers or competitors of the Company; and (ii) information relating to conduct that Employee reasonably believes to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy. This Agreement shall not be construed to limit Employee's rights under the National Labor Relations Act including, but not limited to, the right to engage in protected concerted activity, including discussing terms and conditions of employment with coworkers, and attempting to improve terms and conditions of employment through channels outside the immediate employee-employer relationship, such as through the National Labor Relations Board.

       9.    <u>Entire Agreement</u>.  This Agreement constitutes the entire Agreement and understanding between the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof. No other agreement or amendment to this Agreement shall be binding upon either party including, without limitation, any agreement or amendment made hereafter unless in writing, signed by both parties.

       10.    <u>Successors and Assigns</u>.  This Agreement may be freely assigned by the Company and is fully enforceable by any successor in interest to the Company. Employee hereby gives

5

Employee's consent to any such assignment.  Employee shall not assign any of Employee's rights, powers, duties, or obligations hereunder.

11.   <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state in which Employee worked for the Company at the time Employee signs this Agreement without regard to its conflict of laws provision.  In the event Employee is deemed to be a Washington-based employee for purposes of this Agreement, then this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Washington.

12.   <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which when executed and delivered shall be deemed an original and all of which, taken together, shall constitute the same agreement.  This Agreement and any document or schedule required hereby may be executed by facsimile signature, electronic signature or PDF format, which shall be considered legally binding for all purposes.

13.   <u>Notifications To Third Parties</u>.  Employee agrees that during my employment with the Company and for a period of twelve (12) months after the cessation of Employee's engagement with the Company, Employee will provide a copy of this Agreement to any person or entity with which Employee seeks employment or engagement prior to the commencement of any such employment or engagement, and agrees that the Company may notify any such person or entity of this Agreement.

14.   <u>Disclosure of Existing Obligations</u>.  Except as Employee has disclosed in writing at the end of this Agreement, Employee is not bound by any agreement or obligation that directly or indirectly: (i) restricts Employee from using or disclosing any confidential information of any person or entity in the course of Employee's employment with the Company; (ii) restricts Employee from competing with, or soliciting actual or potential customers or business from, any person or entity; (iii) restricts Employee from soliciting any current or former employees of any person or entity; or (iv) limits Employee's ability to perform any assigned duties for the Company.  Employee represents that Employee does not possess any confidential information or trade secrets of any entity other than the Company, including any prior employers of Employee.  Employee acknowledges and agrees that Employee can perform Employee's job duties on behalf of the Company without using or relying upon any confidential information or trade secrets of any other entity, including any prior employer, and the Company hereby instructs Employee not to use or rely upon any such confidential information or trade secrets.

15.   <u>Knowing and Voluntary</u>.  Employee acknowledges that Employee has read, understood, and accepts the provisions of this Agreement.  The Company is hereby advising Employee, in writing, to consult with an attorney before signing this Agreement.  Employee is further advised that Employee has thirty (30) calendar days to review this Agreement before signing it.

6

EMPLOYEE

*Juan Diaz Cuenca*

Print: Juan Diaz Cuenca

Date: Aug 14, 2023

THE COMPANY

Print: Alejandro Mata

Title: Chief Human Resources Officer

Date: July 19, 2023

Unofficial Copy Office of Marilyn Burgess District Clerk

7

DISCLOSURES

# EXHIBIT F



# ORGAN LAW LLP

### ATTORNEYS AT LAW
### 1330 DUBLIN ROAD
### COLUMBUS, OH 43215
### 614.481.0900

kfraser@organlegal.com
614.869.3221 (direct dial)

April 5, 2024

<u>Via Overnight Mail</u>
Christine Meneses, Esq.
Menses Law
2900 North Loop West, Ste. 300
Houston, Texas 77092

Re:  Notice to Cease and Desist

Dear Ms. Meneses,

We are writing on behalf of Ms. Alexandra Lozano, Esq., owner and founder of Alexandra Lozano Immigration Law, PLLC (together with its subsidiaries, affiliates and related entities hereinafter referred to as "ALIL").  It has come to our attention that you have hired former employees of ALIL, including, but not limited to Juan Pablo Diaz, Catalina Rodriguez, Nelson Polo, Juan David Arciniegas Parra, Sonia Peñarete, and others, who are all subject to restrictive covenants.  Further, we have evidence that suggests that you and these former employees are using ALIL's confidential and proprietary information in violation of federal and state laws, as well as the employees' restrictive covenants.  A copy of one such restrictive covenant is attached for your reference.

Accordingly, we demand that you immediately take the following actions:

(1) Terminate the employment of the former ALIL employees given the clearly imminent threat their continued employment presents to the protection of ALIL's trade secrets and proprietary information;

(2) Cease all recruiting activity aimed at ALIL employees both domestically and abroad, including cancelling the hiring event scheduled for April 10, 2024 at the Hotel Dann Carlton in Bogotà, Colombia;

(3) Cease all use of ALIL's confidential and proprietary information, including but not limited to employee lists, client lists, proprietary software and data management, and business growth strategies;

(4) Destroy all documents, electronic files and other materials that contain ALIL's proprietary information.

Please provide written confirmation that these actions have been taken no later than April 12, 2024. If you continue to interfere with ALIL's restrictive covenants and use ALIL's confidential and proprietary information, ALIL is prepared to take all necessary legal actions to protect its interests, including seeking injunctive relief and damages in court.

To that end, you are under a legal obligation to preserve all materials that may be relevant to this potential legal action. The relevant time frame is 2023 to the present. With this litigation hold notice, we ask that you and Meneses Law take affirmative steps to preserve all documents, data, and/or information in your possession, custody or control related to:

(1) The hiring of former ALIL employees[1];

(2) Employee recruiting strategies;

(3) Business growth strategies, both in the United States and abroad;

(4) Contact with vendors related to those growth strategies;

(5) Data management;

(6) Client lists;

(7) All documents and communications that refer to or are related to Alexandra Lozano, and ALIL, and all of its subsidiaries, affiliates and related entities both in the United States and abroad.

This litigation hold notice includes:

- All communications by any means, including email, regular mail, or any other courier service, and text message on both business and personal devices and accounts;
- Messaging apps, like WhatsApp, including WhatsApp group messages, Facebook Messenger, Slack, Microsoft Teams and Signal—with any ephemeral messaging app's settings being changed so that messages are not automatically deleted;
- All cloud accounts (i.e. iCloud, Google Cloud, etc.), ensuring sufficient backup storage exists for all relevant documents and communications;
- Text files;
- Files on shared servers;
- Databases;

---

[1] A non-exclusive list of names includes: Nelson Polo, Sonia Peñarete, Juan Pablo Diaz, Catalina Rodriguez, Melissa Toscano, Maria Monica Grillo, Diana Cantor, Jesus David Carmona Florez, Juan David Arciniegas Parra, Julian Alejandro Ríos Ramos, Gabriel Nieto, Valeria Candamil Buriticá, Daniel Ferreira, Juan Diego Zuluaga, Camilo Andres Del Castillo Puentes, Danna Méndez Páez, Ines Carmona, Gabriel Eduardo Buitrago Cueto, Juliana Botia, Valentina Rangel, Juan Martin Garcia, David Felipe Camarco, and Sofia Ramirez.

- Calendar entries;
- Computer system activity logs;
- Internet usage files;
- Backup tapes;
- Internal network applications.

Other potentially relevant files or data include:

- Files stored on hard drives
- Laptops
- iPads, Notebooks, etc.
- Home computers
- Handheld devices
- Diskettes
- CD's
- DVD's
- Smartphones
- "Thumb drives"
- Voice-mail
- Videotape.

Thank you for your prompt attention to this matter, and if you have any questions, please feel free to contact the undersigned.

Respectfully,

Kirsten K. Fraser

cc:    Alexandra Lozano, Esq.
       Katie Nentwick

## RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement (the "Agreement"), is made and entered into this 14 day of 08 , 2023, by and between Juan Diaz Cuenca ("Employee") and Alexandra Lozano Immigration Law, PLLC (the "Company").

1.     Consideration. As to only those individuals currently employed by the Company when they sign this Agreement, in consideration for such current employee's acceptance of this Agreement, the Company will provide all such current employees who sign this Agreement with an additional amount of paid time off days beyond what current employees are entitled by applicable Company policy to take. Specifically, each current employee who signs their acceptance to both this Agreement and the Mutual Dispute Resolution Agreement contemporaneously provided to employees along with this Agreement, will be provided four (4) days (or, if employed by the Company on a part-time basis, a pro-rata number of days based on their regular schedule as compared to a full-time employee) of paid time off to be taken during the final week of the 2023 calendar year (between the Christmas holiday and up to and including New Year's Eve). If, however, a current employee signs only this Agreement and not the Mutual Dispute Resolution Agreement (or vice versa), the employee will only receive two (2) days of paid time off (or pro-rata share for part-time employees) to be taken during the final week of the 2023 calendar year. If the current employee signs neither this Agreement nor the Mutual Dispute Resolution Agreement, no additional paid time off days will be provided.

2.     Confidential Information.

a.     "Confidential Information" means information that: (i) is disclosed to Employee or of which the Employee becomes aware as a consequence of or through Employee's employment with the Company, (ii) is not generally known outside of the Company, (iii) has value to the Company, (iv) relates to the business of the Company, and (v) could be damaging to the Company's business if disclosed to or used by others. Such information may include, but is not limited to, data and information with regard to business plans, trade secrets, finances, records, personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods, know-how, sales methodologies, training methodologies, sales channels, product development plans and/or pricing (collectively, "Confidential Information"). The Company agrees to provide Employee with access to such Confidential Information as is necessary to perform Employee's duties for the Company.

Confidential Information does not include information in the public domain or information that is generally known and used within the industry or industries in which the Company engages in business (unless such information entered the public domain and/or became known within the industry through any improper, unauthorized and/or inadvertent disclosure). Confidential Information also does not include information protected from disclosure by the National Labor Relations Act (or other federal or state law) and, for example, does not include information about the terms and conditions of non-management employees' employment at the Company that comes to Employee's attention in the normal course of Employee's employment, but Confidential Information does include information in the Company's non-public records and files.

1

b.      Subject to the provisions of Paragraph 8, below, Employee acknowledges and agrees that all Confidential Information is proprietary to the Company and is a valuable, special and unique asset of the Company, and that any disclosure or unauthorized use of Confidential Information will cause irreparable harm and loss to the Company.  Employee understands and acknowledges that each and every component of the Confidential Information (i) has been developed by the Company at significant effort and expense and is sufficiently secret to derive economic value from not being generally known to other parties, and (ii) constitutes a protectible business interest of the Company.

c.      Employee acknowledges and agrees that the Company owns the Confidential Information.  Employee agrees not to dispute or deny any such ownership rights at any time.

d.      Subject to the provisions of Paragraph 8, below, throughout Employee's employment with the Company: (i) Employee will hold all Confidential Information in the strictest confidence, take all reasonable precautions to prevent its inadvertent disclosure to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (ii) Employee will not, directly or indirectly, utilize, disclose or make available to any other person or entity, any of the Confidential Information, other than in the proper performance of Employee's duties during Employee's employment with the Company; and (iii) Employee will not use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.

e.      Subject to the provisions of Paragraph 8, below, during the two-year period immediately following the end of Employee's employment with the Company, Employee will not, anywhere in the United States, directly or indirectly (i) utilize, disclose, or make available to any other person or entity, any of the Company's Confidential Information; or (ii) use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.  Employee understands and agrees that the time and territory limits on this restriction do not apply to trade secrets (discussed below), which are protected by law.

f.      Employee acknowledges that some of Company's Confidential Information may also qualify as trade secrets as defined by governing state law. Employee acknowledges and agrees that nothing in this Agreement diminishes or reduces Employee's obligations under trade secret law to continue to protect the Company's trade secrets after the end of Employee's employment, and to not use or disclose such trade secrets for as long as they remain protected by law.

3.      Return of Company Property.  At the request of the Company or upon cessation of Employee's employment with the Company for any reason, Employee will immediately deliver to the Company all property of the Company that is then in Employee's possession, custody or control, including, without limitation, all keys, access cards, cellular or smart phones, computer hardware (including but not limited to any hard drives, diskettes, laptop computers and personal data assistants and the contents thereof, as well as any passwords or codes needed to operate any such hardware), computer software and programs, data, materials, papers, books, files, documents, records, policies, client and customer information and lists, rolodexes, financial data, marketing information, design information, specifications and plans, database information and lists, mailing lists, notes, and any other property or information relating to the Company.

2

4.   <u>Non-Solicitation of Customers</u>.

a.      Subject to the provisions of Section 6, below, during the Restricted Period, other than in the proper performance of Employee's duties while employed by the Company, Employee shall not, directly or in concert with others (whether as owner, officer, partner, principal, joint venturer, shareholder, director, member, manager, investor, agent, employee, or otherwise) sell, promote or provide, or attempt to sell, promote or provide, any Competitive Products and Services to any Restricted Customer.

b.      Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth in Paragraph 4 are reasonable and necessary in order for Company to protect its Confidential Information and trade secrets and are fair in that they do not prohibit Employee from continuing to be employed in Employee's chosen field of work.

c.      For purposes of this Agreement, the following definitions apply:

(i)      "Competitive Products and Services" shall mean products or services that serve one or more of the same functions as, or could be used to replace, in whole or in part, products or services which the Company offered to customers at the time Employee's work with the Company ended or which the Company was actively preparing to sell or provide during such time.

(ii)      "Material Contact" means: (1) Employee sold products or services to the customer or client; (2) Employee personally provided services to the customer or client; (3) Employee supervised those who sold products or provided services to the customer or client and had business-related discussions with the customer or client on behalf of the Company; or (4) Employee received Confidential Information in the ordinary course of business about the customer or client.

(iii)      "Restricted Customer" means any person or entity (1) which was a customer or client of the Company during the one-year period ending on Employee's last day of employment and (2) with which Employee had Material Contact during such period.

(iv)      "Restricted Period" means during Employee's employment and for the one-year period immediately following the cessation of Employee's employment with the Company for any reason.

5.      <u>Non-Solicitation of Employees</u>.  Subject to the provisions of Paragraph 6, below, Employee agrees that during the Restricted Period, Employee shall not seek to influence or induce to leave the Company's employment or service, any person (a) who was employed or otherwise engaged by the Company at any time during the twelve (12) months ending on Employee's last day of employment with the Company and (b) with whom Employee had Material Contact during such period. For purposes of this Paragraph 5, "Material Contact" means: (i) Employee supervised such person or was otherwise in such person's chain of command; (ii) Employee regularly worked with the person on behalf of the Employer; or (iii) Employee received Confidential Information in the ordinary course of business about the person.

3

6.    <u>Limitations on Non-Solicitation Obligations.</u> Notwithstanding the foregoing, if Employee's annualized earnings from the Company do not exceed $116,593.18,[1] then: (1) the obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that apply during Employee's employment with the Company shall only be applicable to Employee to the extent they are consistent and coextensive with Employee's common law duties (including the duty of loyalty), statutory duties, and duty to avoid conflicts of interest and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; (2) the obligations and restrictions set forth in Paragraph 4 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any customer of the Company to cease or reduce the extent to which it is doing business with the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; and (3) the obligations and restrictions set forth in Paragraph 5 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any employee of the Company to leave the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets.   In addition, even if Employee makes more than $116,593.18 per year in earnings from the Company, the post-employment obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that are in addition to those described in this Paragraph 6 shall not apply to Employee following Employee's separation from the Company if Employee is terminated by the Company as the result of a layoff, unless the Company, at its sole option, elects to pay Employee compensation equivalent to Employee's base salary at the time of termination for the post-employment restricted period, less any compensation earned by Employee through subsequent employment during that period.

7.    <u>Enforcement.</u>  Employee acknowledges and agrees that to the extent any form of legal action is required to enforce any of Paragraphs 2 through 5 above, the Company shall be entitled to recover its reasonable costs and attorney's fees to the extent the Company is the prevailing party.  The Company will be considered the "prevailing party" if the Company obtains any form of partial or complete injunctive relief, whether temporary, preliminary, or otherwise. The parties understand and agree that nothing in the Agreement is intended to or shall operate to alter, denigrate, or deny Employee the rights and remedies set forth in RCW 49.62.080. If any part of this Agreement is held void or unenforceable, every other term of this Agreement shall remain valid and fully enforceable.  If any court refuses to enforce any part of this Agreement as written,



--------------------------------------------------

[1] The term "earnings" as used in this Paragraph 6 means the compensation reflected on box one of Employee's United States internal revenue service form W-2 that is paid to Employee over the prior year, or portion thereof for which Employee was employed, annualized and calculated as of the earlier of the date enforcement of the provisions in this Agreement are sought or the date of Employee's separation from employment with the Company. The $116,593.18 figure referenced in this Paragraph 6 is current through December 31, 2023, but is deemed to be automatically adjusted for inflation on an annual basis in accord with the adjustments specified in RCW 49.62.040 (or any successor statute).

the court shall, if permitted by applicable law, modify that part to the minimum extent necessary to make it enforceable under applicable law and shall enforce it as so modified.

8.    Authorized Disclosures.    Under the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against the Company for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.    Nothing contained in this Agreement prohibits or prevents Employee from filing a charge with or participating, testifying, or assisting in any investigation, hearing, whistleblowing proceeding or other proceeding before any federal, state, or local government agency, *e.g.* the EEOC, NLRB, SEC, etc., or in any legislative or judicial proceeding nor does anything in this Agreement preclude, prohibit or otherwise limit, in any way, Employee's rights and abilities to contact, communicate with or report unlawful conduct to federal, state, or local officials for investigation or participate in any whistleblower program administered by any such agencies.    The Company further acknowledges Employee's rights to make truthful statements or disclosures required by law, regulation, or legal process and to request or receive confidential legal advice, and nothing in this Agreement shall be deemed to impair those rights.    The Company also acknowledges Employee's rights to make truthful statements or disclosures about unlawful employment practices which are defined to mean any form of unlawful discrimination, harassment, or retaliation that is actionable under Title VII of the Civil Rights Act of 1964 or any comparable state statue or any other related federal or state rule or law that is enforced by the Equal Employment Opportunity Commission or a comparable state agency.    For the sake of clarity, nothing in the Agreement is intended to or shall prevent Employee from disclosing information that Employee has a right to disclose under applicable law, including but not limited to, Employee discussing or disclosing: (i) Employee's own compensation information with other employees, or with third parties who are not future employers or competitors of the Company; and (ii) information relating to conduct that Employee reasonably believes to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.    This Agreement shall not be construed to limit Employee's rights under the National Labor Relations Act including, but not limited to, the right to engage in protected concerted activity, including discussing terms and conditions of employment with coworkers, and attempting to improve terms and conditions of employment through channels outside the immediate employee-employer relationship, such as through the National Labor Relations Board.

9.    Entire Agreement.    This Agreement constitutes the entire Agreement and understanding between the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof.    No other agreement or amendment to this Agreement shall be binding upon either party including, without limitation, any agreement or amendment made hereafter unless in writing, signed by both parties.

10.    Successors and Assigns.    This Agreement may be freely assigned by the Company and is fully enforceable by any successor in interest to the Company.    Employee hereby gives

5

Employee's consent to any such assignment. Employee shall not assign any of Employee's rights, powers, duties, or obligations hereunder.

11.     Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the state in which Employee worked for the Company at the time Employee signs this Agreement without regard to its conflict of laws provision. In the event Employee is deemed to be a Washington-based employee for purposes of this Agreement, then this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Washington.

12.     Counterparts. This Agreement may be executed in two or more counterparts, each of which when executed and delivered shall be deemed an original and all of which, taken together, shall constitute the same agreement. This Agreement and any document or schedule required hereby may be executed by facsimile signature, electronic signature or PDF format, which shall be considered legally binding for all purposes.

13.     Notifications To Third Parties. Employee agrees that during my employment with the Company and for a period of twelve (12) months after the cessation of Employee's engagement with the Company, Employee will provide a copy of this Agreement to any person or entity with which Employee seeks employment or engagement prior to the commencement of any such employment or engagement, and agrees that the Company may notify any such person or entity of this Agreement.

14.     Disclosure of Existing Obligations. Except as Employee has disclosed in writing at the end of this Agreement, Employee is not bound by any agreement or obligation that directly or indirectly: (i) restricts Employee from using or disclosing any confidential information of any person or entity in the course of Employee's employment with the Company; (ii) restricts Employee from competing with, or soliciting actual or potential customers or business from, any person or entity; (iii) restricts Employee from soliciting any current or former employees of any person or entity; or (iv) limits Employee's ability to perform any assigned duties for the Company. Employee represents that Employee does not possess any confidential information or trade secrets of any entity other than the Company, including any prior employers of Employee. Employee acknowledges and agrees that Employee can perform Employee's job duties on behalf of the Company without using or relying upon any confidential information or trade secrets of any other entity, including any prior employer, and the Company hereby instructs Employee not to use or rely upon any such confidential information or trade secrets.

15.     Knowing and Voluntary. Employee acknowledges that Employee has read, understood, and accepts the provisions of this Agreement. The Company is hereby advising Employee, in writing, to consult with an attorney before signing this Agreement. Employee is further advised that Employee has thirty (30) calendar days to review this Agreement before signing it.

6

EMPLOYEE

*Juan Diaz Cuenca*

Print: Juan Diaz Cuenca

Date: Aug 14, 2023

THE COMPANY

Print: Alejandro Mata

Title: Chief Human Resources Officer

Date: July 19, 2023

Unofficial Copy Office of Marilyn Burgess District Clerk

7

## DISCLOSURES

8

5/29/2024 3:58:55 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 88228026
By: JACKSON, MONICA J
Filed: 5/29/2024 3:58:55 PM

CAUSE NO. _____

| | | |
|---|---|---|
| ALEXANDRA LOZANO IMMIGRATION LAW, PLLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| JUAN PABLO DIAZ CUENCA | § | HARRIS COUNTY, TEXAS |
| | § | |
| and | § | |
| | § | |
| MENESES LAW, PLLC | § | |
| | § | |
| Defendants. | § | ___ JUDICIAL DISTRICT |

## ORDER GRANTING PLAINTIFF'S TEMPORARY RESTRAINING ORDER

The Court has considered the Verified Original Petition, Application of Temporary Restraining Order, Temporary Injunction, and Permanent Injunction filed by Plaintiff Alexandra Lozano Immigration Law, PLLC ("ALIL") against Defendants Juan Pablo Diaz Cuenca ("Diaz") and Meneses Law, PLLC ("Meneses Law") (collectively "Defendants"). After hearing arguments of counsel and reviewing the pleadings and admitting the evidence attached to the application, the Court finds if it does not issue the temporary restraining order, Plaintiff will be irreparably injured due to Defendants' alleged actions, including the misappropriation of Plaintiff's trade secrets and Confidential Information.

This Court finds that a Temporary Restraining Order against Defendants is necessary because it clearly appears from Plaintiff's Verified Petition and supporting evidence, including declaration testimony that immediate and irreparable harm, injury, loss, or damage will result to Plaintiff.

The Court finds that Plaintiff attempted to notify Defendants of its intent to seek injunctive relief and to resolve the dispute prior to seeking court intervention, but has not received a sufficient response. As a result, it is clear that Plaintiff has Confidential Information (including, *inter alia*,

information regarding ALIL's business plans, trade secrets, finances, records, personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods, know-how, sales methodologies, training methodologies, sales channels, product development plans, and/or pricing) and that such Confidential Information and trade secrets give Plaintiff a competitive advantage in the marketplace.

Defendants are in positions to misappropriate or may have already misappropriated the Confidential Information and/or trade secrets by virtue of defendant Diaz's employment at competitor Meneses and given his current role and responsibilities, and therefore Plaintiff's Confidential Information and trade secrets are imminently threatened.

The Court finds that without this Temporary Restraining Order Plaintiff will suffer irreparable harm to its protected business interests and property rights in its trade secrets, trademark, goodwill, and Confidential Information, for which there is no adequate remedy at law. To preserve the status quo, this Temporary Restraining Order is appropriate.

**It is therefore ORDERED that Defendants, their partners, agents, servants, employees, employers, and attorneys ("Enjoined Parties") who receive actual notice of this Temporary Restraining Order shall be enjoined as follows:**

        a) Enjoined Parties are prohibited from directly or indirectly, using, reviewing, disclosing, publishing, sharing, disseminating, and/or allowing access to, destroying, concealing, deleting, or removing any of ALIL's Confidential Information and/or trade secrets including, but not limited to, data and information with regard to business plans, trade secrets, finances, records, personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods,

know-how, sales methodologies, training methodologies, sales channels, product development plans, and/or pricing;

b) Enjoined Parties are prohibited from destroying any record, document, report, spreadsheet, communication, or other information, whether in written or electronic format, in their respective possession, control, or otherwise accessible to him, that is contains information that could be relevant or discoverable in this lawsuit, including but not limited to any ALIL's Confidential Information, trade secrets, or any other ALIL proprietary or protected information;

c) Enjoined Parties are prohibited from engaging in any acts that would constitute a breach of the Restrictive Covenant Agreement and are prohibited from engaging in any act, omission, communication, or other effort to assist Diaz in any additional or further breach of his Restrictive Covenant Agreement;

d) Enjoined Parties are prohibited from interfering with any business opportunities or relationships of ALIL, including bidding on any current or pending agreements, sales, or transactions between ALIL and its customers, vendors, partners, or clients;

e) Enjoined Parties are prohibited from directly or indirectly hiring, soliciting, recruiting, or otherwise attempting to induce any person who is, or within the preceding twelve (12) months prior to November 17, 2023 was, (i) employed or otherwise engaged by ALIL and (ii) with whom Diaz had Material Contact during such period, meaning Diaz (a) supervised such

3

person or was otherwise in such person's chain of command; (b) regularly worked with the person on behalf of the ALIL; or (c) whom Diaz received Confidential Information in the ordinary course of business about the person.

f) Enjoined Parties are prohibited from otherwise disrupting, damaging, impairing, or interfering with the business of ALIL or from directly or indirectly deriving any economic benefit from the goodwill, business relationships, or reputation of ALIL.

g) Enjoined Parties must immediately cease and desist use of the trademark "Arreglar Sin Salir!" in any capacity and are prohibited from using such trademark or any variation thereof in commerce.

IT IS ORDERED that this Order shall expire at midnight on the fourteenth (14th) day after the Court enters this Order.

IT IS FURTHER ORDERED that Plaintiff and Defendants shall appear before this honorable Court on _____ ___, 2024, at _____o'clock, ___.m., in the courtroom of the above named district court of Harris County, Texas, to then and there show cause, if any, why a temporary injunction should not be issued enjoining Defendants from engaging in the activities described above.

The clerk of this court IS DIRECTED to issue a show cause notice to Defendants to appear at this temporary injunction hearing.

The clerk of the court shall forthwith issue a Temporary Restraining Order in conformity with the law and the terms of this Order.

The Court imposes a bond of _____ pending _____.

4

SIGNED on this _____ day of _____, 2024.

_____
PRESIDING JUDGE

Unofficial Copy Office of Marilyn Burgess District Clerk