IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALEXANDRA LOZANO IMMIGRATION LAW, PLLC, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. 4:24-cv-2190 |
| JUAN PABLO DIAZ CUENCA | § § | |
| and | § § | |
| MENESES LAW, PLLC | § § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65, Alexandra Lozano Immigration Law, PLLC ("ALIL") respectfully moves the Court for a preliminary injunction against Juan Pablo Diaz Cuenca ("Diaz") and Meneses Law, PLLC ("Meneses Law") (collectively, "Defendants") to: (1) preserve the status quo; (2) enjoin Defendants from using or disclosing any of ALIL's Confidential Information and/or trade secrets as defined in the Restrictive Covenant Agreement, dated August 14, 2023, between ALIL and Diaz, attached to the Complaint as Ex. D (Dkt. 1-4) (the "Restrictive Covenant Agreement"); (3) enjoin Defendants from destroying any relevant records in their respective possession, including but not limited to ALIL's Confidential Information, trade secrets, or any other ALIL proprietary or protected information as defined in the Restrictive Covenant Agreement; (4) enjoin Defendants from engaging in any acts that would constitute or induce a breach of the Restrictive Covenant Agreement; (5) enjoin Defendants from knowingly interfering with any business opportunities or relationships of ALIL, including bidding on any current or pending agreements, sales, or transactions between ALIL and its customers, vendors, partners, or clients; (6) enjoin Defendants from soliciting current and former ALIL employees in accordance

with the Restrictive Covenant Agreement; (7) enjoin Defendants from otherwise knowingly disrupting, damaging, impairing, or interfering with the business of ALIL or from directly or indirectly deriving any economic benefit from the goodwill, business relationships, or reputation of ALIL; and, (8) enjoin Defendants from using ALIL's federally registered trademark "ARREGLAR SIN SALIR!" or any variation in commerce.

A preliminary injunction is necessary to stop the irreparable harm that ALIL is suffering, and will suffer, as a result of Defendants' misappropriation of trade secrets and other tortious conduct. The basis and support for ALIL's Motion for Preliminary Injunction is set forth in detail in the attached Memorandum in Support. For the reasons set forth therein, ALIL respectfully requests the Court enter a preliminary injunction.

Date: July 26, 2024,

Respectfully submitted,

 /s/ *Pamela B. Linberg*
Lauren Hope Whiting
Texas Bar No. 24084091
JACKSON LEWIS P.C.
93 Red River St., Ste. 1150
Austin, Texas 78701
512.362.7408 [Telephone]
512.362.5574 [Facsimile]
Lauren.Whiting@jacksonlewis.com

Pamela B. Linberg
Texas Bar No. 00793299
S.D. TX Bar No. 23981
Nathaniel J. Higgins
Texas Bar No. 24087720
S.D. TX Bar No. 3277285
JACKSON LEWIS P.C.
717 Texas Avenue, Suite 1700
Houston, Texas 77022
713.650.0404 [Telephone]
713.650.0405 [Facsimile]

Kirsten R. Fraser (*Pro Hac Vice*)
Organ Law LLP
1330 Dublin Road

Columbus, Ohio 43215
614.481.0900 [Telephone]
614.481.0904 [Facsimile]
kfraser@organlegal.com

*Attorneys for Plaintiff Alexandra Lozano*
*Immigration Law, PLLC*

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ...............................1

SUMMARY OF THE ARGUMENT ..................................................................................2

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING...............................2

   A.  ALIL Is Founded In 2014, Innovating the Practice of Immigration Law. ........................... 2

   B.  ALIL's Proprietary Innovations Have Independent Economic Value. ............................... 4

   C.  ALIL Protects Its Intellectual Property. ............................................................. 5

   D.  Diaz Was a Trusted ALIL Employee With Access to the Highest Level of ALIL's
Intellectual Property, And Absconded With The Same Upon Discharge. .......................... 6

   E.  With Diaz's Help, Meneses Law Unlawfully Competes with ALIL. ................................ 7

   F.  History of This Action and Stage of the Proceedings Before the Court. .......................... 10

LAW AND ARGUMENT ...............................................................................................10

   A.  ALIL Can Establish Likelihood of Success On All Claims in the Complaint. ................... 10

      1.  Defendants Have and Continue to Engage in Unfair Competition By
Misappropriating Trade Secrets and Confidential Information ................................ 10

      2.  Diaz Breached the Restrictive Covenant Agreement................................... 14

      3.  Defendants Have Tortiously Interfered with ALIL's Contracts. ............................. 16

      4.  Meneses Law Has and Continues to Infringe on ALIL's Trademark....................... 17

   B.  ALIL Will Suffer Irreparable Harm Without an Injunction.............................................. 18

   C.  The Balance of Harms Supports Granting the Injunction. ............................................... 19

   D.  An Injunction Serves the Public Interest. ....................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*A Place for Mom v. Perkins*,
    475 F.Supp.3d 1217 (W.D. Wash. 2020)......................................................................14, 15

*AHS Staffing, LLC v. Quest Staffing Grp.*,
    335 F. Supp. 3d 856 (E.D. Texas 2018).....................................................................19, 20

*Am. Rice, Inc. v. Producers Rice Mill, Inc.*,
    518 F.3d 321 (5th Cir. 2008) .......................................................................................17, 18

*Amazon.com, Inc. v. Moyer*,
    417 F. Supp. 3d 1388 (W.D. Wash. 2019)..........................................................................15

*Baylor Scott & White v. Project Rose MSO, LLC*,
    633 S.W.3d 263 (Tex. App. 2021).......................................................................................13

*Blue Bell Creameries, L.P. v. Denali Co., LLC*,
    Case No. H-08-0981, 2008 WL 2965655 (S.D. Texas July 31, 2008) ...................................20

*Chevron U.S.A., Inc. v. Guajardo*,
    Case No. H-17-1549, 2017 WL 2265694 (S.D. Texas May 24, 2017) ...................................19

*City of Dallas v. Delta Air Lines, Inc.*,
    847 F.3d 279 (5th Cir. 2017) ...............................................................................................2

*ClearOne Advantage, LLC v. Kersen*,
    Case No. JKB-23-03446, 2024 WL 69918 (D. Md. Jan. 5, 2024) .........................................12

*Conseco Fin. Serv. Corp. v. N. Am. Mortg. Co.*
    381 F.3d 811 (8th Cir. 2004) ...............................................................................................12

*Daily Instruments Corp. v. Heidt*,
    998 F. Supp. 2d 553 (S.D. Texas 2014)..............................................................................20

*Ed Nowogroski Ins., Inc. v. Rucker*,
    137 Wash. 2d 427, 971 P.2d 936 (1999).............................................................................13

*Emerick v. Cardiac Study Ctr., Inc. P.S.*,
    357 P.3d 696 (Wash Ct. App. 2015).....................................................................................16

*Fla. Med. Ass'n Inc. v. U.S. Dep't of Health, Educ. & Welfare*,
    601 F.2d 199 (5th Cir. 1979) .................................................................................................2

*Glycobiosciences, Inc. v. Woodfield Pharm., LLC*,
    Case No. 4:15-CV-02109, 2016 WL 170674 (S.D. Texas Apr. 27, 2016).............................18

*Inteum Co., LLC v. Nat'l Univ. of Singapore*,
  371 F.Supp.3d 864 (W.D. Wash. 2019)................................................................14

*Johnson Serv. Grp., Inc. v. France*,
  763 F. Supp. 2d 819 (N.D. Texas 2011) ..............................................................19

*Knight, Vale & Gregory v. McDaniel*,
  37 Wash. App. 366, 680 P.2d 448 (1984)............................................................16

*M-I LLC v. Stelly*,
  733 F. Supp. 2d 759 (S.D. Tex. 2010) ...........................................................16, 17

*Robins v. NuVasive, Inc.*,
  Case No. 2:20-CV-292, 2020 WL 7081588 (E.D. Washington Dec. 3, 2020)........15

*Savage Tavern, Inc. v. Signature Stag, LLC*,
  589 F. Supp. 3d 624 (N.D. Tex. 2022) ................................................................17

*EEOC v. Serv. Temps Inc.*,
  679 F.3d 323 (5th Cir. 2012) .................................................................................1

*SPBS, Inc. v. Mobley*,
  Case No. 4:18-CV-00391, 2018 WL 4185522 (E.D. Tex. Aug. 31, 2018) ............10

*Viacom Int'l Inc. v. IJR Cap. Invs., LLC*,
  242 F. Supp. 3d 563 (S.D. Tex. 2017) .................................................................17

*Viacom Int'l v. IJR Cap. Invs., L.L.C.*,
  891 F.3d 178 (5th Cir. 2018) ...............................................................................17

*WWMAP, LLC v. Birth Your Way Midwifery*,
  Case No. 5:23-cv-243, 2024 WL 151411 (N.D. Fl. Jan. 10, 2024) .......................12

**Statutes**

18 U.S.C. § 1839(3) ...............................................................................................11

18 U.S.C. § 1839(5) ...............................................................................................12

18 U.S. C. § 1839(6)(A) ..........................................................................................12

Fed. R. Civ. P. 65 ....................................................................................................1

Tex. Civ. Prac. & Rem. Code § 134.002(2)..............................................................12

Tex. Civ. Prac. & Rem. Code § 134.002(3)(A)(B)....................................................12

Wash. Rev. Code § 49.62.010(4)(a)-(b) ..................................................................14

## INTRODUCTION

Direct evidence shows that Meneses Law is misappropriating ALIL's trade secrets and proprietary confidential information to build an exact replica of ALIL. The key to this scheme is Juan Pablo Diaz Cuenca ("Diaz"), a former high-ranking ALIL employee. After ALIL discharged Diaz for inappropriate conduct with subordinates, Diaz was out for revenge against ALIL. To exact his revenge, Diaz stole ALIL's educational materials, operational reports, job descriptions, and key client files, and promised Meneses Law unfettered access to everything he knew about ALIL in exchange for employment. Meneses Law moved Diaz from Seattle to Houston, put him up in company housing, employed his wife, and mined Diaz for information. Meneses Law executives bragged internally that Diaz was integral to ALIL's success, and that he would do the same for Meneses Law. Meneses Law put this misappropriated information to use in creating its rival back-office in Bogotá, Colombia in replication of ALIL's Bogotá's back-office. Meneses Law also imitates ALIL in its marketing materials. Meneses Law's marketing materials copy the look, design, format, and text of ALIL's materials, down to ALIL founder Alexandra Lozano's ("Lozano") poses in photographs. Even more, Meneses Law uses ALIL's "ARREGLAR SIN SALIR!" federally registered trademark without license. To protect its trade secrets, confidential information, and trademarks, ALIL brings this motion for a preliminary injunction, and respectfully asks that the Court enjoin Defendants from engaging in illegal, unfair competition.

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

The issue is whether Defendants should be preliminarily enjoined. "[T]he question of whether to award injunctive relief is generally within the trial court's discretion." *EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 338 (5th Cir. 2012). In determining whether to grant this Motion, the Court must consider the following factors: (1) whether ALIL has demonstrated a substantial likelihood of success on the merits; (2) whether there is a substantial threat of irreparable injury to

ALIL if the injunction is not issued; (3) whether the threatened injury outweighs any harm that will result if the injunction is granted; and (4) whether the public interest will be served by the injunction. *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). The Court may employ a "sliding scale" approach, issuing the injunction upon a lesser showing of harm when the likelihood of success on the merits is especially high. *See Fla. Med. Ass'n Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n. 2 (5th Cir. 1979).

## <u>SUMMARY OF THE ARGUMENT</u>

ALIL meets the four-part test for a preliminary injunction against the Defendants. There is direct evidence that both Defendants misappropriated ALIL's confidential information and trade secrets, breached and induced breaches of ALIL's Restrictive Covenant Agreement with Diaz, and that Meneses Law infringed on ALIL's federally registered trademark. Thus, ALIL is likely to succeed on the merits of its claims. Second, ALIL readily demonstrates a substantial threat of irreparable harm because the law is clear that the injury that accompanies misappropriation of trade secrets and confidential information typically has no remedy at law. Third, the balance of harms supports the granting of an injunction. Defendants will not be restricted from practicing their trade or in competing in the market—they will simply have to do so without ALIL's intellectual property. Finally, an injunction serves the public interest because it reinforces the application of the law and honoring of contracts and prevents Defendants from using misappropriated property.

## <u>STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING</u>

**A.      ALIL Is Founded In 2014, Innovating the Practice of Immigration Law.**

Lozano founded ALIL in 2014. (Decl. of A. Rios, May 22, 2024, at ¶ 5, hereinafter "Rios Decl.", attached as Ex. A). Immigration is an extremely competitive field of law and, like other businesses, immigration law practitioners are constantly looking for new ways to serve clients and run their firms more efficiently to gain a competitive edge and increase market share. Against that

backdrop, ALIL set itself apart from other immigration law firms as a first-mover in using and interpreting niche provisions of immigration laws to serve its clients. (*Id.*).

ALIL also coined the phrase "arreglar sin salir," which translates to "fix without leaving" to raise awareness among the Spanish-speaking immigrant community of the possibilities of specialty visas. (*Id.* ¶ 6). ALIL began using "ARREGLAR SIN SALIR!" as a trademark in 2016, and the U.S. Patent and Trademark Office approved registration of the mark in April 2023. (*Id.* ¶ 7). The "ARREGLAR SIN SALIR!" mark has obtained a secondary meaning in the marketplace, and Lozano and ALIL are often referred to as the "ARREGLAR SIN SALIR!" attorneys. (*Id.* ¶ 8).

Next, Lozano revolutionized the operational structure of an immigration law firm. (*Id.* ¶¶ 12-13). Unlike the typical immigration law firm set-up where one paralegal manages a case from start to finish, ALIL developed a proprietary business model that divides the firm into different departments that each handle a different aspect of a client's case. (*Id.*). ALIL also began building back offices in Colombia, Mexico, and Argentina. (*Id.* ¶ 13). The back-offices are ALIL's own business process outsourcing ("BPO") units, providing support for case management, data management, and analysis, software development, and other case preparation support. (*Id.* ¶ 14). In Colombia, ALIL operates through subsidiary Quetzal International Services, S.R.L. ("Quetzal")—ALIL's largest back-office employing over 400 individuals in-office. (*Id.* ¶ 13).

The novel structure of the firm allowed ALIL to scale its operations in the U.S. (*Id.* ¶ 15). Beginning in 2022, ALIL developed a confidential growth strategy to open larger regional offices in cities with high-density immigrant populations. (*Id.*). To date, in addition to ALIL's headquarters in Tukwila, Washington, the firm has regional offices across Texas, Illinois, and California. (*Id.*). In 2024, the firm leveraged its innovative and proprietary approach, opening "micro-offices" around the country in smaller cities with high-density immigrant populations. (*Id.*)

ALIL is also innovating through technology, supporting growth and standardizing excellent customer service. (*Id.* ¶ 16). ALIL has invested millions into technology over the past three years and currently employs over 100 full-time developers focused on automated solutions for various components of the immigration process. ALIL has developed proprietary intake software and immigration form completion software, as well as case management tools. (*Id.*).

**B.      ALIL's Proprietary Innovations Have Independent Economic Value.**

The market for competitive and innovative legal strategies in immigration law is significant. Indeed, before ALIL innovated its processes, organizational structure, proprietary software and data management systems into what they are today, Lozano educated other immigration attorneys through her educational entity called Ally Lozano, LLC, earning over $1.7 million from 2019-2021. (*Id.* ¶ 10-11). Christine Meneses, the owner of Meneses Law, was one of such pupil and used Lozano's early methods to turn her firm into a multi-million-dollar enterprise.

After these trainings stopped and ALIL developed its new, proprietary business model, supported by new, proprietary software and data management systems, ALIL's reputation, size, and market share grew exponentially, attracting significant attention from competitors. (*Id.* ¶ 11). Regarding reputation, since 2022, 32% of all new ALIL clients were referred by existing clients; in 2024, that number has jumped to nearly 50%. (*Id.* ¶ 18). Regarding size, in just five years, ALIL has grown from 15 employees to over 750 employees worldwide. (*Id.* ¶ 19). And regarding market share, ALIL's revenue has more than quadrupled in that same time. (*Id.*). This growth stems directly from the proprietary methodologies implemented and developed by ALIL, and it correlates with the changes made to ALIL's processes including outsourcing back-office operations and automating operational solutions. (*Id.*). These proprietary processes and solutions are not generally known to the public or outside of ALIL's offices. (*Id.* ¶ 11).

4

C.      **ALIL Protects Its Intellectual Property.**

ALIL goes to great lengths to protect its proprietary, confidential information and trade secrets. (*Id.* ¶¶ 20-23). To begin, ALIL takes the necessary steps of protecting its information from external interference by employing a robust cyber security system that defends ALIL's data and servers, and mandates the use of strong password protections. (*Id.* ¶ 23). Next, ALIL deploys several further layers of protection to secure information internally by placing internal restrictions on its proprietary operations, systems, and data via a role-based access control framework, which restricts network access based on an employee's role within the company. (*Id.* ¶ 24). A small subset of employees (executive and select director level employees in operations, technology, and data) have the highest level of access in the company. (*Id.*).

ALIL has policies and procedures that prohibit the reproduction, copying, or transfer of any of ALIL's proprietary data, information, or methodologies. (*Id.* ¶ 27). Violating these policies results in discipline up to and including termination. (*Id.*). Further, all U.S. based ALIL employees sign a "Restrictive Covenant Agreement." (*Id.* ¶ 25).[1] Paragraph 2 of the Restrictive Covenant Agreement governs confidentiality. The Paragraph defines "Confidential Information" as:

> [I]nformation that: (i) is disclosed to Employee or of which the Employee becomes aware as a consequence of or through Employee's employment with the Company, (ii) is not generally known outside of the Company, (iii) has value to the Company, (iv) relates to the business of the Company, and (v) could be damaging to the Company's business if disclosed to or used by others. Such information may include but is not limited to, data and information with regard to ***business plans***, ***trade secrets***, finances, records, ***personnel***, designs, marketing, customers and customer lists, customer requirements, sales, products, ***systems***, ***processes***, trade secrets, ***methods***, ***know-how***, ***sales methodologies***, ***training methodologies***, sales channels, product development plans, and/or pricing. (*Id.*, Ex. 1 at ¶2(a)) (emphasis added).

In Paragraph 2(e) of the Restrictive Covenant Agreement, employees agree:

---

[1]    Pursuant to the terms of the Restrictive Covenant Agreement, Washington law applies to the breach of contract claim because Diaz worked for ALIL in Washington. (Rios Decl., Ex. 1, ¶ 11)

> [D]uring the two-year period immediately following the end of Employees'
> employment with the Company, Employee will not, anywhere in the United States,
> directly or indirectly (i) utilize, disclose, or make available to any other person or
> entity, any of the Company's Confidential Information; or (ii) use the Company's
> Confidential Information to attempt to solicit, induce, recruit, or take away clients,
> suppliers, or customers of the Company. Employee understands and agrees that the
> time and territory limits on this restriction do not apply to trade secrets (discussed
> below), which are protected by law. (*Id.*, ¶ 2(e)).

And, in Paragraph 5 of the Restrictive Covenant Agreement, employees agree that for one year

after the cessation of employment with ALIL:

> Employee shall not seek to influence or induce to leave the Company's employment
> or service, any person (a) who was employed or otherwise engaged by the Company
> at any time during the twelve (12) months ending on Employee's last day of
> employment with the Company and (b) with whom Employee had Material Contact
> during such period. (*Id.*, ¶ 5).

ALIL also protects its trademarks from infringement. Most recently, ALIL filed an action

in the U.S. District Court for Arizona to unmask imposters using ALIL's marks in an attempt to

defraud ALIL clients. (*Id.* ¶ 29).

**D.    Diaz Was a Trusted ALIL Employee With Access to the Highest Level of ALIL's
Intellectual Property And Absconded With The Same Upon Discharge.**

Diaz first associated with ALIL in May 2021, when ALIL was just starting to build its own

back-office in Colombia. (*Id.* ¶ 30; Decl. of N. Herrera, May 21, 2024, at ¶ 6, hereinafter "Herrera

Decl.", attached as Ex. B). As ALIL grew, Diaz became a senior employee relative to the many

new hires. (Rios Decl. ¶ 30). Over time, Diaz ingratiated himself to Lozano, becoming a trusted

advisor. (*Id.*). ALIL paid for Diaz to relocate to Washington upon learning Diaz was a dual citizen

of the U.S. and Colombia, giving Diaz growth opportunities within ALIL. (*Id.* ¶ 32; Herrera Decl.

¶¶ 6-7). In the United States, Diaz was employed full-time as a paralegal, then as Legal Line and

Support Teams Senior Manager. (Rios Decl. ¶32; Herrera Decl. ¶¶ 6-7).

In his senior position within the firm, Diaz had nearly unfettered access to ALIL's

confidential information, such as training materials, salary information, vendors, and growth

strategies, and ALIL's trade secrets such as ALIL's proprietary structure and case processing methodologies, data management, and proprietary software. (Rios Decl. ¶33; Herrera Decl. ¶ 8). Diaz's wife, Laura Catalina Rodriguez ("Rodriguez"), also worked at ALIL as a Data Analyst Team Lead, where she had access to sensitive, proprietary information regarding ALIL's processes, operations, clients, and software to prepare analyses for the executive team. (Rios Decl. ¶ 34; Herrera Decl. ¶ 20). Even more, Diaz was intimately involved with the creation of ALIL's Quetzal office in Bogotá, Colombia, as well as the creation of front offices throughout the U.S. (Rios Decl. ¶ 35). Diaz knew the structure of the offices (in the U.S. and internationally), the various departments needed for the novel immigration law firm setup Lozano developed, the employee profiles needed to staff the offices, the compensation of those employees, and all of the vendors that ALIL used domestically and abroad. (*Id.*). In short, Diaz had ALIL's blueprint to open back offices in Latin America and front offices throughout the United States.

Diaz abused his position of power within ALIL and acted inappropriately with subordinate employees. (*Id.* ¶ 38). Diaz was warned, counseled, and coached regarding his behavior; however, he failed to correct his behavior and ALIL discharged him from employment in November 2023. (*Id.*). In the days leading up to his exit, Diaz took an inordinate number of screenshots of ALIL's confidential information unrelated to his official duties, including training materials, client files, and internal dashboards. (Decl. of C. Ferreira, July 17, 2024 at ¶ 10, hereinafter "Ferreira Decl.", attached as Ex. E). Diaz also downloaded six client files to a USB thumb-drive. (*Id.* ¶ 9). Those files represent all of the types of visa cases in which ALIL specializes providing Diaz a template for how ALIL conducts its business and serves its clients. (*Id.*).

E.    **With Diaz's Help, Meneses Law Unlawfully Competes with ALIL.**

Meneses Law is a direct competitor of ALIL. (Rios Decl. ¶ 45). Like ALIL, Meneses Law

serves clients nationwide, and similarly uses niche areas of immigration law to serve clients. (*Id.* ¶ 46). Meneses Law's unfair competition scheme starts with Meneses Law's marketing materials. Meneses Law's marketing materials copy the design, look, format, text and Lozano's poses from ALIL's marketing materials. (*Id.* ¶ 48, Exs. 5, 6, & 7). Further, Meneses Law uses ALIL's "ARREGLAR SIN SALIR!" trademark in its print advertising. (*Id.* ¶ 47). However, Meneses Law does not have authorization or license to use the trademark. (*Id.*).

Meneses Law scaled its imitation scheme up after meeting Diaz. In December 2023, Meneses Law had no plans to establish a back-office in Colombia, its growth plans were modest, and it rejected integrating artificial intelligence into its processes. (Decl. of S. Maan, May 22, 2024 at ¶ 6, hereinafter "Maan Decl.", attached as Ex. C). However, Meneses Law's plans changed when it hired Diaz in January 2024. (*Id.* ¶ 11). Diaz told Meneses Law that he was out for revenge. (*Id.* ¶ 14). So, in exchange for employment, Diaz promised to tell Meneses Law everything he knew about ALIL; specifically, he would set up a back-office in Colombia for Meneses Law exactly like ALIL's, staffed with poached ALIL employees. (*Id.* ¶ 14).

Meneses Law treated Diaz like a VIP, flying him on the firm's private jet, hiring his wife, Rodriguez, and setting up Diaz and Rodriguez in company housing. (*Id.* ¶ 15). Meneses Law promoted Diaz from Customer Service Manager to Senior Operations Manager within three months. (Rios Decl. ¶ 51, Ex. 8). In return, Diaz spilled ALIL's secrets. Diaz took Meneses Law's leadership on a trip to Bogotá, Colombia, arranging meetings with ALIL's Colombian vendors. (Maan Decl. ¶¶ 18-20). Every night on the trip, Meneses Law leadership quizzed Diaz about the ins and outs of ALIL's practice, back-office set-up, and operations, asking, "Is this how ALIL conducted their business?" (*Id.* ¶ 22). In these conversations, Diaz detailed what a typical day at ALIL entailed, the lifecycle of a case at ALIL from intake through final documentation, ALIL's

case management processes, ALIL's team structures, and ALIL's strategies to scale operations. (*Id.* ¶ 23). Diaz offered that Rodriguez could implement the data management processes she learned at ALIL for Meneses Law. (*Id.* ¶ 24). Diaz also detailed ALIL's hiring strategies, ALIL's training strategies, identified employees for Meneses Law to target to fill strategic roles at Meneses Law, and disclosed these employees' compensation packages so Meneses Law could create competing packages paying slightly more than ALIL paid to entice these individuals. (*Id.* ¶¶ 25-26). Diaz also described ALIL's proprietary software for Meneses Law, explicitly laying out each element of the software. (*Id.* ¶ 27). Finally, Diaz used ALIL's confidential training materials to train Meneses Law's employees. (Herrera Decl. ¶¶ 24-25).

During Diaz's tenure, Meneses Law hired over a dozen current and former employees of ALIL/Quetzal. (*Id.* ¶ 17). Meneses Law has hired most of ALIL's Colombia-based human resources team and critical employees who had comprehensive knowledge of ALIL's internal metrics used to measure performance and effectiveness and ALIL's operations. (*Id.* ¶¶ 18-19; Rios Decl. ¶ 57). Diaz either supervised these individuals, was in the chain of command for these individuals, or regularly worked with these individuals on behalf of ALIL. (Rios Decl. ¶ 58). These individuals, combined with Diaz and Rodriguez can recreate most, if not all, of ALIL's proprietary business operations, growth strategies, data management, and proprietary software based on ALIL's confidential information and trade secrets. (*Id.* ¶ 55).

Diaz together with former Quetzal employee Sonia Peñarete solicited ALIL/Quetzal employees to work for Meneses Law. (*Id.* ¶60; Herrera Decl. ¶¶ 13-15). In particular, Diaz and Peñarete encouraged ALIL/Quetzal employees to attend a job fair Meneses Law was hosting on April 10, 2024. (Rios Decl. ¶¶ 60-61; Herrera Decl. ¶ 21). After learning about the job fair, ALIL reminded both Diaz and Meneses Law in writing and through counsel that under the Restrictive

Covenant Agreement, Diaz was not allowed to solicit ALIL's current and former employees. (Rios Decl. ¶¶ 41-42, 62, Exs. 3 & 4). Yet, at the job fair, Diaz and Meneses Law interviewed recent former ALIL employees and encouraged current ALIL employees to resign from ALIL, then apply to work at Meneses Law, under the incorrect assumption that this was a workaround that would not violate any Restrictive Covenant Agreements.  (Herrera Decl. ¶¶ 22-23).

**F.      History of This Action and Stage of the Proceedings Before the Court.**

On May 29, 2024, Plaintiff ALIL filed its Original Verified Petition for Temporary Restraining Order, Temporary Injunction, Permanent Injunction and Expedited Discovery in Harris County District Court against Diaz and Meneses Law. On May 31, 2024, a hearing on the Petition for Temporary Restraining Order was held before Judge Cheryl Elliott Thornton. Judge Thornton granted the majority of the relief sought in the Petition for Temporary Restraining Order and set a hearing on the Petition for Temporary Injunction for June 14, 2024. On June 7, 2024, Defendants filed a Joint Notice of Removal. (Dkt. 1). The Court has set the initial pretrial conference for August 20, 2024. (Dkt. 5). On July 22, 2024, Meneses Law filed a Partial Motion to Dismiss (Dkt. 16), as well as its Answer and Counterclaim (Dkt. 18). That same day, Diaz's Waiver of Service of Summons was filed. (Dkt. 17). No discovery has been exchanged.

**LAW AND ARGUMENT**

**A.      ALIL Can Establish Likelihood of Success On All Claims in the Complaint.**

**1.      Defendants Have and Continue to Engage in Unfair Competition By Misappropriating Trade Secrets and Confidential Information**

Defendants have already and are actively misappropriating ALIL's trade secrets in violation of federal law and state law.[2]  Under the Defend Trade Secrets Act ("DSTA"), a claim

---

[2]      The Texas Uniform Trade Secrets Act ("TUTSA") has similar elements to the DTSA, the single difference being that under the TUTSA, a plaintiff need not show that the trade secret was used in interstate

for misappropriation of trade secret requires: (1) a trade secret; (2) misappropriation: and (3) use in interstate commerce. Each of these elements is satisfied in the instant action.

The DTSA defines a "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, complied, or memorialized physically, electronically, graphically, photographically, or in writing if –
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). ALIL's business operations, business strategy, growth strategy, data management, and proprietary software all constitute trade secrets under the law. (Rios Decl. ¶¶ 12-16). ALIL has taken reasonable measures to keep this information secret. (*Id.* ¶¶ 22-28). ALIL protects its data and servers from external interference, mandates the use of strong password protections, places internal restrictions on data access where only a small group of leaders have the highest level of access, binds employees through Restrictive Covenant Agreements that contain strong confidentiality protections, and trains employees on maintaining confidentiality. (*Id.*).

Importantly, ALIL's trade secrets derive independent economic value from not being generally known or readily ascertainable. The market for competitive strategies in the immigration legal field is strong, as evidenced by the revenue Lozano generated simply teaching legal strategies to other practitioners. (*Id.* ¶ 10). ALIL has further separated itself from the pack with its novel approach to the business of immigration law. (*Id.* ¶¶ 12-16). Indeed, ALIL's business operations

---

commerce. *See SPBS, Inc. v. Mobley*, Case No. 4:18-CV-00391, 2018 WL 4185522, at *3 (E.D. Tex. Aug. 31, 2018).

and strategies, and growth strategies are so advantageous they allowed ALIL to scale such that it could quadruple its revenue in five years. (*Id.* ¶ 19). ALIL's proprietary software and data management likewise separates ALIL from the competition. (*Id.* ¶ 16). ALIL's unique ability to serve clients through its proprietary systems and operations, and thereby increase market share and gain economic advantage in the industry, certainly means that ALIL derives economic benefit from this information—and from its secrecy. *See, e.g., Conseco Fin. Serv. Corp. v. N. Am. Mortg. Co.* 381 F.3d 811, 819 (8th Cir. 2004) (finding information that allows business to uniquely serve clients has independent economic value); *WWMAP, LLC v. Birth Your Way Midwifery*, Case No. 5:23-cv-243, 2024 WL 151411, at *3 (N.D. Fl. Jan. 10, 2024) (finding information that could afford competitors economic advantage derives economic value from secrecy); *ClearOne Advantage, LLC v. Kersen*, Case No. JKB-23-03446, 2024 WL 69918, at *6 (D. Md. Jan. 5, 2024) (same). In other words, there is a demonstrable market for ALIL's secret sauce, making ALIL's business operations, business strategy, growth strategy, data management, and proprietary software all trade secrets.

It is indisputable that Diaz had access to ALIL's trade secrets. (Rios Decl. ¶ 41; Herrera Decl. ¶ 8). Diaz and Meneses Law, in turn, misappropriated those trade secrets. Under both the DSTA and TUTSA, misappropriation occurs when: (a) trade secrets are acquired by "improper means"; or, (b) disclosed or used by a person who used improper means to acquire knowledge of the trade secret; or, (c) derived from a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret. *Compare* 18 U.S.C. § 1839(5) *with* Tex. Civ. Prac. & Rem. Code § 134.002(3)(A)(B). Both the DSTA and TUTSA define "improper means" to include a breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret. *Compare* 18 U.S. C. § 1839(6)(A) *with* Tex. Civ. Prac.

& Rem. Code § 134.002(2).

Diaz owed ALIL both a contractual and common law duty to maintain the secrecy of ALIL's trade secrets. *See* Rios Decl., Ex. 1, ¶ 2(f); *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash. 2d 427, 439, 971 P.2d 936, 943 (1999). Yet, in anticipation of being discharged, Diaz took client files and screenshots of confidential training materials and other information, then turned around and essentially sold ALIL's trade secrets to Meneses Law in exchange for employment. (Maan Decl. ¶ 14; Ferreira Decl. ¶¶ 9-10). To wit, Diaz disclosed to Meneses Law ALIL's case management processes, team structures, business growth strategies, data management systems, ALIL's hiring strategies and compensation packages, and ALIL's proprietary software. (Maan Decl. ¶¶ 17-27). Diaz also used ALIL's training materials to train Meneses Law employees. (Herrera Decl. ¶¶ 24-25, Ex. 2). Meneses Law put this information to use in creating an office in Bogotá, Colombia, hiring over a dozen former ALIL/Queztal employees, and using automated solutions based on ALIL's proprietary software.  (Maan Decl. ¶¶ 16-17, 26-27; Rios Decl. ¶¶ 56-57). These actions by both Diaz and Meneses Law are "misappropriation" because they were derived from Diaz's confidential relationship with ALIL, and through this breach, and inducement thereof, of the Restrictive Covenant Agreement.

Finally, the DTSA's jurisdictional element is satisfied because ALIL's trade secrets are used to provide immigration law services to customers across the U.S. and throughout the world, and throughout ALIL's operations nationwide and globally. (Rios Decl. ¶¶ 13, 15). Therefore, the trade secrets are used in interstate commerce. With all elements satisfied, ALIL has demonstrated a likelihood of success on the merits of its trade secrets misappropriation claims, and thus Defendants should be enjoined from any further use of ALIL's trade secrets.[3]

---

[3]   ALIL also alternatively brings claims against Defendants for unfair competition and misappropriation/conversion of confidential information in the alternative. The elements of these claims

2.          __Diaz Breached the Restrictive Covenant Agreement.__

ALIL will succeed on its breach of contract claim against Diaz because all elements are met. *First*, Diaz breached the Restrictive Covenant Agreement by taking, utilizing, disclosing, and making available to Meneses Law, ALIL's Confidential Information, in direct violation of Paragraph 2(e). (Rios Decl., Ex. 1, at ¶2(e); *supra* at 6-10). Diaz also breached the Restrictive Covenant Agreement by seeking to "influence or induce" current and former ALIL employees with whom he had "Material Contact" (as that term is defined in the Restrictive Covenant Agreement) to work for Meneses Law, in direct violation of Paragraph 5. (Rios Decl. ¶¶ 56-58, Ex. 1, at ¶ 5; Herrera Decl. ¶¶ 13-23). *Second*, the Restrictive Covenant Agreement is a valid and enforceable contract. *Third*, ALIL performed its duties under the Agreement including providing Diaz with Confidential Information necessary to perform his job while employed with ALIL. (Rios Decl. ¶¶ 30-37). *Fourth*, as a result of this breach, ALIL has suffered and will continue to suffer damages, including irreparable harm to its reputation and business. (*Id.* ¶¶ 67). Accordingly, ALIL will succeed on its breach of contract claim. *See Inteum Co., LLC v. Nat'l Univ. of Singapore*, 371 F.Supp.3d 864, 872 (W.D. Wash. 2019) (setting forth elements of breach of contract claim).

There is no defense to enforcement. There is no statutory bar to enforcing the Restrictive Covenant Agreement because Washington's noncompetition statute explicitly excludes non-solicitation and confidentiality agreements from its strict enforceability requirements. *See* Wash. Rev. Code § 49.62.010(4)(a)-(b); *see also A Place for Mom v. Perkins*, 475 F.Supp.3d 1217, 1230 (W.D. Wash. 2020). As for the common law, Washington requires non-solicitation agreements be

---

are quite similar to the DTSA/TUTSA claims, as all involve misappropriation. *See Baylor Scott & White v. Project Rose MSO, LLC*, 633 S.W.3d 263, 287 (Tex. App. 2021). Unfair competition by misappropriation also requires: (1) creation of trade secret/confidential information through extensive time, labor, skill and money; and (2) commercial damage. *Id.* Those elements as they relate to ALIL's Confidential Information (to the extent that information does not constitute a trade secret) are readily satisfied here. (Rios Decl. ¶¶ 11-16; 21; 67).

reasonable. Three factors govern reasonability: (1) necessity for protection of business or goodwill; (2) the scope of the agreement; and (3) whether public injury results from the restraint. *Robins v. NuVasive, Inc.*, Case No. 2:20-CV-292, 2020 WL 7081588, at *7 (E.D. Washington Dec. 3, 2020) (citing *Emerick v. Cardiac Study Ctr., Inc. P.S.,* 357 P.3d 696, 701 (Wash Ct. App. 2015)). The Restrictive Covenant Agreement readily satisfies these three factors.

Regarding whether the restraint is necessary to protect a party's business, "Washington provides broad protection to tangible and intangible business interests and goodwill." *See Robins*, 2020 WL 7081588 at *7 (citing *Amazon.com, Inc. v. Moyer*, 417 F. Supp. 3d 1388, 1396 (W.D. Wash. 2019)). This includes protecting confidential information and avoiding unfair competition. *Perkins*, 475 F. Supp. 3d at 1228. ALIL has protectable goodwill and business interests with regards to the goodwill it has built with its clientele and in the immigration community at large. For example, this year, 50% of ALIL's new clients have come from existing/former client referrals. (Rios Decl. ¶ 18).  ALIL's competitive advantage derived from its proprietary operations, growth strategies, and data management and software systems is also protectable. (Rios Decl. ¶¶ 10, 12-19); *see also Amazon*, 417 F. Supp. 3d at 1397 (citing examples of legitimate business interest and protectable goodwill). The prohibition of soliciting ALIL employees protects that goodwill and those business interests.

The restraint is reasonable in scope. The Restrictive Covenant Agreement only restricts solicitation of current and former ALIL employees for one year, and only applies to employees who worked at ALIL at the same time as Diaz, and with whom Diaz had "Material Contact." (Rios Decl., Ex. 1, ¶ 5). One-year durations are regularly determined to be reasonable under Washington law. *Robins*, 2020 WL 7081588, at *9. And the scope of the Restrictive Covenant Agreement is reasonably tailored to protect ALIL's legitimate business interests.

Finally, the Restrictive Covenant Agreement poses no risk of harm to the public. The Restrictive Covenant Agreement does not unduly limit employment opportunities or deny the public access to necessary services. For example, ALIL employees are free to work in the immigration law field, free to work for competitors, and free to serve clients not served by ALIL. *See Knight, Vale & Gregory v. McDaniel*, 37 Wash. App. 366, 370, 680 P.2d 448, 452 (1984). Most importantly, the Restrictive Covenant Agreement does not limit any individual's ability to access counsel on immigration law. *See Emerick*, 357 P.3d at 728-29. Accordingly, the Restrictive Covenant Agreement is reasonable and enforceable. *Id*. Thus, ALIL is likely to succeed in its breach of contract claim against Diaz, warranting the requested injunction.

### 3.    Defendants Have Tortiously Interfered with ALIL's Contracts.

ALIL is likely to succeed on its claim of tortious interference with a contract as against Defendants. "The elements of a tortious interference with contract claim are: (1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss." *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 776 (S.D. Tex. 2010). Here, Meneses Law has already and is actively interfering with Diaz's Restrictive Covenant Agreement, and both Meneses Law and Diaz are interfering with contracts substantially similar to the Restrictive Covenant Agreement that other ALIL employees, such as Rodriguez, entered into with ALIL. Defendants' interference with ALIL's contracts includes: (a) inducing breaches of confidentiality provisions; (b) using ALIL's Confidential Information; (c) inducing breaches of the non-solicitation provisions by tasking employees, like Diaz, to solicit current and former ALIL employees; and (d) by encouraging ALIL employees to resign from ALIL to join Meneses Law. (Maan Decl. ¶¶ 14-27; Herrera Decl. ¶¶ 13-25).

Defendants' conduct is willful and intentional. Defendants are aware of the Restrictive Covenant Agreement. (Rios Decl. ¶¶ 41-42; 62-63). Nevertheless, Defendants deliberately induced

breaches to acquire Confidential Information. (Maan Decl. ¶¶ 14-27). This conduct typifies willful and intentional interference. *See, e.g.*, *Stelly*, 733 F. Supp. 2d at 777. Finally, ALIL has and will continue to suffer damages, including, but not limited to, loss of market share, loss of goodwill, and out-of-pocket expenses. (Rios Decl. ¶ 67). Therefore, ALIL is likely to succeed on the merits of its tortious interference claim.

### 4.  Meneses Law Has and Continues to Infringe on ALIL's Trademark

ALIL will prevail on its trademark claim. "To prevail on a claim of trademark infringement under the Lanham Act, a plaintiff must show: (1) it possesses a valid mark; and (2) defendant's use of its mark creates a likelihood of confusion as to source, affiliation, or sponsorship." *Viacom Int'l Inc. v. IJR Cap. Invs., LLC*, 242 F. Supp. 3d 563, 568 (S.D. Tex. 2017), aff'd sub nom. *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178 (5th Cir. 2018).

ALIL possesses a valid mark. Since at least 2016, ALIL has used the mark "ARREGLAR SIN SALIR!" in commerce in connection with its legal services. (Rios Decl. ¶¶ 6-8). On April 11, 2023, the U.S. Patent and Trademark Office registered the mark. (*Id.*). ALIL's use and registration of the trademark satisfies the first element of trademark infringement. *See Viacom*, 242 F. Supp. 3d at 568 ("[A] registered mark with the U.S. Patent and Trade Office comes with a presumption of validity" and notes ownership is determined by use); *Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 644 (N.D. Tex. 2022) (same).

Regarding likelihood of confusion, "The factors used by this Circuit in determining whether a likelihood of confusion exists are: (1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *Am. Rice, Inc. v. Producers Rice Mill, Inc*., 518 F.3d 321, 329 (5th Cir. 2008) (internal quotations omitted). "The absence of

any one factor is not dispositive, and a finding of likelihood of confusion need not be supported by even a majority of the factors." *Id.* Here, a majority of these factors demonstrates that a likelihood of confusion exists. First, the "ARREGLAR SIN SALIR!" trademark is strong because it has obtained a secondary meaning in the marketplace. (Rios Decl. ¶ 8). The phrase is now commonly associated with Lozano and ALIL. (*Id.*). Second, the photographic evidence shows that Meneses Law is using the exact phrase "arreglar sin salir" in its advertising materials. (*Id.* ¶¶ 47-49, Exs. 5-7). Third, both ALIL and Meneses Law are in the business of providing immigration legal services specifically humanitarian immigration relief. (*Id.* ¶ 46). Fourth, both ALIL and Meneses Law serve the same population of clients, nationwide. (*Id.*). Fifth, both ALIL and Meneses Law use the "ARREGLAR SIN SALIR!" mark in marketing materials. (*Id.* ¶¶ 47-49). Sixth, Meneses Law's intent to benefit from ALIL's goodwill by using the mark is self-evident; Meneses Law copies not only the text, but also the look and feel of ALIL's marketing material to benefit from the goodwill ALIL created. (*Id.*). Finally, undocumented immigrants take great care in choosing counsel, and put large emphasis on the ability to stay in the United States while obtaining legal status; therefore, misappropriation of ALIL's mark could easily lead to confusion. Thus, ALIL will likely succeed on the merits of its trademark infringement claim.

**B.     ALIL Will Suffer Irreparable Harm Without an Injunction.**

Absent an injunction, ALIL will suffer irreparable harm for with no adequate remedy at law. As a starting point, "[t]he damages occasioned by a case involving breach of confidentiality and misappropriation of trade secrets is, by its nature, irreparable and not susceptible of adequate measurement for remedy at law." *Glycobiosciences, Inc. v. Woodfield Pharm., LLC*, Case No. 4:15-CV-02109, 2016 WL 170674, at *8 (S.D. Texas Apr. 27, 2016). "Thus, when a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be

presumed." *Id.* "This established law is particularly applicable when, as here, a former . . . employee takes confidential information and trade secrets while pursuing employment with industry competitors." *Chevron U.S.A., Inc. v. Guajardo*, Case No. H-17-1549, 2017 WL 2265694, at *2 (S.D. Texas May 24, 2017).

Here, there is no question that Diaz is in possession of ALIL's confidential information and trade secrets, has disclosed that information and those secrets to Meneses Law, and Meneses Law is now using that information to unfairly compete with ALIL. (Maan Decl. ¶¶ 14-27). Defendants are poaching ALIL employees, contacting ALIL vendors, and using ALIL training materials to copy ALIL's operating playbook. (*Id.*; Herrera Decl. ¶¶ 13-25). These actions threaten ALIL with a loss of clients, employees, goodwill, and revenue—the type of irreparable harm described above and recognized by the law, supporting the granting of an injunction.

## C.    The Balance of Harms Supports Granting the Injunction.

The harm to ALIL, as described above, outweighs the potential harm an injunction would cause Diaz or Meneses Law. Regarding Diaz, there is no undue harm when a court enforces the agreement pursuant to terms already agreed to. *See Johnson Serv. Grp., Inc. v. France*, 763 F. Supp. 2d 819, 831 (N.D. Texas 2011). Regarding Meneses Law, Meneses Law will not suffer any harm that would weigh against granting the injunction. Meneses Law would still be able to serve clients nationwide and practice in the immigration space, just without the benefit of ALIL's confidential information, trade secrets, and trademark. In situations exactly like this, courts find that the balance of harms weights in favor of an injunction. *See, e.g.*, *Chevron U.S.A., Inc.*, 2017 WL 2265694, at *3 (citing *Glycobiosciences*, 2016 WL 170674 at *9, and *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, Case No. 2:13-cv-00784, 2013 WL 2151553, at *14 (E.D. Cal. May 16, 2013)); *AHS Staffing, LLC v. Quest Staffing Grp.*, 335 F. Supp. 3d 856, 873 (E.D. Texas 2018)

(noting courts consider threat of disclosure of trade secrets against whether injunction will effectively destroy a business). The balance of harms supports the granting of an injunction.

**D.      An Injunction Serves the Public Interest.**

The public interest is served by the granting of an injunction. In particular, "the public interest is served whenever state and federal laws are enforced." *Blue Bell Creameries, L.P. v. Denali Co., LLC*, Case No. H-08-0981, 2008 WL 2965655, at *7 (S.D. Texas July 31, 2008). This is "particularly true" for enforcing trademark laws. *Id.* It is also in the public interest to "uphold contracts." *See Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 571 (S.D. Texas 2014). Finally, "depriving Defendants of the benefit of . . . allegedly misappropriated trade secret[s] . . . enforces better business ethics by depriving . . . alleged wrongdoers of the benefit of their wrongdoing." *AHS Staffing, LLC*, 335 F. Supp. 3d at 874.

<u>CONCLUSION</u>

For the foregoing reasons, ALIL respectfully requests that the Court grant the instant motion, and enter an order that enjoins Defendants from: (1) using or disclosing any of ALIL's Confidential Information and/or trade secrets; (2) destroying any relevant records in their respective possession, including but not limited to ALIL's Confidential Information, trade secrets, or any other ALIL proprietary or protected information; (3) engaging in any acts that would constitute or induce a breach of the Restrictive Covenant Agreement; (4) knowingly interfering with any business opportunities or relationships of ALIL; (5) soliciting current and former ALIL employees in accordance with the Restrictive Covenant Agreement; (6) knowingly disrupting, damaging, impairing, or interfering with the business of ALIL or from directly or indirectly deriving any economic benefit from the goodwill, business relationships, or reputation of ALIL; and, (8) using ALIL's federally registered trademark "ARREGLAR SIN SALIR!" or any variation in commerce.

Date: July 26, 2024                              Respectfully submitted,

                                                 /s/ *Pamela B. Linberg*
                                                 Lauren Hope Whiting
                                                 Texas Bar No. 24084091
                                                 JACKSON LEWIS P.C.
                                                 93 Red River St., Ste. 1150
                                                 Austin, Texas 78701
                                                 512.362.7408 [Telephone]
                                                 512.362.5574 [Facsimile]
                                                 Lauren.Whiting@jacksonlewis.com

                                                 Pamela B. Linberg
                                                 Texas Bar No. 00793299
                                                 S.D. TX Bar No. 23981
                                                 Nathaniel J. Higgins
                                                 Texas Bar No. 24087720
                                                 S.D. TX Bar No. 3277285
                                                 JACKSON LEWIS P.C.
                                                 717 Texas Avenue, Suite 1700
                                                 Houston, Texas 77022
                                                 713.650.0404 [Telephone]
                                                 713.650.0405 [Facsimile]

                                                 Kirsten R. Fraser (*Pro Hac Vice*)
                                                 Organ Law LLP
                                                 1330 Dublin Road
                                                 Columbus, Ohio 43215
                                                 614.481.0900 [Telephone]
                                                 614.481.0904 [Facsimile]
                                                 kfraser@organlegal.com

                                                 *Attorneys for Plaintiff Alexandra Lozano*
                                                 *Immigration Law, PLLC*

## CERTIFICATE OF CONFERENCE

Pursuant to LR 7.1(D) and the Court's Civil Procedures Rule 7.P, the undersigned counsel conferred by video conference with Jason S. McManis, counsel for Meneses Law PLLC, on July 22, 2024, to see if an agreement could be reached as to the scope and substance of the proposed injunction, but counsel could not come to an agreement on terms. Then on July 25, 2024, Plaintiff's counsel conferred with Ashish Mahendru, counsel for Juan Pablo Diaz Cuenca, to see if an agreement could be reached as to the scope and substance of the proposed injunction. Again, counsel could not come to an agreement on terms. Therefore, the parties have been unable to reach agreement regarding the instant motion.

*/s/ Pamela B. Linberg*
Pamela B. Linberg

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of *Plaintiff Alexandra Lozano Immigration Law, PLLC's Motion for Preliminary Injunction* was served on July 26, 2024 to the following entities:

*Via Email*
Jason S. McManis, JMcManis@azalaw.com
Joseph Y. Ahmad, JoeAhmad@azalaw.com
Ahmad, Zavitsanos, & Mensing, PLLC
1221 McKinney, Ste. 2500
Houston, Texas 77010

**Edwin Sullivan,** ed@osattorneys.com
Oberti Sullivan LLP
712 Main Street, Suite 900
Houston, TX 77002
**Attorneys for Defendant, Meneses Law PLLC**

*Via Email*
Ashish Mahendru, amahendru@thelitigationgroup.com
Mahendru, PC
639 Heights Blvd.
Houston, Texas 77007
**Attorneys for Defendant, Juan Pablo Diaz Cuenca**

*/s/ Pamela B. Linberg*
Pamela B. Linberg

22