# EXHIBIT A

NO. _____

| | |
|---|---|
| **ALEXANDRA LOZANO IMMIGRATION LAW, PLLC** | **IN THE DISTRICT COURT OF** |
| **Plaintiff,** | **HARRIS COUNTY, TEXAS** |
| **v.** | |
| **JUAN PABLO DIAZ CUENCA** | **_____ JUDICIAL DISTRICT** |
| **and** | |
| **MENESES LAW** | |
| **Defendants.** | |

## DECLARATION OF AMY RIOS

1.      My name is Amy Rios.  I am the Chief Operating Officer of Alexandra Lozano Immigration Law ("ALIL").  I am over the age of 21 and am competent to testify.

2.      All statements are based on my personal knowledge.

3.      I began working for ALIL in 2015 as a virtual assistant.  I was promoted to Executive Assistant, then Director of Legal Operations, and then Director of Strategic Operations, before becoming Chief Operating Officer.  Before working for ALIL, I worked in the medical field.  In the over nine years that I have worked at ALIL, I earned three certificates from Harvard Business School Online, became a black belt in Lean Six Sigma, and I am a certified victim's advocate.  As Director of Legal Operations, my job responsibilities included managing the daily operations of the various departments in the firm.  I worked closely with department heads and supervisors to support the day-to-day activity of the firm.  Now, as Chief Operating Officer, my job responsibilities have expanded to include reviewing, analyzing, and evaluating business procedures, and then implementing those policies and procedures to improve

1

business operations.  In my role, I am privy to updates and information concerning employment

issues with our employees across the firm and its subsidiaries

4.	Given that I have worked at ALIL for nearly a decade and have worked closely

with its founder, Alexandra Lozano ("Lozano"), from the very beginning of the company, I am

extremely familiar with ALIL's history and operations as well as the issues raised in this

litigation.

5.	Lozano founded ALIL in 2014.  Setting herself apart, Lozano employed

specialized knowledge of Violence Against Women Act ("VAWA") visas and Victims of

Trafficking in Person or "T" visas, which are underutilized and largely misunderstood.  Many

attorneys believe that these types of visas have extremely limited application to women and sex

trafficking, respectively, when in fact, both visas can be used more broadly.  These visas can lead

to work authorizations and make it possible to obtain green cards without having to leave the

country to obtain legal status, an option that is critical for vulnerable immigrants, including

immigrant victims of domestic violence, human trafficking, and other violent crimes.

6.	In or around 2016, Lozano coined the phrase "Arreglar sin salir," which translates

to "fix without leaving" to raise awareness among the Spanish-speaking immigrant community

of the possibilities of VAWA and T visas.  No later than August 2016, Lozano started using this

phrase as a trademark in connection with ALIL's legal services, and has continuously used it

ever since.

7.	On or about July 15, 2022, ALIL filed an application for the mark "ARREGLAR

SIN SALIR!" with the U.S. Patent and Trademark Office, which was assigned Serial No.

97504788 and registered on or about April 11, 2023.

8.      "ARREGLAR SIN SALIR!" is strongly associated with Lozano and ALIL among potential clients as well as other attorneys.  Lozano and ALIL are often referred to as the ARREGLAR SIN SALIR! attorneys, particularly on social media.

9.      Lozano and ALIL changed the way many attorneys now approach immigration law.

10.      In addition to my duties for ALIL, I also worked as a virtual assistant for Lozano's AMIGA LAWYERS, LLC and for Lozano's educational entity, Ally Lozano, LLC.  In those roles, I assisted Lozano with her work as an educator of other immigration attorneys.  It was my impression that there was serious demand for the competitive and innovative legal strategies Lozano was teaching.  Lozano earned over $1.7 million between 2019 and 2021 teaching hundreds of immigration attorneys legal strategies around VAWA and T visas.  Lozano taught other attorneys how to screen for these visas and set up efficient processes to obtain these visas for clients.  Lozano also taught other immigration attorneys general business and marketing strategies as well, particularly related to using social media to advertise and educate potential clients about VAWA and T visas.

11.      Lozano stopped these trainings in or around 2021.  Since then, ALIL has changed its processes, organization, and developed proprietary software and data management that was not in existence when Lozano was educating other lawyers.  ALIL's new processes, organization, and software are not generally known to the public or outside of ALIL's offices, and ALIL employees are all subject to confidentiality agreements.

12.      Specifically, in or around 2021, ALIL developed a proprietary business model that divides the firm into different departments that each handle a different aspect of a client's case, from intake, through investigation, to preparing documentation, and final review.

3

13.     As part of this strategy, ALIL hired staff from across the U.S. and abroad to manage the firm's caseload.  ALIL also began building a back office operation in Bogota, Colombia, which is now known as Quetzal International Services ("Quetzal") and has grown to employ over 400 individuals.  ALIL also has smaller back office operations in Mexico and Argentina that staff and support many of the ALIL departments.

14.     In establishing Quetzal and its counterparts in Mexico and Argentina, ALIL essentially established its own business processing outsourcing ("BPO") offices, to perform supportive functions for ALIL such as human resources, case management, data management and analysis, software development, and other case preparation support.  These entities perform "back office" functions, in contrast to ALIL's client-facing U.S. "front offices."

15.     The novel structure of the firm allowed ALIL to scale nationwide.  Beginning in 2022, ALIL developed a confidential growth strategy to open larger regional offices in cities with high-density immigrant populations.  To date, in addition to ALIL's headquarters in Tukwila, Washington, the firm has regional offices in Berwyn, Illinois, Houston, Texas, San Antonio, Texas, and Commerce, California.  In 2024, the firm leveraged its innovative and proprietary approach to expand further its novel concept by opening "micro-offices" around the country, in smaller cities with high-density immigrant populations.  Those offices are located in Yakima, Washington, Gilroy, Washington, Fresno, Washington, Miami, Florida, and Denver, Colorado.  Those "micro-offices" are leanly staffed, but provide the exact same quality of service and high results level ALIL clients receive in the home and regional offices.

16.     To further support growth and to standardize excellent customer service, ALIL has invested millions of dollars into technology over the past three years and currently employs over 100 full-time developers focused exclusively on automation solutions for various

4

components of the immigration process.  ALIL has developed proprietary intake software and immigration form completion software, and has also invested in data management and analytics, and case management tools.

17.     ALIL's substantial investments in its business structure combined with its strategies, operations, and proprietary systems has led to both increased goodwill with current and prospective clients, and increased market share.

18.     For example, ALIL's clients regularly recommend ALIL to their families and friends.  Since 2022, referrals from existing clients have represented over 32% of all new clients gained by ALIL, and thus far, in 2024, that number has jumped to nearly 50%.

19.     ALIL also enjoys a significant economic advantage over other immigration firms in this space, due to ALIL's increased market share.  In just five years, ALIL has grown from 15 employees to over 750 employees globally, and the firm's revenue has more than quadrupled. This growth stems directly from the proprietary methodologies implemented and developed by ALIL and Lozano, and it correlates with the changes made to our processes, outsourcing back-office operations, and automation solutions.

20.     ALIL protects information related to business operations, business strategy, growth strategy, data management, proprietary software, and other highly confidential information as trade secrets.

21.     ALIL has invested substantial time, money, skill and effort into developing its proprietary, confidential information and trade secrets.  ALIL has also invested substantial time, money, skill, and effort into developing its employees by providing extensive and ongoing training, and investing in sales and client service strategies, marketing, and ALIL's internal systems and database.

5

22.     To protect ALIL's innovative, proprietary, confidential information and trade secrets, ALIL implements many comprehensive strategies.

23.     First, ALIL takes necessary steps to ensure a robust cyber security system that defends its data and servers from external interference and mandates the use of strong password protections.

24.     Internally, ALIL deploys several further layers of protection, to secure proprietary, confidential information and trade secrets.  To begin, not all ALIL employees have equal access to information related to ALIL's proprietary operations, systems, and data.  ALIL places internal restrictions on this type of information via a role-based access control framework, which restricts network access based on a person's role within the company.  The roles with the highest level of access in the company are executive level and select director level employees in operations, technology, and data, a small subset of ALIL employees.

25.     Further, all U.S. based ALIL employees sign a "Restrictive Covenant Agreement" as a term of their employment in which they agree to hold all confidential information in the strictest confidence, and even after the end of their employment, agree to refrain from utilizing, disclosing, or making available any confidential information, or to use the confidential information to attempt to solicit, induce, recruit, or take away clients, suppliers, or customers of ALIL.

26.     U.S. based ALIL employees also agree that they will not solicit customers or current or former employees that worked for ALIL in the U.S. or were otherwise engaged by the Company, which covers Quetzal employees that work exclusively for ALIL in Colombia.  It is important to note that Quetzal exists only to perform back-office functions for ALIL and its subsidiaries.

27.     ALIL also has policies and procedures all employees are trained on and expected to follow that prohibit the reproduction, copying, or transfer of any of the proprietary data, information, or methodologies used within ALIL.  These policies are disseminated to all employees and violation of such policies is strictly enforced, resulting in discipline up to and including termination.

28.     With a few exceptions, ALIL generally does not permit employees to work remotely, in part to control the flow of and access to confidential information and trade secrets. Only certain senior-level employees and attorneys have authorization from the firm to work hybrid and/or remotely.

29.     ALIL also protects the ARREGLAR SIN SALIR! mark from infringement.  Most recently, ALIL filed an action in U.S. District Court for Arizona to protect the firm's intellectual property from impersonators using ALIL's marks in an attempt to defraud ALIL clients.  The action in Arizona allowed ALIL to identify the impersonators, and ALIL is now in the process now of sending cease and desist letters and taking further action against these imposters to protect the mark, and ALIL's associated goodwill.

30.     Juan Pablo Diaz Cuenca ("Diaz") started working with ALIL in or about May 2021 when the firm was just beginning to build its own office in Colombia.  First, Diaz worked for a staffing company that ALIL worked with, and the company assigned Diaz to ALIL.  Then, he became an independent contractor working directly with ALIL in Colombia.  As ALIL grew rapidly, he became a senior employee relative to the many new hires.  Over time, he ingratiated himself to Lozano.  Lozano regularly ran business ideas past Diaz, and socialized with him on occasion.

31.     Diaz indirectly reported to me, so I am familiar with the work he performed for ALIL and the information to which Diaz had access.

32.     Diaz was hired as a full-time employee in the Tukwila, Washington office of ALIL with a start date in or about February 2022.  As I understand it, Lozano learned that Diaz was a dual citizen of Colombia and the United States and brought him to the United States to work at ALIL's headquarters without the need for a visa.  Diaz had proven leadership skills and moving him to the United States provided him with growth opportunities within the firm.  ALIL paid for Diaz's relocation to Seattle, Washington, where he was first employed as a paralegal, but then became Legal Line and Support Teams Senior Manager.

33.     In his senior position within the firm, Diaz had nearly unfettered access to confidential information concerning all of ALIL's proprietary business operations including but not limited to salary information, growth strategies, data management, vendors, and proprietary software (both software developed internally, and the confidential mix of external software providers integrated into the ALIL practice).

34.     Diaz's wife, Laura Catalina Rodriguez ("Rodriguez") was also employed by ALIL as a Data Analyst Team Lead.  Based on my understanding of the work the Data Analyst Team performs, and what that particular position entails, I can confirm that Rodriguez had access to sensitive, proprietary information regarding ALIL's operations, processes, clients, and software in order to extract meaningful operational and financial analyses for the executive team.

35.     As noted above, Diaz was promoted within ALIL to help build ALIL's office in Bogotá, Colombia.  He was also intimately involved in the creation of front offices throughout the United States.  To that end, Diaz knew the structure of the offices (in the U.S. and internationally), the various departments needed for the novel immigration law firm setup

8

Lozano developed, the employee profiles needed to staff the offices, the compensation of those employees, and all of the vendors that ALIL used domestically and abroad.

36.     It can be said that Diaz possessed ALIL's entire blueprint to open back offices in Latin America and front offices throughout the United States.

37.     Further, Diaz supervised may of ALIL's employees, particularly those working in Colombia.

38.     Unfortunately, ALIL discovered that Diaz abused his position of power within ALIL and acted inappropriately with subordinate employees.  Diaz was warned, counseled, and coached regarding his behavior; however, Diaz failed to correct his behavior and ALIL terminated his employment.

39.     Rodriguez resigned from her position at ALIL a few days after Diaz was terminated, allegedly "in protest" of her husband's termination.

40.     Diaz and Rodriguez both entered into Restrictive Covenant Agreements as conditions of their employment with ALIL.  A true and correct copy of those Agreements are attached as Exhibits 1 and 2 to this declaration.

41.     ALIL, through counsel, sent Diaz a copy of his Restrictive Covenant Agreement on or about April 2, 2024, attached to a cease and desist letter.  A true and correct copy of that correspondence is attached as Exhibit 3 to this declaration.

42.     Likewise, ALIL, through counsel, sent Meneses Law a copy of Diaz's Restrictive Covenant Agreement on or about April 5, 2024, attached to this declaration as Exhibit 4.

43.     In these Restrictive Covenant Agreements, Diaz and Rodriguez both agreed to strict confidentiality provisions and agreed not to solicit ALIL employees and clients.

44.     Through my association with Lozano and ALIL, I have come to know Christine Meneses and her firm Meneses Law, PLLC ("Meneses Law").

45.     Meneses participated in some of the educational programming Lozano offered, and Meneses Law has become a direct competitor of ALIL's.

46.     Like ALIL, Meneses Law serves clients nationwide and similarly uses niche areas of immigration law, such as VAWA and T visas to gain clients legal status in the United States.

47.     I have seen Meneses Law's marketing materials, and those materials imitate ALIL's.  In fact, I have seen advertising in which Meneses Law uses ALIL's "ARREGLAR SIN SALIR!" mark on print advertising.  Meneses Law does not have license or permission to use the mark.

48.     Attached to this declaration are true and correct photos of ALIL's marketing materials from 2022 and a true and correct photo of Meneses Law's marketing material from 2024.  (Exhibits 5, 6, and 7, respectively).  Meneses Law's material shows use of the "ARREGLAR SIN SALIR!" mark.  Despite adding "del pais," which translates to "the country" onto the end of the mark, this does not materially change the meaning of the phrase for Spanish speakers, nor does it change the English translation.

49.     Meneses Law's material also copies the pose, format, and other text from ALIL's materials.  In particular, Meneses Law imitates ALIL's "Dedicados a [Los] Resultados!" language.  Again, dropping the word "Los" ("the") from "Resultados" does not materially change the meaning of the phrase for Spanish speakers, nor does it change the English translation.

50.     After Diaz was terminated from ALIL for misconduct, we learned that he was hired by Meneses Law in or around January 2024.

51.     Based on his LinkedIn profile, which I have viewed, he was initially hired as a Customer Service Manager, but within three months, Diaz was promoted to Senior Operations Manager.  A true and correct printout of his public LinkedIn profile is attached to this declaration as Exhibit 8.

52.     It is my opinion that in his new role, Diaz has a greater impact on Meneses Law's overarching strategy and company development and has made use of his inside knowledge to improperly benefit Meneses Law.

53.     Since Diaz was hired by Meneses Law we at ALIL have learned that he has: (a) targeted employees in key positions from ALIL and Quetzal; (b) approached ALIL's vendors in Colombia; and, (c) apparently used ALIL's confidential business strategies and methodologies to scale Meneses Law's operations in Colombia and in the United States.  I discuss each of these issues in turn in greater specificity below.

54.     I have learned from our team in Bogotá that Diaz has contacted former ALIL and Quetzal employees and solicited them to come work at Meneses Law.  Since Meneses Law hired Diaz, approximately eighteen (18) former ALIL and Quetzal employees are now employed by Meneses Law.  These employees include Rodriguez who is now a Research Analyst at Meneses Law, and Sonia Peñarete, who was the head of Quetzal's Customer Experience department and is now working as Operations Manager – Colombia for Meneses Law.  True and correct copies of printouts of Rodriguez's and Peñarete's LinkedIn Profiles are attached to this declaration as Exhibits 9 and 10, respectively.

55.     When she was with ALIL, Peñarete had access to all of ALIL's systems and proprietary technology.  Therefore, together with Diaz and Rodriguez, the three can recreate

11

most, if not all, of ALIL's proprietary business operations, growth strategies, data management, and proprietary software based on ALIL's confidential information and trade secrets.

56.     Meneses Law and Diaz have recruited other ALIL managers and employees from across ALIL's departments who all were exposed to different aspects of ALIL's confidential information and trade secrets (collectively, these individuals are referred to as "Other Employees") to work for Meneses Law.

57.     It is my understanding, based on information provided to me by ALIL's team in Bogotá that, in addition to Diaz, Rodriguez, and Peñarete, Meneses Law has hired Melissa Toscano, Maria Monica Grillo, Juan David Arciniegas Parra, Julian Alejandro Rios Ramos, Gabriel Nieto, Valeria Candamil Buriticá, Daniel Ferreira, Gabriel Eduardo Butrago Cueto, Juan Martin Garcia, Juan Carvajal, Juan Murrilo, Natalia Martinez, Julian Cortes, Juan Guillermo Fernandez, and Sofia Culma.  These individuals represent a cross-section of ALIL/Quetzal operations ranging from human resources, to intake, to research, to evidence verification, to case management, with knowledge of VAWA, T visas, and asylum claims (ALIL's proverbial bread and butter).

58.     Diaz either supervised these Other Employees, was in the chain of command for these Other Employees, or regularly worked with these Other Employees on behalf of ALIL.

59.     I have been informed by ALIL's team in Bogotá that Diaz is providing training to Meneses Law employees, using ALIL's educational materials.

60.     I am also aware that Diaz and Peñarete are soliciting ALIL/Quetzal employees to work for Meneses Law.  For example, I have seen a screenshot from a Quetzal employee of a message Peñarete sent to her former direct reports at Quetzal advertising a job fair that Meneses

12

Law was hosting.  A true and correct copy of this screenshot is attached to this Declaration as Exhibit 11.

61.     Nicolas Herrera at Quetzal also forwarded a screenshot from Diaz's Instagram to the home office in Washington, showing Diaz advertising for this same job fair.  A true and correct copy of this screenshot is attached to this Declaration as Exhibit 12.

62.     Prior to the job fair, ALIL's counsel spoke with Diaz's counsel on or about April 8, 2024, and again on or about April 9, 2024.  ALIL's counsel reiterated that the Restrictive Covenant Agreement applied to both current and former employees of ALIL, and requested that Diaz not attend the job fair to comply with his contract.

63.     Diaz and Meneses Law ignored ALIL's counsel's admonitions and interviewed former ALIL employees at the job fair.  It is my understanding, based on feedback from ALIL's Bogotá office, that Meneses Law encouraged ALIL employees to resign from employment then submit resumes to Meneses Law.

64.     ALIL was also made aware by our attorney in Colombia, Mauricio Montealegre León, that Diaz had contacted him to create a Colombian entity for Meneses Law.  Fortunately, that attorney was ethical and contacted ALIL regarding the conflict of interest presented, and refused to work with Diaz to perpetuate his scheme.

65.     It is apparent to ALIL that Diaz is using ALIL's proprietary, confidential information and trade secrets to assist Meneses Law with recreating ALIL's business model and growth strategies to build out a back office in Colombia that will allow Meneses Law to scale across the United States.

66.     ALIL has never authorized Meneses Law to use ALIL's proprietary, confidential information or trade secrets.

67.     ALIL has suffered incalculable lost profits due to Meneses Law and Diaz stealing ALIL's confidential information and trade secrets, poaching employees, and targeting ALIL's vendor network in Colombia.  Further ALIL has suffered damage to its reputation, loss of clients, vendors, employees, and other business deals, impairment of future earnings capacity, diminution in the value of its business, and loss of goodwill.

68.     My birthdate is October 16, 1987 and my address is M1 L2 Calle Amatista, San Jose del Cabo, Baja California Sur 23444, Mexico.  I execute this Declaration consistent with Texas Civil Practice and Remedies Code § 132.001 and I declare under penalty of perjury under the laws of the United States of America and the State of Texas that the foregoing is true and correct.

/s/ Amy Rios
Amy Rios

Executed in the City of San Jose del Cabo, State of Baja California Sur, in the Country of Mexico, on the 22nd day of May, 2024

# EXHIBIT 1

## RESTRICTIVE COVENANT AGREEMENT

  This Restrictive Covenant Agreement (the "Agreement"), is made and entered into this <u>14</u> day of <u>08</u>, 2023, by and between <u>Juan Diaz Cuenca</u> ("Employee") and Alexandra Lozano Immigration Law, PLLC (the "Company").

  1. <u>Consideration.</u> As to only those individuals currently employed by the Company when they sign this Agreement, in consideration for such current employee's acceptance of this Agreement, the Company will provide all such current employees who sign this Agreement with an additional amount of paid time off days beyond what current employees are entitled by applicable Company policy to take. Specifically, each current employee who signs their acceptance to both this Agreement and the Mutual Dispute Resolution Agreement contemporaneously provided to employees along with this Agreement, will be provided four (4) days (or, if employed by the Company on a part-time basis, a pro-rata number of days based on their regular schedule as compared to a full-time employee) of paid time off to be taken during the final week of the 2023 calendar year (between the Christmas holiday and up to and including New Year's Eve). If, however, a current employee signs only this Agreement and not the Mutual Dispute Resolution Agreement (or vice versa), the employee will only receive two (2) days of paid time off (or pro-rata share for part-time employees) to be taken during the final week of the 2023 calendar year. If the current employee signs neither this Agreement nor the Mutual Dispute Resolution Agreement, no additional paid time off days will be provided.

  2. <u>Confidential Information.</u>

  a. "Confidential Information" means information that: (i) is disclosed to Employee or of which the Employee becomes aware as a consequence of or through Employee's employment with the Company, (ii) is not generally known outside of the Company, (iii) has value to the Company, (iv) relates to the business of the Company, and (v) could be damaging to the Company's business if disclosed to or used by others. Such information may include, but is not limited to, data and information with regard to business plans, trade secrets, finances, records, personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods, know-how, sales methodologies, training methodologies, sales channels, product development plans and/or pricing (collectively, "Confidential Information"). The Company agrees to provide Employee with access to such Confidential Information as is necessary to perform Employee's duties for the Company.

  Confidential Information does not include information in the public domain or information that is generally known and used within the industry or industries in which the Company engages in business (unless such information entered the public domain and/or became known within the industry through any improper, unauthorized and/or inadvertent disclosure). Confidential Information also does not include information protected from disclosure by the National Labor Relations Act (or other federal or state law) and, for example, does not include information about the terms and conditions of non-management employees' employment at the Company that comes to Employee's attention in the normal course of Employee's employment, but Confidential Information does include information in the Company's non-public records and files.

1

b.      Subject to the provisions of Paragraph 8, below, Employee acknowledges and agrees that all Confidential Information is proprietary to the Company and is a valuable, special and unique asset of the Company, and that any disclosure or unauthorized use of Confidential Information will cause irreparable harm and loss to the Company.  Employee understands and acknowledges that each and every component of the Confidential Information (i) has been developed by the Company at significant effort and expense and is sufficiently secret to derive economic value from not being generally known to other parties, and (ii) constitutes a protectible business interest of the Company.

c.      Employee acknowledges and agrees that the Company owns the Confidential Information.  Employee agrees not to dispute or deny any such ownership rights at any time.

d.      Subject to the provisions of Paragraph 8, below, throughout Employee's employment with the Company: (i) Employee will hold all Confidential Information in the strictest confidence, take all reasonable precautions to prevent its inadvertent disclosure to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (ii) Employee will not, directly or indirectly, utilize, disclose or make available to any other person or entity, any of the Confidential Information, other than in the proper performance of Employee's duties during Employee's employment with the Company; and (iii) Employee will not use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.

e.      Subject to the provisions of Paragraph 8, below, during the two-year period immediately following the end of Employee's employment with the Company, Employee will not, anywhere in the United States, directly or indirectly (i) utilize, disclose, or make available to any other person or entity, any of the Company's Confidential Information; or (ii) use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.  Employee understands and agrees that the time and territory limits on this restriction do not apply to trade secrets (discussed below), which are protected by law.

f.      Employee acknowledges that some of Company's Confidential Information may also qualify as trade secrets as defined by governing state law. Employee acknowledges and agrees that nothing in this Agreement diminishes or reduces Employee's obligations under trade secret law to continue to protect the Company's trade secrets after the end of Employee's employment, and to not use or disclose such trade secrets for as long as they remain protected by law.

3.      Return of Company Property.  At the request of the Company or upon cessation of Employee's employment with the Company for any reason, Employee will immediately deliver to the Company all property of the Company that is then in Employee's possession, custody or control, including, without limitation, all keys, access cards, cellular or smart phones, computer hardware (including but not limited to any hard drives, diskettes, laptop computers and personal data assistants and the contents thereof, as well as any passwords or codes needed to operate any such hardware), computer software and programs, data, materials, papers, books, files, documents, records, policies, client and customer information and lists, rolodexes, financial data, marketing information, design information, specifications and plans, database information and lists, mailing lists, notes, and any other property or information relating to the Company.

2

4.    Non-Solicitation of Customers.

a.    Subject to the provisions of Section 6, below, during the Restricted Period, other than in the proper performance of Employee's duties while employed by the Company, Employee shall not, directly or in concert with others (whether as owner, officer, partner, principal, joint venturer, shareholder, director, member, manager, investor, agent, employee, or otherwise) sell, promote or provide, or attempt to sell, promote or provide, any Competitive Products and Services to any Restricted Customer.

b.    Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth in Paragraph 4 are reasonable and necessary in order for Company to protect its Confidential Information and trade secrets and are fair in that they do not prohibit Employee from continuing to be employed in Employee's chosen field of work.

c.    For purposes of this Agreement, the following definitions apply:

(i)    "Competitive Products and Services" shall mean products or services that serve one or more of the same functions as, or could be used to replace, in whole or in part, products or services which the Company offered to customers at the time Employee's work with the Company ended or which the Company was actively preparing to sell or provide during such time.

(ii)    "Material Contact" means: (1) Employee sold products or services to the customer or client; (2) Employee personally provided services to the customer or client; (3) Employee supervised those who sold products or provided services to the customer or client and had business-related discussions with the customer or client on behalf of the Company; or (4) Employee received Confidential Information in the ordinary course of business about the customer or client.

(iii)    "Restricted Customer" means any person or entity (1) which was a customer or client of the Company during the one-year period ending on Employee's last day of employment and (2) with which Employee had Material Contact during such period.

(iv)    "Restricted Period" means during Employee's employment and for the one-year period immediately following the cessation of Employee's employment with the Company for any reason.

5.    Non-Solicitation of Employees.  Subject to the provisions of Paragraph 6, below, Employee agrees that during the Restricted Period, Employee shall not seek to influence or induce to leave the Company's employment or service, any person (a) who was employed or otherwise engaged by the Company at any time during the twelve (12) months ending on Employee's last day of employment with the Company and (b) with whom Employee had Material Contact during such period.  For purposes of this Paragraph 5, "Material Contact" means: (i) Employee supervised such person or was otherwise in such person's chain of command; (ii) Employee regularly worked with the person on behalf of the Employer; or (iii) Employee received Confidential Information in the ordinary course of business about the person.

3

6.     Limitations on Non-Solicitation Obligations. Notwithstanding the foregoing, if Employee's annualized earnings from the Company do not exceed $116,593.18,[1] then: (1) the obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that apply during Employee's employment with the Company shall only be applicable to Employee to the extent they are consistent and coextensive with Employee's common law duties (including the duty of loyalty), statutory duties, and duty to avoid conflicts of interest and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; (2) the obligations and restrictions set forth in Paragraph 4 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any customer of the Company to cease or reduce the extent to which it is doing business with the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; and (3) the obligations and restrictions set forth in Paragraph 5 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any employee of the Company to leave the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets.   In addition, even if Employee makes more than $116,593.18 per year in earnings from the Company, the post-employment obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that are in addition to those described in this Paragraph 6 shall not apply to Employee following Employee's separation from the Company if Employee is terminated by the Company as the result of a layoff, unless the Company, at its sole option, elects to pay Employee compensation equivalent to Employee's base salary at the time of termination for the post-employment restricted period, less any compensation earned by Employee through subsequent employment during that period.

7.     Enforcement. Employee acknowledges and agrees that to the extent any form of legal action is required to enforce any of Paragraphs 2 through 5 above, the Company shall be entitled to recover its reasonable costs and attorney's fees to the extent the Company is the prevailing party. The Company will be considered the "prevailing party" if the Company obtains any form of partial or complete injunctive relief, whether temporary, preliminary, or otherwise. The parties understand and agree that nothing in the Agreement is intended to or shall operate to alter, denigrate, or deny Employee the rights and remedies set forth in RCW 49.62.080. If any part of this Agreement is held void or unenforceable, every other term of this Agreement shall remain valid and fully enforceable.  If any court refuses to enforce any part of this Agreement as written,

---

[1] The term "earnings" as used in this Paragraph 6 means the compensation reflected on box one of Employee's United States internal revenue service form W-2 that is paid to Employee over the prior year, or portion thereof for which Employee was employed, annualized and calculated as of the earlier of the date enforcement of the provisions in this Agreement are sought or the date of Employee's separation from employment with the Company. The $116,593.18 figure referenced in this Paragraph 6 is current through December 31, 2023, but is deemed to be automatically adjusted for inflation on an annual basis in accord with the adjustments specified in RCW 49.62.040 (or any successor statute).

4

the court shall, if permitted by applicable law, modify that part to the minimum extent necessary to make it enforceable under applicable law and shall enforce it as so modified.

      8.    <u>Authorized Disclosures</u>.  Under the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against the Company for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Nothing contained in this Agreement prohibits or prevents Employee from filing a charge with or participating, testifying, or assisting in any investigation, hearing, whistleblowing proceeding or other proceeding before any federal, state, or local government agency, *e.g.* the EEOC, NLRB, SEC, etc., or in any legislative or judicial proceeding nor does anything in this Agreement preclude, prohibit or otherwise limit, in any way, Employee's rights and abilities to contact, communicate with or report unlawful conduct to federal, state, or local officials for investigation or participate in any whistleblower program administered by any such agencies.  The Company further acknowledges Employee's rights to make truthful statements or disclosures required by law, regulation, or legal process and to request or receive confidential legal advice, and nothing in this Agreement shall be deemed to impair those rights.  The Company also acknowledges Employee's rights to make truthful statements or disclosures about unlawful employment practices which are defined to mean any form of unlawful discrimination, harassment, or retaliation that is actionable under Title VII of the Civil Rights Act of 1964 or any comparable state statue or any other related federal or state rule or law that is enforced by the Equal Employment Opportunity Commission or a comparable state agency.  For the sake of clarity, nothing in the Agreement is intended to or shall prevent Employee from disclosing information that Employee has a right to disclose under applicable law, including but not limited to, Employee discussing or disclosing: (i) Employee's own compensation information with other employees, or with third parties who are not future employers or competitors of the Company; and (ii) information relating to conduct that Employee reasonably believes to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.  This Agreement shall not be construed to limit Employee's rights under the National Labor Relations Act including, but not limited to, the right to engage in protected concerted activity, including discussing terms and conditions of employment with coworkers, and attempting to improve terms and conditions of employment through channels outside the immediate employee-employer relationship, such as through the National Labor Relations Board.

      9.    <u>Entire Agreement</u>.  This Agreement constitutes the entire Agreement and understanding between the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof.  No other agreement or amendment to this Agreement shall be binding upon either party including, without limitation, any agreement or amendment made hereafter unless in writing, signed by both parties.

      10.    <u>Successors and Assigns</u>. This Agreement may be freely assigned by the Company and is fully enforceable by any successor in interest to the Company.  Employee hereby gives

5

Employee's consent to any such assignment. Employee shall not assign any of Employee's rights, powers, duties, or obligations hereunder.

11.     Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state in which Employee worked for the Company at the time Employee signs this Agreement without regard to its conflict of laws provision.  In the event Employee is deemed to be a Washington-based employee for purposes of this Agreement, then this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Washington.

12.     Counterparts.  This Agreement may be executed in two or more counterparts, each of which when executed and delivered shall be deemed an original and all of which, taken together, shall constitute the same agreement. This Agreement and any document or schedule required hereby may be executed by facsimile signature, electronic signature or PDF format, which shall be considered legally binding for all purposes.

13.     Notifications To Third Parties.  Employee agrees that during my employment with the Company and for a period of twelve (12) months after the cessation of Employee's engagement with the Company, Employee will provide a copy of this Agreement to any person or entity with which Employee seeks employment or engagement prior to the commencement of any such employment or engagement, and agrees that the Company may notify any such person or entity of this Agreement.

14.     Disclosure of Existing Obligations.  Except as Employee has disclosed in writing at the end of this Agreement, Employee is not bound by any agreement or obligation that directly or indirectly: (i) restricts Employee from using or disclosing any confidential information of any person or entity in the course of Employee's employment with the Company; (ii) restricts Employee from competing with, or soliciting actual or potential customers or business from, any person or entity; (iii) restricts Employee from soliciting any current or former employees of any person or entity; or (iv) limits Employee's ability to perform any assigned duties for the Company. Employee represents that Employee does not possess any confidential information or trade secrets of any entity other than the Company, including any prior employers of Employee.  Employee acknowledges and agrees that Employee can perform Employee's job duties on behalf of the Company without using or relying upon any confidential information or trade secrets of any other entity, including any prior employer, and the Company hereby instructs Employee not to use or rely upon any such confidential information or trade secrets.

15.     Knowing and Voluntary.  Employee acknowledges that Employee has read, understood, and accepts the provisions of this Agreement.  The Company is hereby advising Employee, in writing, to consult with an attorney before signing this Agreement.  Employee is further advised that Employee has thirty (30) calendar days to review this Agreement before signing it.

6

EMPLOYEE

THE COMPANY

*Juan Diaz Cuenca*

Print: **Juan Diaz Cuenca**

Date: **Aug 14, 2023**

Print: Alejandro Mata

Title: Chief Human Resources Officer

Date: July 19, 2023

7

## DISCLOSURES

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# EXHIBIT 2

## RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement (the "Agreement"), is made and entered into this 28 day of 08 , 2023, by and between Laura Catalina Rodriguez ("Employee") and Alexandra Lozano Immigration Law, PLLC (the "Company").

1.      Consideration. As to only those individuals currently employed by the Company when they sign this Agreement, in consideration for such current employee's acceptance of this Agreement, the Company will provide all such current employees who sign this Agreement with an additional amount of paid time off days beyond what current employees are entitled by applicable Company policy to take. Specifically, each current employee who signs their acceptance to both this Agreement and the Mutual Dispute Resolution Agreement contemporaneously provided to employees along with this Agreement, will be provided four (4) days (or, if employed by the Company on a part-time basis, a pro-rata number of days based on their regular schedule as compared to a full-time employee) of paid time off to be taken during the final week of the 2023 calendar year (between the Christmas holiday and up to and including New Year's Eve). If, however, a current employee signs only this Agreement and not the Mutual Dispute Resolution Agreement (or vice versa), the employee will only receive two (2) days of paid time off (or pro-rata share for part-time employees) to be taken during the final week of the 2023 calendar year. If the current employee signs neither this Agreement nor the Mutual Dispute Resolution Agreement, no additional paid time off days will be provided.

2.      Confidential Information.

a.      "Confidential Information" means information that: (i) is disclosed to Employee or of which the Employee becomes aware as a consequence of or through Employee's employment with the Company, (ii) is not generally known outside of the Company, (iii) has value to the Company, (iv) relates to the business of the Company, and (v) could be damaging to the Company's business if disclosed to or used by others.  Such information may include, but is not limited to, data and information with regard to business plans, trade secrets, finances, records, personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods, know-how, sales methodologies, training methodologies, sales channels, product development plans and/or pricing (collectively, "Confidential Information").  The Company agrees to provide Employee with access to such Confidential Information as is necessary to perform Employee's duties for the Company.

Confidential Information does not include information in the public domain or information that is generally known and used within the industry or industries in which the Company engages in business (unless such information entered the public domain and/or became known within the industry through any improper, unauthorized and/or inadvertent disclosure). Confidential Information also does not include information protected from disclosure by the National Labor Relations Act (or other federal or state law) and, for example, does not include information about the terms and conditions of non-management employees' employment at the Company that comes to Employee's attention in the normal course of Employee's employment, but Confidential Information does include information in the Company's non-public records and files.

1

b.      Subject to the provisions of Paragraph 8, below, Employee acknowledges and agrees that all Confidential Information is proprietary to the Company and is a valuable, special and unique asset of the Company, and that any disclosure or unauthorized use of Confidential Information will cause irreparable harm and loss to the Company.  Employee understands and acknowledges that each and every component of the Confidential Information (i) has been developed by the Company at significant effort and expense and is sufficiently secret to derive economic value from not being generally known to other parties, and (ii) constitutes a protectible business interest of the Company.

c.      Employee acknowledges and agrees that the Company owns the Confidential Information.  Employee agrees not to dispute or deny any such ownership rights at any time.

d.      Subject to the provisions of Paragraph 8, below, throughout Employee's employment with the Company: (i) Employee will hold all Confidential Information in the strictest confidence, take all reasonable precautions to prevent its inadvertent disclosure to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (ii) Employee will not, directly or indirectly, utilize, disclose or make available to any other person or entity, any of the Confidential Information, other than in the proper performance of Employee's duties during Employee's employment with the Company; and (iii) Employee will not use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.

e.      Subject to the provisions of Paragraph 8, below, during the two-year period immediately following the end of Employee's employment with the Company, Employee will not, anywhere in the United States, directly or indirectly (i) utilize, disclose, or make available to any other person or entity, any of the Company's Confidential Information; or (ii) use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.  Employee understands and agrees that the time and territory limits on this restriction do not apply to trade secrets (discussed below), which are protected by law.

f.      Employee acknowledges that some of Company's Confidential Information may also qualify as trade secrets as defined by governing state law. Employee acknowledges and agrees that nothing in this Agreement diminishes or reduces Employee's obligations under trade secret law to continue to protect the Company's trade secrets after the end of Employee's employment, and to not use or disclose such trade secrets for as long as they remain protected by law.

3.      <u>Return of Company Property</u>.  At the request of the Company or upon cessation of Employee's employment with the Company for any reason, Employee will immediately deliver to the Company all property of the Company that is then in Employee's possession, custody or control, including, without limitation, all keys, access cards, cellular or smart phones, computer hardware (including but not limited to any hard drives, diskettes, laptop computers and personal data assistants and the contents thereof, as well as any passwords or codes needed to operate any such hardware), computer software and programs, data, materials, papers, books, files, documents, records, policies, client and customer information and lists, rolodexes, financial data, marketing information, design information, specifications and plans, database information and lists, mailing lists, notes, and any other property or information relating to the Company.

2

4.      <u>Non-Solicitation of Customers</u>.

a.      Subject to the provisions of Section 6, below, during the Restricted Period, other than in the proper performance of Employee's duties while employed by the Company, Employee shall not, directly or in concert with others (whether as owner, officer, partner, principal, joint venturer, shareholder, director, member, manager, investor, agent, employee, or otherwise) sell, promote or provide, or attempt to sell, promote or provide, any Competitive Products and Services to any Restricted Customer.

b.      Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth in Paragraph 4 are reasonable and necessary in order for Company to protect its Confidential Information and trade secrets and are fair in that they do not prohibit Employee from continuing to be employed in Employee's chosen field of work.

c.      For purposes of this Agreement, the following definitions apply:

(i)      "Competitive Products and Services" shall mean products or services that serve one or more of the same functions as, or could be used to replace, in whole or in part, products or services which the Company offered to customers at the time Employee's work with the Company ended or which the Company was actively preparing to sell or provide during such time.

(ii)      "Material Contact" means: (1) Employee sold products or services to the customer or client; (2) Employee personally provided services to the customer or client; (3) Employee supervised those who sold products or provided services to the customer or client and had business-related discussions with the customer or client on behalf of the Company; or (4) Employee received Confidential Information in the ordinary course of business about the customer or client.

(iii)      "Restricted Customer" means any person or entity (1) which was a customer or client of the Company during the one-year period ending on Employee's last day of employment and (2) with which Employee had Material Contact during such period.

(iv)      "Restricted Period" means during Employee's employment and for the one-year period immediately following the cessation of Employee's employment with the Company for any reason.

5.      <u>Non-Solicitation of Employees</u>.  Subject to the provisions of Paragraph 6, below, Employee agrees that during the Restricted Period, Employee shall not seek to influence or induce to leave the Company's employment or service, any person (a) who was employed or otherwise engaged by the Company at any time during the twelve (12) months ending on Employee's last day of employment with the Company and (b) with whom Employee had Material Contact during such period.  For purposes of this Paragraph 5, "Material Contact" means: (i) Employee supervised such person or was otherwise in such person's chain of command; (ii) Employee regularly worked with the person on behalf of the Employer; or (iii) Employee received Confidential Information in the ordinary course of business about the person.

3

6.      <u>Limitations on Non-Solicitation Obligations.</u>  Notwithstanding the foregoing, if Employee's annualized earnings from the Company do not exceed $116,593.18,[1] then: (1) the obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that apply during Employee's employment with the Company shall only be applicable to Employee to the extent they are consistent and coextensive with Employee's common law duties (including the duty of loyalty), statutory duties, and duty to avoid conflicts of interest and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; (2) the obligations and restrictions set forth in Paragraph 4 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any customer of the Company to cease or reduce the extent to which it is doing business with the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; and (3) the obligations and restrictions set forth in Paragraph 5 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any employee of the Company to leave the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets.   In addition, even if Employee makes more than $116,593.18 per year in earnings from the Company, the post-employment obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that are in addition to those described in this Paragraph 6 shall not apply to Employee following Employee's separation from the Company if Employee is terminated by the Company as the result of a layoff, unless the Company, at its sole option, elects to pay Employee compensation equivalent to Employee's base salary at the time of termination for the post-employment restricted period, less any compensation earned by Employee through subsequent employment during that period.

7.      <u>Enforcement.</u>  Employee acknowledges and agrees that to the extent any form of legal action is required to enforce any of Paragraphs 2 through 5 above, the Company shall be entitled to recover its reasonable costs and attorney's fees to the extent the Company is the prevailing party.  The Company will be considered the "prevailing party" if the Company obtains any form of partial or complete injunctive relief, whether temporary, preliminary, or otherwise. The parties understand and agree that nothing in the Agreement is intended to or shall operate to alter, denigrate, or deny Employee the rights and remedies set forth in RCW 49.62.080. If any part of this Agreement is held void or unenforceable, every other term of this Agreement shall remain valid and fully enforceable.  If any court refuses to enforce any part of this Agreement as written,

--------

[1] The term "earnings" as used in this Paragraph 6 means the compensation reflected on box one of Employee's United States internal revenue service form W-2 that is paid to Employee over the prior year, or portion thereof for which Employee was employed, annualized and calculated as of the earlier of the date enforcement of the provisions in this Agreement are sought or the date of Employee's separation from employment with the Company. The $116,593.18 figure referenced in this Paragraph 6 is current through December 31, 2023, but is deemed to be automatically adjusted for inflation on an annual basis in accord with the adjustments specified in RCW 49.62.040 (or any successor statute).

4

the court shall, if permitted by applicable law, modify that part to the minimum extent necessary to make it enforceable under applicable law and shall enforce it as so modified.

8.    <u>Authorized Disclosures</u>.   Under the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against the Company for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.   Nothing contained in this Agreement prohibits or prevents Employee from filing a charge with or participating, testifying, or assisting in any investigation, hearing, whistleblowing proceeding or other proceeding before any federal, state, or local government agency, *e.g.* the EEOC, NLRB, SEC, etc., or in any legislative or judicial proceeding nor does anything in this Agreement preclude, prohibit or otherwise limit, in any way, Employee's rights and abilities to contact, communicate with or report unlawful conduct to federal, state, or local officials for investigation or participate in any whistleblower program administered by any such agencies.   The Company further acknowledges Employee's rights to make truthful statements or disclosures required by law, regulation, or legal process and to request or receive confidential legal advice, and nothing in this Agreement shall be deemed to impair those rights.   The Company also acknowledges Employee's rights to make truthful statements or disclosures about unlawful employment practices which are defined to mean any form of unlawful discrimination, harassment, or retaliation that is actionable under Title VII of the Civil Rights Act of 1964 or any comparable state statue or any other related federal or state rule or law that is enforced by the Equal Employment Opportunity Commission or a comparable state agency.   For the sake of clarity, nothing in the Agreement is intended to or shall prevent Employee from disclosing information that Employee has a right to disclose under applicable law, including but not limited to, Employee discussing or disclosing: (i) Employee's own compensation information with other employees, or with third parties who are not future employers or competitors of the Company; and (ii) information relating to conduct that Employee reasonably believes to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.   This Agreement shall not be construed to limit Employee's rights under the National Labor Relations Act including, but not limited to, the right to engage in protected concerted activity, including discussing terms and conditions of employment with coworkers, and attempting to improve terms and conditions of employment through channels outside the immediate employee-employer relationship, such as through the National Labor Relations Board.

9.    <u>Entire Agreement</u>.    This Agreement constitutes the entire Agreement and understanding between the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof.   No other agreement or amendment to this Agreement shall be binding upon either party including, without limitation, any agreement or amendment made hereafter unless in writing, signed by both parties.

10.    <u>Successors and Assigns</u>.   This Agreement may be freely assigned by the Company and is fully enforceable by any successor in interest to the Company.   Employee hereby gives

5

Employee's consent to any such assignment.  Employee shall not assign any of Employee's rights, powers, duties, or obligations hereunder.

11.    <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state in which Employee worked for the Company at the time Employee signs this Agreement without regard to its conflict of laws provision.  In the event Employee is deemed to be a Washington-based employee for purposes of this Agreement, then this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Washington.

12.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which when executed and delivered shall be deemed an original and all of which, taken together, shall constitute the same agreement. This Agreement and any document or schedule required hereby may be executed by facsimile signature, electronic signature or PDF format, which shall be considered legally binding for all purposes.

13.    <u>Notifications To Third Parties</u>.  Employee agrees that during my employment with the Company and for a period of twelve (12) months after the cessation of Employee's engagement with the Company, Employee will provide a copy of this Agreement to any person or entity with which Employee seeks employment or engagement prior to the commencement of any such employment or engagement, and agrees that the Company may notify any such person or entity of this Agreement.

14.    <u>Disclosure of Existing Obligations</u>.  Except as Employee has disclosed in writing at the end of this Agreement, Employee is not bound by any agreement or obligation that directly or indirectly: (i) restricts Employee from using or disclosing any confidential information of any person or entity in the course of Employee's employment with the Company; (ii) restricts Employee from competing with, or soliciting actual or potential customers or business from, any person or entity; (iii) restricts Employee from soliciting any current or former employees of any person or entity; or (iv) limits Employee's ability to perform any assigned duties for the Company. Employee represents that Employee does not possess any confidential information or trade secrets of any entity other than the Company, including any prior employers of Employee.  Employee acknowledges and agrees that Employee can perform Employee's job duties on behalf of the Company without using or relying upon any confidential information or trade secrets of any other entity, including any prior employer, and the Company hereby instructs Employee not to use or rely upon any such confidential information or trade secrets.

15.    <u>Knowing and Voluntary</u>.  Employee acknowledges that Employee has read, understood, and accepts the provisions of this Agreement.  The Company is hereby advising Employee, in writing, to consult with an attorney before signing this Agreement.  Employee is further advised that Employee has thirty (30) calendar days to review this Agreement before signing it.

6

EMPLOYEE

*Laura Catalina Rodriguez*

Print: ___Laura Catalina Rodriguez___

Date: ___8/28/2023___

THE COMPANY

Print: Alejandro Mata

Title: Chief Human Resources Officer

Date: July 19, 2023

7

## <u>DISCLOSURES</u>

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

EXHIBIT 3

# OWEN | VANDERBRUG

*james@owenvanderbrug.com*
*vanessa@owenvanderbrug.com*

April 2, 2024

*Via Electronic Mail*
Juan Diaz Cuenca
Juanpablo.diazcuenca@gmail.com

RE:     *Notice to Cease and Desist*

Dear Mr. Diaz Cuenca:

This letter serves as a formal demand for you to immediately cease and desist from the use and disclosure of confidential and proprietary information belonging to Alexandra Lozano Immigration Law, PLLC (ALIL). It has come to our attention that you have engaged in actions that violate the Uniform Trade Secrets Act (RCW 19.108 *et. seq.*) and the terms of the Restrictive Covenant Agreement ("Agreement") you signed on August 14, 2023, specifically regarding the protection of ALIL's trade secrets and confidential information. A copy of the Agreement is enclosed, for your reference.

During your employment with ALIL, you had access to valuable and sensitive information that is considered a trade secret and proprietary to ALIL. This information includes, but is not limited to, business strategies, our unique business model, marketing methodology and client lists. The unauthorized use or disclosure of such information constitutes a breach of Washington law and your contractual obligations.

We have evidence that suggests you have used proprietary information to start a competing business and shared proprietary information with competitors. Such actions have caused or have the potential to cause significant harm to ALIL's competitive position and financial well-being.

You must immediately:

(1) Cease all use and disclosure of ALIL's trade secrets and confidential information.

(2) Return all documents, electronic files, and other materials containing ALIL's proprietary information.

SEATTLE
1700 SEVENTH AVENUE, SUITE 2100
SEATTLE, WASHINGTON  98101
P: (206) 467-1400   F: (206) 467-4884

SPOKANE
421 WEST RIVERSIDE AVENUE, STE. 416
SPOKANE, WASHINGTON  99201
P: (509) 863-9771   F: (206) 467-4884

www.owenvanderbrug.com

**OWEN | VANDERBRUG**

April 2, 2024
Page 2 of 2

      Provide a written assurance within five days of receipt of this letter that you have complied with these demands and will refrain from any further unauthorized use or disclosure of ALIL's trade secrets and confidential information.

      Please be advised that ALIL is prepared to take all necessary legal actions to protect its interests, including filing a lawsuit for injunctive relief and damages without further notice if you fail to comply with the demands outlined in this letter.

      We expect your immediate attention to this matter. Please contact the undersigned to discuss your compliance with these demands.

      Very truly yours,

*Vanessa Vanderbrug*

Vanessa M. Vanderbrug

cc:  Alexandra Lozano
     Katie Nentwick

SEATTLE
1700 SEVENTH AVENUE, SUITE 2100
SEATTLE, WASHINGTON  98101
P: (206) 467-1400  F: (206) 467-4884

SPOKANE
421 WEST RIVERSIDE AVENUE, STE. 416
SPOKANE, WASHINGTON  99201
P: (509) 863-9771  F: (206) 467-4884

www.owenvanderbrug.com

## RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement (the "Agreement"), is made and entered into this 14 day of 08 , 2023, by and between Juan Diaz Cuenca ("Employee") and Alexandra Lozano Immigration Law, PLLC (the "Company").

1.     <u>Consideration.</u> As to only those individuals currently employed by the Company when they sign this Agreement, in consideration for such current employee's acceptance of this Agreement, the Company will provide all such current employees who sign this Agreement with an additional amount of paid time off days beyond what current employees are entitled by applicable Company policy to take. Specifically, each current employee who signs their acceptance to both this Agreement and the Mutual Dispute Resolution Agreement contemporaneously provided to employees along with this Agreement, will be provided four (4) days (or, if employed by the Company on a part-time basis, a pro-rata number of days based on their regular schedule as compared to a full-time employee) of paid time off to be taken during the final week of the 2023 calendar year (between the Christmas holiday and up to and including New Year's Eve). If, however, a current employee signs only this Agreement and not the Mutual Dispute Resolution Agreement (or vice versa), the employee will only receive two (2) days of paid time off (or pro-rata share for part-time employees) to be taken during the final week of the 2023 calendar year. If the current employee signs neither this Agreement nor the Mutual Dispute Resolution Agreement, no additional paid time off days will be provided.

2.     <u>Confidential Information.</u>

a.     "Confidential Information" means information that: (i) is disclosed to Employee or of which the Employee becomes aware as a consequence of or through Employee's employment with the Company, (ii) is not generally known outside of the Company, (iii) has value to the Company, (iv) relates to the business of the Company, and (v) could be damaging to the Company's business if disclosed to or used by others.  Such information may include, but is not limited to, data and information with regard to business plans, trade secrets, finances, records, personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods, know-how, sales methodologies, training methodologies, sales channels, product development plans and/or pricing (collectively, "Confidential Information").  The Company agrees to provide Employee with access to such Confidential Information as is necessary to perform Employee's duties for the Company.

Confidential Information does not include information in the public domain or information that is generally known and used within the industry or industries in which the Company engages in business (unless such information entered the public domain and/or became known within the industry through any improper, unauthorized and/or inadvertent disclosure).  Confidential Information also does not include information protected from disclosure by the National Labor Relations Act (or other federal or state law) and, for example, does not include information about the terms and conditions of non-management employees' employment at the Company that comes to Employee's attention in the normal course of Employee's employment, but Confidential Information does include information in the Company's non-public records and files.

1

b.      Subject to the provisions of Paragraph 8, below, Employee acknowledges and agrees that all Confidential Information is proprietary to the Company and is a valuable, special and unique asset of the Company, and that any disclosure or unauthorized use of Confidential Information will cause irreparable harm and loss to the Company. Employee understands and acknowledges that each and every component of the Confidential Information (i) has been developed by the Company at significant effort and expense and is sufficiently secret to derive economic value from not being generally known to other parties, and (ii) constitutes a protectible business interest of the Company.

c.      Employee acknowledges and agrees that the Company owns the Confidential Information. Employee agrees not to dispute or deny any such ownership rights at any time.

d.      Subject to the provisions of Paragraph 8, below, throughout Employee's employment with the Company: (i) Employee will hold all Confidential Information in the strictest confidence, take all reasonable precautions to prevent its inadvertent disclosure to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (ii) Employee will not, directly or indirectly, utilize, disclose or make available to any other person or entity, any of the Confidential Information, other than in the proper performance of Employee's duties during Employee's employment with the Company; and (iii) Employee will not use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.

e.      Subject to the provisions of Paragraph 8, below, during the two-year period immediately following the end of Employee's employment with the Company, Employee will not, anywhere in the United States, directly or indirectly (i) utilize, disclose, or make available to any other person or entity, any of the Company's Confidential Information; or (ii) use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company. Employee understands and agrees that the time and territory limits on this restriction do not apply to trade secrets (discussed below), which are protected by law.

f.      Employee acknowledges that some of Company's Confidential Information may also qualify as trade secrets as defined by governing state law. Employee acknowledges and agrees that nothing in this Agreement diminishes or reduces Employee's obligations under trade secret law to continue to protect the Company's trade secrets after the end of Employee's employment, and to not use or disclose such trade secrets for as long as they remain protected by law.

3.      Return of Company Property. At the request of the Company or upon cessation of Employee's employment with the Company for any reason, Employee will immediately deliver to the Company all property of the Company that is then in Employee's possession, custody or control, including, without limitation, all keys, access cards, cellular or smart phones, computer hardware (including but not limited to any hard drives, diskettes, laptop computers and personal data assistants and the contents thereof, as well as any passwords or codes needed to operate any such hardware), computer software and programs, data, materials, papers, books, files, documents, records, policies, client and customer information and lists, rolodexes, financial data, marketing information, design information, specifications and plans, database information and lists, mailing lists, notes, and any other property or information relating to the Company.

2

4.    Non-Solicitation of Customers.

a.    Subject to the provisions of Section 6, below, during the Restricted Period, other than in the proper performance of Employee's duties while employed by the Company, Employee shall not, directly or in concert with others (whether as owner, officer, partner, principal, joint venturer, shareholder, director, member, manager, investor, agent, employee, or otherwise) sell, promote or provide, or attempt to sell, promote or provide, any Competitive Products and Services to any Restricted Customer.

b.    Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth in Paragraph 4 are reasonable and necessary in order for Company to protect its Confidential Information and trade secrets and are fair in that they do not prohibit Employee from continuing to be employed in Employee's chosen field of work.

c.    For purposes of this Agreement, the following definitions apply:

(i)    "Competitive Products and Services" shall mean products or services that serve one or more of the same functions as, or could be used to replace, in whole or in part, products or services which the Company offered to customers at the time Employee's work with the Company ended or which the Company was actively preparing to sell or provide during such time.

(ii)    "Material Contact" means: (1) Employee sold products or services to the customer or client; (2) Employee personally provided services to the customer or client; (3) Employee supervised those who sold products or provided services to the customer or client and had business-related discussions with the customer or client on behalf of the Company; or (4) Employee received Confidential Information in the ordinary course of business about the customer or client.

(iii)    "Restricted Customer" means any person or entity (1) which was a customer or client of the Company during the one-year period ending on Employee's last day of employment and (2) with which Employee had Material Contact during such period.

(iv)    "Restricted Period" means during Employee's employment and for the one-year period immediately following the cessation of Employee's employment with the Company for any reason.

5.    Non-Solicitation of Employees.  Subject to the provisions of Paragraph 6, below, Employee agrees that during the Restricted Period, Employee shall not seek to influence or induce to leave the Company's employment or service, any person (a) who was employed or otherwise engaged by the Company at any time during the twelve (12) months ending on Employee's last day of employment with the Company and (b) with whom Employee had Material Contact during such period.  For purposes of this Paragraph 5, "Material Contact" means: (i) Employee supervised such person or was otherwise in such person's chain of command; (ii) Employee regularly worked with the person on behalf of the Employer; or (iii) Employee received Confidential Information in the ordinary course of business about the person.

3

6.     <u>Limitations on Non-Solicitation Obligations.</u> Notwithstanding the foregoing, if Employee's annualized earnings from the Company do not exceed $116,593.18,[1] then: (1) the obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that apply during Employee's employment with the Company shall only be applicable to Employee to the extent they are consistent and coextensive with Employee's common law duties (including the duty of loyalty), statutory duties, and duty to avoid conflicts of interest and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; (2) the obligations and restrictions set forth in Paragraph 4 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any customer of the Company to cease or reduce the extent to which it is doing business with the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; and (3) the obligations and restrictions set forth in Paragraph 5 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any employee of the Company to leave the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets.   In addition, even if Employee makes more than $116,593.18 per year in earnings from the Company, the post-employment obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that are in addition to those described in this Paragraph 6 shall not apply to Employee following Employee's separation from the Company if Employee is terminated by the Company as the result of a layoff, unless the Company, at its sole option, elects to pay Employee compensation equivalent to Employee's base salary at the time of termination for the post-employment restricted period, less any compensation earned by Employee through subsequent employment during that period.

7.     <u>Enforcement.</u> Employee acknowledges and agrees that to the extent any form of legal action is required to enforce any of Paragraphs 2 through 5 above, the Company shall be entitled to recover its reasonable costs and attorney's fees to the extent the Company is the prevailing party.  The Company will be considered the "prevailing party" if the Company obtains any form of partial or complete injunctive relief, whether temporary, preliminary, or otherwise. The parties understand and agree that nothing in the Agreement is intended to or shall operate to alter, denigrate, or deny Employee the rights and remedies set forth in RCW 49.62.080. If any part of this Agreement is held void or unenforceable, every other term of this Agreement shall remain valid and fully enforceable.  If any court refuses to enforce any part of this Agreement as written,

---

[1] The term "earnings" as used in this Paragraph 6 means the compensation reflected on box one of Employee's United States internal revenue service form W-2 that is paid to Employee over the prior year, or portion thereof for which Employee was employed, annualized and calculated as of the earlier of the date enforcement of the provisions in this Agreement are sought or the date of Employee's separation from employment with the Company. The $116,593.18 figure referenced in this Paragraph 6 is current through December 31, 2023, but is deemed to be automatically adjusted for inflation on an annual basis in accord with the adjustments specified in RCW 49.62.040 (or any successor statute).

the court shall, if permitted by applicable law, modify that part to the minimum extent necessary to make it enforceable under applicable law and shall enforce it as so modified.

       8.     Authorized Disclosures.  Under the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against the Company for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Nothing contained in this Agreement prohibits or prevents Employee from filing a charge with or participating, testifying, or assisting in any investigation, hearing, whistleblowing proceeding or other proceeding before any federal, state, or local government agency, *e.g.* the EEOC, NLRB, SEC, etc., or in any legislative or judicial proceeding nor does anything in this Agreement preclude, prohibit or otherwise limit, in any way, Employee's rights and abilities to contact, communicate with or report unlawful conduct to federal, state, or local officials for investigation or participate in any whistleblower program administered by any such agencies.  The Company further acknowledges Employee's rights to make truthful statements or disclosures required by law, regulation, or legal process and to request or receive confidential legal advice, and nothing in this Agreement shall be deemed to impair those rights.  The Company also acknowledges Employee's rights to make truthful statements or disclosures about unlawful employment practices which are defined to mean any form of unlawful discrimination, harassment, or retaliation that is actionable under Title VII of the Civil Rights Act of 1964 or any comparable state statue or any other related federal or state rule or law that is enforced by the Equal Employment Opportunity Commission or a comparable state agency.  For the sake of clarity, nothing in the Agreement is intended to or shall prevent Employee from disclosing information that Employee has a right to disclose under applicable law, including but not limited to, Employee discussing or disclosing: (i) Employee's own compensation information with other employees, or with third parties who are not future employers or competitors of the Company; and (ii) information relating to conduct that Employee reasonably believes to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.  This Agreement shall not be construed to limit Employee's rights under the National Labor Relations Act including, but not limited to, the right to engage in protected concerted activity, including discussing terms and conditions of employment with coworkers, and attempting to improve terms and conditions of employment through channels outside the immediate employee-employer relationship, such as through the National Labor Relations Board.

       9.     Entire Agreement.  This Agreement constitutes the entire Agreement and understanding between the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof.  No other agreement or amendment to this Agreement shall be binding upon either party including, without limitation, any agreement or amendment made hereafter unless in writing, signed by both parties.

       10.    Successors and Assigns. This Agreement may be freely assigned by the Company and is fully enforceable by any successor in interest to the Company.  Employee hereby gives

5

Employee's consent to any such assignment. Employee shall not assign any of Employee's rights, powers, duties, or obligations hereunder.

11. <u>Governing Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the state in which Employee worked for the Company at the time Employee signs this Agreement without regard to its conflict of laws provision. In the event Employee is deemed to be a Washington-based employee for purposes of this Agreement, then this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Washington.

12. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which when executed and delivered shall be deemed an original and all of which, taken together, shall constitute the same agreement. This Agreement and any document or schedule required hereby may be executed by facsimile signature, electronic signature or PDF format, which shall be considered legally binding for all purposes.

13. <u>Notifications To Third Parties</u>. Employee agrees that during my employment with the Company and for a period of twelve (12) months after the cessation of Employee's engagement with the Company, Employee will provide a copy of this Agreement to any person or entity with which Employee seeks employment or engagement prior to the commencement of any such employment or engagement, and agrees that the Company may notify any such person or entity of this Agreement.

14. <u>Disclosure of Existing Obligations</u>. Except as Employee has disclosed in writing at the end of this Agreement, Employee is not bound by any agreement or obligation that directly or indirectly: (i) restricts Employee from using or disclosing any confidential information of any person or entity in the course of Employee's employment with the Company; (ii) restricts Employee from competing with, or soliciting actual or potential customers or business from, any person or entity; (iii) restricts Employee from soliciting any current or former employees of any person or entity; or (iv) limits Employee's ability to perform any assigned duties for the Company. Employee represents that Employee does not possess any confidential information or trade secrets of any entity other than the Company, including any prior employers of Employee. Employee acknowledges and agrees that Employee can perform Employee's job duties on behalf of the Company without using or relying upon any confidential information or trade secrets of any other entity, including any prior employer, and the Company hereby instructs Employee not to use or rely upon any such confidential information or trade secrets.

15. <u>Knowing and Voluntary</u>. Employee acknowledges that Employee has read, understood, and accepts the provisions of this Agreement. The Company is hereby advising Employee, in writing, to consult with an attorney before signing this Agreement. Employee is further advised that Employee has thirty (30) calendar days to review this Agreement before signing it.

6

EMPLOYEE

*Juan Diaz Cuenca*

Print: Juan Diaz Cuenca

Date: Aug 14, 2023

THE COMPANY

*Alejandro Mata*

Print: Alejandro Mata

Title: Chief Human Resources Officer

Date: July 19, 2023

7

## DISCLOSURES

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# EXHIBIT 4

# O**RGAN** L**AW** LLP

### A T T O R N E Y S   A T   L A W
### 1330 DUBLIN ROAD
### COLUMBUS, OH 43215
### 614.481.0900

kfraser@organlegal.com
614.869.3221 (direct dial)

April 5, 2024

<u>Via Overnight Mail</u>
Christine Meneses, Esq.
Menses Law
2900 North Loop West, Ste. 300
Houston, Texas 77092

Re:  Notice to Cease and Desist

Dear Ms. Meneses,

    We are writing on behalf of Ms. Alexandra Lozano, Esq., owner and founder of Alexandra Lozano Immigration Law, PLLC (together with its subsidiaries, affiliates and related entities hereinafter referred to as "ALIL").  It has come to our attention that you have hired former employees of ALIL, including, but not limited to Juan Pablo Diaz, Catalina Rodriguez, Nelson Polo, Juan David Arciniegas Parra, Sonia Peñarete, and others, who are all subject to restrictive covenants.  Further, we have evidence that suggests that you and these former employees are using ALIL's confidential and proprietary information in violation of federal and state laws, as well as the employees' restrictive covenants.  A copy of one such restrictive covenant is attached for your reference.

    Accordingly, we demand that you immediately take the following actions:

        (1) Terminate the employment of the former ALIL employees given the clearly imminent threat their continued employment presents to the protection of ALIL's trade secrets and proprietary information;

        (2) Cease all recruiting activity aimed at ALIL employees both domestically and abroad, including cancelling the hiring event scheduled for April 10, 2024 at the Hotel Dann Carlton in Bogotà, Colombia;

        (3) Cease all use of ALIL's confidential and proprietary information, including but not limited to employee lists, client lists, proprietary software and data management, and business growth strategies;

        (4) Destroy all documents, electronic files and other materials that contain ALIL's proprietary information.

Please provide written confirmation that these actions have been taken no later than April 12, 2024. If you continue to interfere with ALIL's restrictive covenants and use ALIL's confidential and proprietary information, ALIL is prepared to take all necessary legal actions to protect its interests, including seeking injunctive relief and damages in court.

To that end, you are under a legal obligation to preserve all materials that may be relevant to this potential legal action. The relevant time frame is 2023 to the present. With this litigation hold notice, we ask that you and Meneses Law take affirmative steps to preserve all documents, data, and/or information in your possession, custody or control related to:

(1) The hiring of former ALIL employees[1];

(2) Employee recruiting strategies;

(3) Business growth strategies, both in the United States and abroad;

(4) Contact with vendors related to those growth strategies;

(5) Data management;

(6) Client lists;

(7) All documents and communications that refer to or are related to Alexandra Lozano, and ALIL, and all of its subsidiaries, affiliates and related entities both in the United States and abroad.

This litigation hold notice includes:

- All communications by any means, including email, regular mail, or any other courier service, and text message on both business and personal devices and accounts;
- Messaging apps, like WhatsApp, including WhatsApp group messages, Facebook Messenger, Slack, Microsoft Teams and Signal—with any ephemeral messaging app's settings being changed so that messages are not automatically deleted;
- All cloud accounts (i.e. iCloud, Google Cloud, etc.), ensuring sufficient backup storage exists for all relevant documents and communications;
- Text files;
- Files on shared servers;
- Databases;

---

[1] A non-exclusive list of names includes: Nelson Polo, Sonia Peñarete, Juan Pablo Diaz, Catalina Rodriguez, Melissa Toscano, Maria Monica Grillo, Diana Cantor, Jesus David Carmona Florez, Juan David Arciniegas Parra, Julian Alejandro Ríos Ramos, Gabriel Nieto, Valeria Candamil Buriticá, Daniel Ferreira, Juan Diego Zuluaga, Camilo Andres Del Castillo Puentes, Danna Méndez Páez, Ines Carmona, Gabriel Eduardo Buitrago Cueto, Juliana Botia, Valentina Rangel, Juan Martin Garcia, David Felipe Camarco, and Sofia Ramirez.

- Calendar entries;
- Computer system activity logs;
- Internet usage files;
- Backup tapes;
- Internal network applications.

Other potentially relevant files or data include:

- Files stored on hard drives
- Laptops
- iPads, Notebooks, etc.
- Home computers
- Handheld devices
- Diskettes
- CD's
- DVD's
- Smartphones
- "Thumb drives"
- Voice-mail
- Videotape.

Thank you for your prompt attention to this matter, and if you have any questions, please feel free to contact the undersigned.

Respectfully,

Kirsten R. Fraser

cc:   Alexandra Lozano, Esq.
      Katie Nentwick

## RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement (the "Agreement"), is made and entered into this 14 day of 08 , 2023, by and between Juan Diaz Cuenca ("Employee") and Alexandra Lozano Immigration Law, PLLC (the "Company").

1.    Consideration. As to only those individuals currently employed by the Company when they sign this Agreement, in consideration for such current employee's acceptance of this Agreement, the Company will provide all such current employees who sign this Agreement with an additional amount of paid time off days beyond what current employees are entitled by applicable Company policy to take. Specifically, each current employee who signs their acceptance to both this Agreement and the Mutual Dispute Resolution Agreement contemporaneously provided to employees along with this Agreement, will be provided four (4) days (or, if employed by the Company on a part-time basis, a pro-rata number of days based on their regular schedule as compared to a full-time employee) of paid time off to be taken during the final week of the 2023 calendar year (between the Christmas holiday and up to and including New Year's Eve). If, however, a current employee signs only this Agreement and not the Mutual Dispute Resolution Agreement (or vice versa), the employee will only receive two (2) days of paid time off (or pro-rata share for part-time employees) to be taken during the final week of the 2023 calendar year. If the current employee signs neither this Agreement nor the Mutual Dispute Resolution Agreement, no additional paid time off days will be provided.

2.    Confidential Information.

a.    "Confidential Information" means information that: (i) is disclosed to Employee or of which the Employee becomes aware as a consequence of or through Employee's employment with the Company, (ii) is not generally known outside of the Company, (iii) has value to the Company, (iv) relates to the business of the Company, and (v) could be damaging to the Company's business if disclosed to or used by others.  Such information may include, but is not limited to, data and information with regard to business plans, trade secrets, finances, records, personnel, designs, marketing, customers and customer lists, customer requirements, sales, products, systems, processes, trade secrets, methods, know-how, sales methodologies, training methodologies, sales channels, product development plans and/or pricing (collectively, "Confidential Information").  The Company agrees to provide Employee with access to such Confidential Information as is necessary to perform Employee's duties for the Company.

Confidential Information does not include information in the public domain or information that is generally known and used within the industry or industries in which the Company engages in business (unless such information entered the public domain and/or became known within the industry through any improper, unauthorized and/or inadvertent disclosure).  Confidential Information also does not include information protected from disclosure by the National Labor Relations Act (or other federal or state law) and, for example, does not include information about the terms and conditions of non-management employees' employment at the Company that comes to Employee's attention in the normal course of Employee's employment, but Confidential Information does include information in the Company's non-public records and files.

1

b.      Subject to the provisions of Paragraph 8, below, Employee acknowledges and agrees that all Confidential Information is proprietary to the Company and is a valuable, special and unique asset of the Company, and that any disclosure or unauthorized use of Confidential Information will cause irreparable harm and loss to the Company.  Employee understands and acknowledges that each and every component of the Confidential Information (i) has been developed by the Company at significant effort and expense and is sufficiently secret to derive economic value from not being generally known to other parties, and (ii) constitutes a protectible business interest of the Company.

c.      Employee acknowledges and agrees that the Company owns the Confidential Information.  Employee agrees not to dispute or deny any such ownership rights at any time.

d.      Subject to the provisions of Paragraph 8, below, throughout Employee's employment with the Company: (i) Employee will hold all Confidential Information in the strictest confidence, take all reasonable precautions to prevent its inadvertent disclosure to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (ii) Employee will not, directly or indirectly, utilize, disclose or make available to any other person or entity, any of the Confidential Information, other than in the proper performance of Employee's duties during Employee's employment with the Company; and (iii) Employee will not use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.

e.      Subject to the provisions of Paragraph 8, below, during the two-year period immediately following the end of Employee's employment with the Company, Employee will not, anywhere in the United States, directly or indirectly (i) utilize, disclose, or make available to any other person or entity, any of the Company's Confidential Information; or (ii) use the Company's Confidential Information to attempt to solicit, induce, recruit, or take away clients, suppliers or customers of the Company.  Employee understands and agrees that the time and territory limits on this restriction do not apply to trade secrets (discussed below), which are protected by law.

f.      Employee acknowledges that some of Company's Confidential Information may also qualify as trade secrets as defined by governing state law. Employee acknowledges and agrees that nothing in this Agreement diminishes or reduces Employee's obligations under trade secret law to continue to protect the Company's trade secrets after the end of Employee's employment, and to not use or disclose such trade secrets for as long as they remain protected by law.

3.      <u>Return of Company Property</u>.  At the request of the Company or upon cessation of Employee's employment with the Company for any reason, Employee will immediately deliver to the Company all property of the Company that is then in Employee's possession, custody or control, including, without limitation, all keys, access cards, cellular or smart phones, computer hardware (including but not limited to any hard drives, diskettes, laptop computers and personal data assistants and the contents thereof, as well as any passwords or codes needed to operate any such hardware), computer software and programs, data, materials, papers, books, files, documents, records, policies, client and customer information and lists, rolodexes, financial data, marketing information, design information, specifications and plans, database information and lists, mailing lists, notes, and any other property or information relating to the Company.

2

4.   Non-Solicitation of Customers.

a.   Subject to the provisions of Section 6, below, during the Restricted Period, other than in the proper performance of Employee's duties while employed by the Company, Employee shall not, directly or in concert with others (whether as owner, officer, partner, principal, joint venturer, shareholder, director, member, manager, investor, agent, employee, or otherwise) sell, promote or provide, or attempt to sell, promote or provide, any Competitive Products and Services to any Restricted Customer.

b.   Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth in Paragraph 4 are reasonable and necessary in order for Company to protect its Confidential Information and trade secrets and are fair in that they do not prohibit Employee from continuing to be employed in Employee's chosen field of work.

c.   For purposes of this Agreement, the following definitions apply:

(i)   "Competitive Products and Services" shall mean products or services that serve one or more of the same functions as, or could be used to replace, in whole or in part, products or services which the Company offered to customers at the time Employee's work with the Company ended or which the Company was actively preparing to sell or provide during such time.

(ii)   "Material Contact" means: (1) Employee sold products or services to the customer or client; (2) Employee personally provided services to the customer or client; (3) Employee supervised those who sold products or provided services to the customer or client and had business-related discussions with the customer or client on behalf of the Company; or (4) Employee received Confidential Information in the ordinary course of business about the customer or client.

(iii)   "Restricted Customer" means any person or entity (1) which was a customer or client of the Company during the one-year period ending on Employee's last day of employment and (2) with which Employee had Material Contact during such period.

(iv)   "Restricted Period" means during Employee's employment and for the one-year period immediately following the cessation of Employee's employment with the Company for any reason.

5.   Non-Solicitation of Employees.  Subject to the provisions of Paragraph 6, below, Employee agrees that during the Restricted Period, Employee shall not seek to influence or induce to leave the Company's employment or service, any person (a) who was employed or otherwise engaged by the Company at any time during the twelve (12) months ending on Employee's last day of employment with the Company and (b) with whom Employee had Material Contact during such period. For purposes of this Paragraph 5, "Material Contact" means: (i) Employee supervised such person or was otherwise in such person's chain of command; (ii) Employee regularly worked with the person on behalf of the Employer; or (iii) Employee received Confidential Information in the ordinary course of business about the person.

3

6.      Limitations on Non-Solicitation Obligations. Notwithstanding the foregoing, if Employee's annualized earnings from the Company do not exceed $116,593.18,[1] then: (1) the obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that apply during Employee's employment with the Company shall only be applicable to Employee to the extent they are consistent and coextensive with Employee's common law duties (including the duty of loyalty), statutory duties, and duty to avoid conflicts of interest and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; (2) the obligations and restrictions set forth in Paragraph 4 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any customer of the Company to cease or reduce the extent to which it is doing business with the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets; and (3) the obligations and restrictions set forth in Paragraph 5 of this Agreement that apply following the cessation of Employee's employment with the Company shall only prohibit Employee from directly or indirectly soliciting any employee of the Company to leave the Company and/or to the extent they relate to a prohibition on the use or disclosure of the Company's Confidential Information or trade secrets.   In addition, even if Employee makes more than $116,593.18 per year in earnings from the Company, the post-employment obligations and restrictions set forth in Paragraphs 4 and 5 of this Agreement that are in addition to those described in this Paragraph 6 shall not apply to Employee following Employee's separation from the Company if Employee is terminated by the Company as the result of a layoff, unless the Company, at its sole option, elects to pay Employee compensation equivalent to Employee's base salary at the time of termination for the post-employment restricted period, less any compensation earned by Employee through subsequent employment during that period.

7.      Enforcement. Employee acknowledges and agrees that to the extent any form of legal action is required to enforce any of Paragraphs 2 through 5 above, the Company shall be entitled to recover its reasonable costs and attorney's fees to the extent the Company is the prevailing party.  The Company will be considered the "prevailing party" if the Company obtains any form of partial or complete injunctive relief, whether temporary, preliminary, or otherwise. The parties understand and agree that nothing in the Agreement is intended to or shall operate to alter, denigrate, or deny Employee the rights and remedies set forth in RCW 49.62.080. If any part of this Agreement is held void or unenforceable, every other term of this Agreement shall remain valid and fully enforceable.  If any court refuses to enforce any part of this Agreement as written,

---

[1] The term "earnings" as used in this Paragraph 6 means the compensation reflected on box one of Employee's United States internal revenue service form W-2 that is paid to Employee over the prior year, or portion thereof for which Employee was employed, annualized and calculated as of the earlier of the date enforcement of the provisions in this Agreement are sought or the date of Employee's separation from employment with the Company. The $116,593.18 figure referenced in this Paragraph 6 is current through December 31, 2023, but is deemed to be automatically adjusted for inflation on an annual basis in accord with the adjustments specified in RCW 49.62.040 (or any successor statute).

the court shall, if permitted by applicable law, modify that part to the minimum extent necessary to make it enforceable under applicable law and shall enforce it as so modified.

8.     Authorized Disclosures.   Under the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against the Company for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.   Nothing contained in this Agreement prohibits or prevents Employee from filing a charge with or participating, testifying, or assisting in any investigation, hearing, whistleblowing proceeding or other proceeding before any federal, state, or local government agency, *e.g.* the EEOC, NLRB, SEC, etc., or in any legislative or judicial proceeding nor does anything in this Agreement preclude, prohibit or otherwise limit, in any way, Employee's rights and abilities to contact, communicate with or report unlawful conduct to federal, state, or local officials for investigation or participate in any whistleblower program administered by any such agencies.   The Company further acknowledges Employee's rights to make truthful statements or disclosures required by law, regulation, or legal process and to request or receive confidential legal advice, and nothing in this Agreement shall be deemed to impair those rights.   The Company also acknowledges Employee's rights to make truthful statements or disclosures about unlawful employment practices which are defined to mean any form of unlawful discrimination, harassment, or retaliation that is actionable under Title VII of the Civil Rights Act of 1964 or any comparable state statue or any other related federal or state rule or law that is enforced by the Equal Employment Opportunity Commission or a comparable state agency.   For the sake of clarity, nothing in the Agreement is intended to or shall prevent Employee from disclosing information that Employee has a right to disclose under applicable law, including but not limited to, Employee discussing or disclosing: (i) Employee's own compensation information with other employees, or with third parties who are not future employers or competitors of the Company; and (ii) information relating to conduct that Employee reasonably believes to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.   This Agreement shall not be construed to limit Employee's rights under the National Labor Relations Act including, but not limited to, the right to engage in protected concerted activity, including discussing terms and conditions of employment with coworkers, and attempting to improve terms and conditions of employment through channels outside the immediate employee-employer relationship, such as through the National Labor Relations Board.

9.     Entire Agreement.   This Agreement constitutes the entire Agreement and understanding between the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or between the parties, written or oral, which may have related in any manner to the subject matter hereof.   No other agreement or amendment to this Agreement shall be binding upon either party including, without limitation, any agreement or amendment made hereafter unless in writing, signed by both parties.

10.    Successors and Assigns.   This Agreement may be freely assigned by the Company and is fully enforceable by any successor in interest to the Company.   Employee hereby gives

5

Employee's consent to any such assignment. Employee shall not assign any of Employee's rights, powers, duties, or obligations hereunder.

11.     Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the state in which Employee worked for the Company at the time Employee signs this Agreement without regard to its conflict of laws provision. In the event Employee is deemed to be a Washington-based employee for purposes of this Agreement, then this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Washington.

12.     Counterparts. This Agreement may be executed in two or more counterparts, each of which when executed and delivered shall be deemed an original and all of which, taken together, shall constitute the same agreement. This Agreement and any document or schedule required hereby may be executed by facsimile signature, electronic signature or PDF format, which shall be considered legally binding for all purposes.

13.     Notifications To Third Parties. Employee agrees that during my employment with the Company and for a period of twelve (12) months after the cessation of Employee's engagement with the Company, Employee will provide a copy of this Agreement to any person or entity with which Employee seeks employment or engagement prior to the commencement of any such employment or engagement, and agrees that the Company may notify any such person or entity of this Agreement.

14.     Disclosure of Existing Obligations. Except as Employee has disclosed in writing at the end of this Agreement, Employee is not bound by any agreement or obligation that directly or indirectly: (i) restricts Employee from using or disclosing any confidential information of any person or entity in the course of Employee's employment with the Company; (ii) restricts Employee from competing with, or soliciting actual or potential customers or business from, any person or entity; (iii) restricts Employee from soliciting any current or former employees of any person or entity; or (iv) limits Employee's ability to perform any assigned duties for the Company. Employee represents that Employee does not possess any confidential information or trade secrets of any entity other than the Company, including any prior employers of Employee. Employee acknowledges and agrees that Employee can perform Employee's job duties on behalf of the Company without using or relying upon any confidential information or trade secrets of any other entity, including any prior employer, and the Company hereby instructs Employee not to use or rely upon any such confidential information or trade secrets.

15.     Knowing and Voluntary. Employee acknowledges that Employee has read, understood, and accepts the provisions of this Agreement. The Company is hereby advising Employee, in writing, to consult with an attorney before signing this Agreement. Employee is further advised that Employee has thirty (30) calendar days to review this Agreement before signing it.

EMPLOYEE

*Juan Diaz Cuenca*

Print: Juan Diaz Cuenca

Date: Aug 14, 2023

THE COMPANY

Print: Alejandro Mata

Title: Chief Human Resources Officer

Date: July 19, 2023

7

## DISCLOSURES

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# EXHIBIT 5



# EXHIBIT 6



# EXHIBIT 7



EXHIBIT 8

      

## Juan Pablo Díaz Cuenca · 3rd

Senior Operations Manager at Meneses Law

- Meneses Law
- Harvard University

Houston, Texas, United States · Contact info

230 connections

Message   + Follow   More

## Activity

234 followers

Posts   Comments

Juan Pablo Diaz Cuenca reposted this • 1mo

🔺 Attention licensed lawyers in Bogota, Colombia! 🔺
Dress to impress and seize the opportunity to showcase your skills at the Meneses Law Career Fair on April 10th in Bogota, Colombia  ...show more

😊❤️👍 36                                                    2 comments

Juan Pablo Diaz Cuenca posted this • 1mo

¡He empezado en un nuevo puesto de Senior Operations Manager!

👍❤️ 43                                                    14 comments

Juan Pablo Diaz Cuenca posted this • 4mo

¡He empezado en un nuevo puesto de Customer Service Manager!

👍❤️ 44                                                    10 comments

Show all posts →

## Experience

 **Meneses Law**
Full-time · 5 mos
Estados Unidos · On-site

**Senior Operations Manager**
Mar 2024 - Present · 3 mos

**Customer Service Manager**
Jan 2024 - Mar 2024 · 3 mos

 **Alexandra Lozano Immigration Law PLLC**
Full-time · 2 yrs 9 mos
Estados Unidos · On-site

**Senior manager**
Aug 2023 - Jan 2024 · 6 mos

**Paralegal**
May 2021 - Aug 2023 · 2 yrs 4 mos

 **Abogado asociado**
R&S C Legal Abogados · Full-time
Oct 2019 - May 2021 · 1 yr 8 mos
Bogotá, Distrito Capital, Colombia · On-site

 **Legal Trainee**
Fiscalía General de la Nación · Internship
Oct 2018 - Aug 2019 · 11 mos
Bogotá, Distrito Capital, Colombia · On-site

## Education

 **Harvard University**
Management essencials, Administración y gestión de empresas, general
Oct 2022 - Dec 2022

 **Universidad del Rosario**
Especialista en derecho penal, Justicia penal/Gestión de la aplicación de la ley
Jan 2020 - Oct 2021

Show all 3 educations →

## Licenses & certifications

**Victim Advocacy Certificate Course**
CLS by BARBRI
Issued Oct 2023

Show credential ⧉

## Languages

**Español**
Native or bilingual proficiency

**Inglés**
Native or bilingual proficiency

## Interests

EXHIBIT 9

 

 Home    My Network    Jobs    Messaging    Notifications    Me ▾   | For Business ▾    Premium free



## Catalina Rodríguez ☑ · 3rd
Data Analytics

-  Meneses Law
- Politécnico Grancolombiano

Houston, Texas, United States · Contact info

240 connections

Message   + Follow   More

---

## Activity
242 followers

Posts   Comments

Catalina Rodríguez reposted this · 7mo
 **Data Analyst, Bilingual - In office**
boards.greenhouse.io

👍❤️ 5

Catalina Rodríguez reposted this · 9mo
 **Data Analyst, Bilingual - In office**
boards.greenhouse.io

👍🟢 3

Show all posts →

---

## Experience

 **Research Analyst**
Meneses Law · Full-time
Feb 2024 - Present · 4 mos

 **Alexandra Lozano Immigration Law PLLC**
1 yr 4 mos

**Data Team Lead**
Feb 2023 - Nov 2023 · 10 mos

**Data analyst**
Aug 2022 - Jan 2023 · 6 mos

 **Logistics & Deliver Customer Service Analyst**
Johnson & Johnson
Mar 2021 - Sep 2022 · 1 yr 7 mos



**Hy Cite Enterprises, LLC**
3 yrs 1 mo

**Analista de credito senior**
Sep 2018 - Mar 2021 · 2 yrs 7 mos

**Analista de credito senior**
Full-time
Sep 2018 - Mar 2021 · 2 yrs 7 mos
Bogotá, Distrito Capital, Colombia

**Analista de créditos**
Mar 2018 - Sep 2018 · 7 mos

---

**hy cite enterprises colombia**
4 yrs 1 mo

**Analista de credito senior**
Sep 2018 - Mar 2021 · 2 yrs 7 mos

**asistente de administracion de ventas**
Mar 2017 - Sep 2018 · 1 yr 7 mos
Bogotá D.C., Colombia

Show all 10 experiences →

## Education



**Politécnico Grancolombiano**
Especialista en gestion empresarial, Administración y gestión de empresas
2020 - 2021

Grade: Cursando especialización en gestión empresarial



**Politécnico Grancolombiano**
negocios internacionales
2012 - 2017

Show all 3 educations →

## Licenses & certifications



**Aprende Power BI**
LinkedIn
Issued Aug 2022

Show credential ⬀



**Developing a Diversity, Inclusion, and Belonging Program**
LinkedIn
Issued Jul 2022

Show credential ⬀

Show all 8 licenses & certifications →

## Skills

**Servicio de atención al cliente**

 2 endorsements

EXHIBIT 10

        



## Sonia Mercedes Peñarete Ortiz · 3rd

Operations manager/Director of client relations/ VP Experiencia al Cliente & Mercadeo / Director General / VP comercial/ Customer Experience Director / Marketing Estratégico / VP Latam

-  Meneses Law
- INALDE Business School

Bogota, D.C., Capital District, Colombia · Contact info

500+ connections

Message    + Follow    More

## About

Especialista en el Programa de Desarrollo Directivo PDD – Alta Gerencia Empresarial (INALDE), Contadora Publica, Bilingüe, con más de 20 años de experiencia trabajando en compañías multinacionales, ocupando cargos desde: Gerente Financiero /Controller, Gerente General ,Senior Manager Retail LATAM, Directora Cor  ...see more

## Activity

1,905 followers

Posts    Comments    Images

Sonia Mercedes Peñarete Ortiz posted this · 1mo

 No pierdas la oportunidad de unirte al mejor equipo en Meneses Law 🌿 ¡¡ Envía tu hoja de vida al email adjunto y te esperamos el 10 de abril en este gran evento !!

👍❤️ 31

Sonia Mercedes Peñarete Ortiz reposted this · 7mo

🇺🇸🇺🇸 We are #Hiring!
🚀 #Bogotá, we are looking for a #CustomerExperience Specialist...  ...show more

 **Customer Experience Specialist**
Job by Alexandra Lozano Immigration Law PLLC
Bogota, D.C., Capital District, Colombia (On-site)

👍❤️ 12

Sonia Mercedes Peñarete Ortiz reposted this · 7mo

Alexandra Lozano Immigration Law PLLC is hiring a Customer Journey Manager https://lnkd.in/gR-DwvGv via @greenhouse

 **Customer Journey Manager**
boards.greenhouse.io

👍 5

Show all posts →

## Experience


**Operations manager Colombia**
Meneses Law · Full-time
Apr 2024 - Present · 2 mos
Bogotá, Distrito Capital, Colombia

⬦ Dirección, Liderazgo and +4 skills

---


**Director of Client Relations**
Alexandra Lozano Immigration Law PLLC · Full-time
May 2023 - Feb 2024 · 10 mos
Bogotá, Distrito Capital, Colombia · On-site

⬦ Relación con el cliente, Management and +3 skills

---


**Gerente comercial**
IMS COLOMBIA · Full-time
Jul 2022 - May 2023 · 11 mos
Bogotá, Distrito Capital, Colombia

⬦ Leadership, Management and +5 skills

---


**Azteca Comunicaciones Colombia**
4 yrs 6 mos

**VP estrategia de Clientes y Mercadeo**
Full-time
Jan 2021 - Apr 2022 · 1 yr 4 mos
Colombia

• Responsable de dirigir el diseño y ejecución de las estrategias de
experiencia al cliente y mercadeo de la compañía, con el objetivo de...

⬦ Retención de clientes, Estrategias de mercado and +5 skills

**VP comercial y experiencia al cliente**
Nov 2017 - Dec 2020 · 3 yrs 2 mos

• Responsable directo del diseño y ejecución de las Estrategias Comerciales,
de Mercadeo y de Experiencia al Cliente de la compañía, con el objetivo de...

⬦ Retención de clientes, Gestión comercial and +6 skills

---


**ALTO Colombia SAS**
2 yrs 5 mos

**Gerente general**
Jul 2017 - Nov 2017 · 5 mos
Cra 11BNo 96-03

• Responsable de proveer dirección estratégica y liderazgo efectivo al
equipo de trabajo, para asegurar el cumplimiento de los objetivos de la...

⬦ estretegia comercial, Relación con el cliente and +4 skills

**Director de ventas y Servicio al cliente**
Full-time
Jul 2015 - Jun 2017 · 2 yrs
Bogotá, Distrito Capital, Colombia

• Responsable del cumplimiento del presupuesto de prospección de la
empresa, lo cual implica el definir y dirigir la Estrategia Comercial para la...

⬦ Atención al cliente and Capacidad de análisis

Show all 10 experiences →

## Education



**INALDE Business School**
Especialización de Desarrololo Gerencial, Programa de Desarrolo para
Directivos (PDD)
2005

🏵 Finanzas



**Universidad Jorge Tadeo Lozano**
Contador Publico, Finanzas y Planeación estratégica de negocios
1995

Contador Publico Tituado con énfasis en Planeación estratégica .

🏵 Finanzas

## Skills

### Capacidad de análisis

🧑 7 experiences across Azteca Comunicaciones Colombia and 2 other companies

### Atención al cliente

🧑 3 experiences across Azteca Comunicaciones Colombia and 1 other company

Show all 50 skills →

## Recommendations

**Received**    Given



**Alejandro Mata** · 3rd
HR Executive | HR Analytics & Technology | Systemic Forward-Thinking
Problem-Solver | ex-Amazon
April 13, 2024, Alejandro was senior to Sonia Mercedes but didn't
manage Sonia Mercedes directly

It's my pleasure to endorse Sonia based on our collaboration at ALIL. Sonia's
leadership as Director of Global Client Care Experience was nothing short of
inspiring. She possesses a talent for achieving remarkable results while
keeping her team fully engaged and motivated. Sonia's approach, rooted in
aligning personal aspirations with business purpose and objectives, coupled
with her relentless focus on execution, consistently drove extraordinary
outcomes. Working alongside Sonia was not just productive but also deeply
fulfilling in spite of highly ambiguous and stressful situations. She brings a...



**Nelson Enrique Polo Santrich** · 3rd
CX Manager en Alexandra Lozano Immigration Law PLLC
February 16, 2024, Nelson Enrique reported directly to Sonia Mercedes

Sonia es una excelente líder. Una trabajadora incansable, capaz de liderar
proyectos a corto y mediano plazo, sabe escuchar y algo muy valioso es que
permite q el equipo de trabajo partícipe en la construcción, desarrollo y
ejecución de proyectos o tareas.

Show all 11 received →

## Languages

### Español
Native or bilingual proficiency

EXHIBIT 11



< 122 **ALIL Soccer 94**
Alvaro Quintanilla, Carlos, Je...

**Carlos Barrios**
*Reenviado*

3:30 p.m.

Buenas tardes, espero que estén bien. Me llegó esta convocatoria abierta para Meneses para los que quieran pueden mandar su hoja de vida y tratar de asistir al evento el día 10
3:30 p.m.

Se que hay unos que no son abogados pero también pueden intentar mandar las hojas de vida
3:31 p.m.

También lo pueden compartir con otras personas y el día del evento pueden preguntar por Sonia Peñarete
3:32 p.m.

# EXHIBIT 12

