# EXHIBIT C

NO. _____

| | |
|---|---|
| ALEXANDRA LOZANO IMMIGRATION LAW, PLLC | IN THE DISTRICT COURT OF |
| **Plaintiff,** | HARRIS COUNTY, TEXAS |
| **v.** | |
| JUAN PABLO DIAZ CUENCA | _____ JUDICIAL DISTRICT |
| **and** | |
| MENESES LAW, PLLC | |
| **Defendants.** | |

## <u>DECLARATION OF SIMRAN MAAN</u>

1.    My name is Simran Maan.  I am the former Director of Operations for Meneses Law, PLLC ("Meneses Law").  I am over the age of 21 and am competent to testify.

2.    All statements are based on my personal knowledge.

3.    I was born and raised in Houston, Texas to immigrant parents.  I attended the University of Houston - Downtown where I majored in biological and physical sciences and minored in marketing, and received my Bachelors of Science degree in 2015.  I returned to school in 2019, and received my Masters of Business Administration from Texas A&M University-Corpus Christi in 2021.

4.    From December 2023 until March 15, 2024, I served as the Director of Operations for Meneses Law.  In that role, I directed the day-to-day activities of the company, focusing on implementing strategic initiatives and fostering coordination between departments. Collaborating with executive leadership, I contributed to the development and execution of strategic goals and objectives, aligning operational strategies with overall business objectives.

My core objective was to ensure the smooth operation of the company and its departments, including participating in vital leadership meetings for organizational changes where I provided insights aimed at enhancing operational efficiency and driving growth. Additionally, once the firm began to outsource operations to Colombia, my involvement in international business processes directly impacted outsourcing the operations department. Throughout my tenure, I remained dedicated to steering the organization towards sustained success and excellence.

5. I reported directly to Christine Meneses, the founder of Meneses Law, up until the last week of my employment with the firm.

6. When I started with Meneses Law, there was no discussion about setting up a back-office in Colombia to support the firm's current activities and potential expansion plans. The firm's expansion plans at that point were quite modest.

7. Not long after I began working at Meneses Law, I floated the idea of integrating artificial intelligence ("AI") into some of our processes to help with efficiency and case management. My idea was promptly shot down.

8. During my time at Meneses Law, I learned that Alexandra Lozano, the founder of Alexandra Lozano Immigration Law, PLLC ("ALIL"), had been a mentor to Christine Meneses. Meneses herself told me that she had paid Lozano for training, and that Meneses and Lozano had become friends, along with other personal details of Lozano's life.

9. It was my impression that Meneses modeled herself, and her law firm, after Lozano. I noticed a striking similarity in Meneses Law's Instagram content and in Meneses Law's billboard ads to ALIL's content and ads.

10. As I was developing new standard operating procedures for Meneses Law, I saw ALIL's information in our files. For example, I saw recordings of a presentation Lozano made

2

using the legal software MyCase, describing how to process client cases.  It was clear to me that Meneses Law was modeled on ALIL.

11.     In or about January 2024, I attended a daily morning leadership meeting that included Christine Meneses, Vice President and Business Manager JC Meneses (who is married to Christine Meneses), Attorney Todd Henderson, HR Manager Patricia Guerra, Accountant Gilda Mendoza, Director of Customer Service Pamela Mendoza, as well as the IT Manager Fermin Guzman, and a customer service manager.  At that leadership meeting, Christine Meneses started speaking about a recent hire, Juan Pablo Diaz Cuenca ("Diaz"), who started with the firm on or about January 8, 2024.  JC Meneses relayed to the leadership team that Diaz had worked for ALIL and was now working for Meneses Law.

12.     Meneses Law and ALIL are direct competitors in the immigration law field, and serve similar clientele and compete for market share.  The competition between immigration law firms is intense, and firms are always looking for the next competitive advantage.

13.     In the January leadership meeting JC Meneses initially voiced a concern that Diaz was a mole, sent by ALIL to commit corporate espionage against Meneses Law.  He was also referred to as "the insider from the other firm."  At the beginning of his tenure, Diaz would be asked to leave the room before sensitive information, like finances, were discussed.

14.     At a subsequent meeting, however, JC Meneses said he had had a lengthy conversation with Diaz, and there was no need to be worried that Diaz was a threat to Meneses Law because  Diaz's ego had been bruised by ALIL when he was terminated, and that Diaz wanted "to get back" at his former employer.  Diaz promised to Meneses Law that he knew everything about ALIL, had driven the set-up of ALIL's back-office operations in Colombia, and that he would do the same for Meneses Law.

3

15. On a return trip from Colombia to Houston on or about February 9, 2024, I learned from Diaz that Christine Meneses had flown Diaz down to Houston to interview, and set him up in housing in Texas on the firm's dime. Meneses Law also said they were going to hire Diaz's wife, Laura Catalina Rodriguez, who had also worked for ALIL. Diaz told me that had told the firm that Rodriguez had quit her job at ALIL per Diaz's advice after his employment was terminated, and that she had managed to take ALIL confidential information with her upon her departure. Diaz told me Rodriguez knew how to manage data based on her work with ALIL, and she would do the same for us.

16. It was made clear at later January 2024 leadership meetings that Diaz had been hired specifically to build an exact replica of ALIL's operations and processes for Meneses Law. Indeed, the new plan for Meneses Law was to create its own back-office operation in Colombia, and that Diaz was going to lead the way in doing so. It was clear that Meneses Law's entire strategy for Colombia hinged on Diaz's knowledge and experience from ALIL. They continuously mentioned that Diaz was a part of the integral implementation teams at ALIL and could do the same for Meneses since they were so successful.

17. Diaz developed a presentation outlining his understanding of why Bogotá would be the ideal location to start a business due to its competitive advantage, and stated that he was knowledgeable about the process of setting up an office in Colombia, and which meetings to conduct to achieve that goal based on his experience at ALIL.

18. On or about February 6, 2024, I flew on the firm's private jet to Bogotá, Colombia with Diaz, Christine Meneses, J.C. Meneses, and Patricia Guerra. Diaz had organized the trip and the itinerary. The purpose of the trip was to lay the groundwork for setting up a

4

Meneses Law back-office in Colombia.  We were in Colombia from February 6, 2024 through February 9, 2024.

19.    As we went about meeting vendors and creating a strategy for the firm's potential Colombia operations, Diaz specifically told us that each vendor we were meeting with had the same criteria and standards that were used to qualify an ALIL vendor, and each step we were taking was what ALIL had done in Colombia.  He explained at length why those types of vendors were necessary and why those steps were necessary.  He repeatedly would say something to the effect of, "This is what ALIL did, and here is why they did it."

20.    As for specific ALIL vendors that I can recall, we met with Mauricio Montealegre León from the Bogotá law firm Gómez-Pinzón the attorney who set up ALIL's business operations in Colombia.  Diaz set up that meeting.  We also met with a company called Invest Bogotá, who Diaz had met with when setting up the ALIL office.  Diaz set up that meetings as well.

21.    We even drove to ALIL's physical offices in Bogotá and parked in front of the building as Diaz explained every detail of the physical set-up of the office as well as its internal operations.

22.    Every night of the trip, the group gathered for dinner.  During those dinners, Christine Meneses and JC Meneses grilled Diaz about the specifics of ALIL's operations.  They would ask Diaz the ins and outs of ALIL's practice and back-office set-up and operations, and constantly confirm that what Diaz was proposing Meneses Law undertake was what ALIL had done.  Indeed, throughout the trip, JC and Christine Meneses continuously asked Diaz something to the effect of: "Is this how ALIL conducted their business?"

5

23. During these conversations, I heard Diaz detail what a typical day at ALIL entailed, the lifecycle of a case at ALIL from intake through final documentation and how the cases were managed each step of the way, along with all ALIL's business operations. JC Meneses specifically asked how ALIL was able to operate at scale, how ALIL moved cases through its offices, and how ALIL structured its teams. Diaz answered all of these questions.

24. While in Colombia, JC Menses mentioned how valuable data was. Diaz repeated that his wife, Rodriguez, worked in data management at ALIL and that she could implement the processes that were in place at ALIL at Meneses Law.

25. Diaz explicitly detailed ALIL's hiring and training strategies. Diaz even described for us how ALIL processed resumes, how it made hiring decisions, and how ALIL retained their employees.

26. During the February 2024 Colombia trip, and afterwards, Diaz identified specific ALIL employees that he believed Meneses Law should hire away from ALIL to fill strategic roles in the Meneses Law Colombia office. He specifically identified leaders of departments and employees whose assistance was instrumental in laying the foundation and developing strategies similar to his role, particularly targeting supervisors and trainers. Diaz knew their compensation packages at ALIL and made suggestions for a competing compensation package Meneses Law could present to induce those employees to leave ALIL and come work for Meneses Law.

27. In February 2024, Meneses Law was short-staffed, which limited productivity and the ability to complete client cases. To solve this problem, Diaz described for us how ALIL used a proprietary AI program to generate declarations—thus saving labor and time. Diaz explicitly laid out each step of how the program was built and what information it was fed to generate the declarations, so that Meneses Law could build the exact same system for itself.

6

28.     It did not sit well with me that Diaz was divulging all of this information that appeared to me to be confidential trade secrets belonging to ALIL.  It also bothered me that Christine Meneses had no problem taking this information from Diaz, and signing off on its use by Meneses Law.  It was as though Meneses Law was figuratively stealing ALIL's school project and putting her own name on it.

29.     Because of Diaz and the apparently confidential information he brought over from ALIL, Meneses Law is setting up its new Colombia office to support even further expansion in the United States.  Currently, Meneses Law has satellite offices in Dallas, Texas, Charlotte, North Carolina, and Orlando, Florida.  Now, with ALIL's information and strategies in hand, Meneses Law is planning to open at least three more offices, mostly in locations where ALIL also has regional offices.

30.     I resigned from Meneses Law on or about March 15, 2024.

31.     My birthdate is October 16, 1991, and my address is 8307 Sedona Ridge Drive, Cypress, Texas, 77433.  I execute this Declaration consistent with Texas Civil Practice and Remedies Code § 132.001 and I declare under penalty of perjury under the laws of the United States of America and the State of Texas that the foregoing is true and correct.

/s/ Simran Maan
Simran Maan

Executed in the City of Mohali, State of Punjab, in the Country of India on the 22nd day of May, 2024

7